## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **TEXAS AMERICAN FEDERATION OF TEACHERS,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO. 1:26-cv-00024** |
| **TEXAS EDUCATION AGENCY and MIKE MORATH, in his official capacity as Commissioner of the Texas Education Agency,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Texas American Federation of Teachers ("Texas AFT"), on behalf of its membership, brings this action against Defendants Texas Education Agency (the "TEA") and Commissioner Mike Morath in his official capacity ("Mr. Morath"; together, "Defendants") and requests relief from this Court based on the following:

### I.   INTRODUCTION

1.   Texas AFT is a labor union dedicated to promoting the rights and advancing the interests of its members, all of whom are focused on the critical, all-important goal of educating the children of Texas.  Its membership is composed of approximately 66,000 public school teachers and other employees—including teachers' aides, custodians, bus drivers, and cafeteria workers—in districts throughout Texas.

2.      Texas AFT works both through union locals and on a statewide level, as well as through its national affiliate, the American Federation of Teachers, to secure better public school funding, improve employee benefits, and ensure safer schools for its members and their students, reflecting its members' commitment to creating a stable, quality learning environment for students. Texas AFT also provides professional development and other services that enhance both its members' and students' school and classroom experiences, as well as enriching its members' professional lives overall.  Texas AFT's priorities reflect the interests of its members, and it prioritizes protecting its members from patently unfair policies or infringement of their legal rights.

3.      Although public school teachers and other employees are public servants, they do not surrender their First Amendment rights simply by virtue of their employment, especially with respect to their activities as private citizens outside of the school environment.  More specifically, the First Amendment rights granted to all American citizens, including public school teachers and other employees, protect their ability to comment on current events through their personal accounts on social media platforms, which are outside of their school roles and their official school duties.  Unfortunately, recent actions taken by the TEA through Mr. Morath have violated these fundamental rights and chilled the protected speech of public school teachers and other Texas AFT members.

4.      On September 12, 2025, in the wake of the shooting death of public figure Charlie Kirk, Mr. Morath sent a Policy Letter to all superintendents in the

state targeting allegedly "reprehensible and inappropriate content on social media" posted by "*some*" Texas public school educators, without specifically naming any of those "educators" or identifying the allegedly inappropriate content.  Exhibit 1, TEA Policy from Mr. Morath, dated September 12, 2025 (the "TEA Policy") (emphasis added).  After recognizing that "the exercise of free speech is a fundamental right we are all blessed to share," Mr. Morath immediately contradicted himself and stated his intention to violate that right, explaining that he would refer any educators whose Kirk-related posts he personally considered "vile" to the TEA's Educator Investigations Division.  Mr. Morath mandated superintendents across Texas do the same, directing as follows:

> If you are made aware of additional instances of inappropriate conduct being shared, it should be reported to the agency through TEA's Misconduct Reporting Panel.

*Id.*  The TEA Policy fails to identify or define "inappropriate conduct," or provide any other guidelines or protections to ensure that the due process and free speech rights of educators are preserved and protected.  Texas AFT members are subject to the TEA Policy.

5.    The TEA Policy disseminated by Mr. Morath quickly unleashed a wave of retaliation and disciplinary actions against teachers based on their First Amendment protected speech.  Some superintendents echoed the TEA Policy, emailing their teachers and employees about the policy and stating that teachers who violated it would be investigated.

6.    As a result, Texas AFT members have been placed on administrative leave, reprimanded, and even in some cases terminated for expressing their views

about Mr. Kirk and other matters of public concern in social media posts made on their own time and using their own resources. These teachers were disciplined solely for their speech, without any regard to whether the posts disrupted school operations in any way. In many cases, Texas AFT members made their posts on online profiles or pages that are "private," and can be viewed only by individuals who have been specifically approved by the account owner.

7.    Critically, consistent with TEA's mandate contained in the TEA Policy, Texas AFT members have been referred to the TEA for investigation based on their social media posts. These investigations into allegations of misconduct are performed by TEA staff and can result in sanction or revocation of an educator's teaching certificate—or put another way, the destruction of a career in education.

8.    Further, as a result of the TEA Policy and Mr. Morath's actions, educators and other employees have come under immediate, vicious attack and doxxing, often by outsiders who do not live in the educator's district or have children at the educator's school, and in some cases are not even residents of Texas.

9.    One popular high school English teacher, Teacher 1, was fired after a politician used her posts—which simply raised questions about the circumstances of Mr. Kirk's death and did not promote violence in any way—as the centerpiece of his election campaign, encouraging his supporters to call for Teacher 1's dismissal. Tellingly, only two members of the school board voted for Teacher 1's termination; the remaining five present members abstained in protest.

10.     As a result of the TEA Policy, and based on information and belief, over 350 public school teachers and other public school employees have been reported to and/or are under investigation by the TEA.   Simply being under investigation negatively impacts an educator's reputation, requires resource expenditures for legal representation, and can have lasting detrimental impacts on an employee's long-term employment prospects, even outside of the education arena.

11.     Texas AFT denounces violence in every form, whether it is children killed in mass school shootings or a public figure like Charlie Kirk being shot and killed. Free speech under the First Amendment, however, is a fundamental right in a democratic society, and nonviolent speech, even when others strongly disagree with it, is protected.

12.     The TEA Policy violates the First Amendment rights of Texas AFT members because it is impermissibly vague, overbroad, and chills their protected speech.  Texas AFT thus brings this action to prevent and enjoin further infringement of these dedicated public servants' protected rights.

## II.    JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

14.     The Court has personal jurisdiction over Defendants because they are residents of Texas, have their principal places of business in Texas, and the acts

giving rise to Plaintiff's claims have occurred in, and continue to occur in, this judicial district.

### III.    PARTIES

15.    Texas AFT is a labor union representing over 66,000 teachers and non-administrative public school employees across the state. In addition to employees of K-12 schools, Texas AFT also represents employees of higher education institutions and retired teachers. Texas AFT is organized in accordance with the laws of the state of Texas. As required of labor organizations representing public employees in Texas, Texas AFT does not claim the right to strike. As a labor union, Texas AFT is committed to enforcing and protecting the employment rights of its members, who work hard to provide an education to the schoolchildren who attend Texas schools. Further, among the purposes of Texas AFT is the improvement of public education in Texas, which is tied inextricably to the improvement of the working conditions and professional standing of teachers and other public school employees. Thousands of Texas AFT members are aggrieved by the actions of the defendants, and Texas AFT brings this action on their behalf. Texas AFT's primary business address is 1106 Lavaca Street, Suite 100A, Austin, Texas, 78701. Texas AFT members are subject to the TEA Policy described above. As a central part of its mission, Texas AFT advocates for and protects the legal rights of its members. Texas AFT appears through its undersigned counsel.

16.    Defendant Texas Education Agency ("TEA") is the state agency that oversees primary and secondary public education in Texas. The TEA's Educator Investigations Division is responsible for investigating reports of misconduct by

educators, school staff, and service providers on behalf of the State Board for Educator Certification. The TEA's primary business address is 1701 N. Congress Avenue, Austin, Texas, 78701. It can be served at this location. Texas AFT seeks only declaratory and injunctive relief against Defendant TEA. Texas AFT does not seek monetary damages from Defendant TEA.

17.    Defendant Mike Morath is the Commissioner of the Texas Education Agency and is sued in his official capacity. His primary business address is 1701 N. Congress Avenue, Austin, Texas, 78701. He can be served at this location. Texas AFT seeks only declaratory and injunctive relief against Defendant Morath. Texas AFT does not seek monetary damages from Defendant Morath.

## IV.    FACTUAL BACKGROUND

### The First Amendment Protects the Free Speech of All Americans

18.    The First Amendment guarantees the right to free speech for all Americans, protecting their ability to express opinions and engage in public conversation without fear of government retaliation. These fundamental rights belong to everyone—including educators—and are not surrendered because of one's employment. Public school teachers, like all citizens, retain their constitutional protections when speaking in a personal capacity, including on their personal social media accounts. When they express themselves as private individuals, they are engaging in the same protected activity afforded to every member of the public, even if their views may be disfavored by government actors.

## The Death of Charlie Kirk

19.    Tragically, on September 10, 2025, political commentator Charlie Kirk was shot and killed while addressing an audience at Utah Valley University in Orem, Utah.

20.    Traditional media outlets and social media platforms erupted with news of the event and reactions to it, including highly charged discussions concerning political violence and the life and work of Mr. Kirk.  Some of that discussion focused on the controversial statements he made throughout his life, which created large groups of both supporters and detractors across the political spectrum.  Although Mr. Kirk described himself as a passionate proponent of First Amendment rights, individuals who, after Mr. Kirk's death, publicly expressed their belief that some of his statements were offensive were met with online harassment and hostility.  This backlash extended to public school educators who, on their own time, posted about the event on their personal social media accounts, and who suffered professional consequences as a result.

## Mr. Morath and the TEA

21.    Mr. Morath, as Texas's Commissioner of Education, is "the educational leader of the state."  Tex.  Educ.  Code § 7.055(b)(1).  He is the "executive officer" of TEA.  *Id.* at § 7.055(b)(2).  State law gives Mr. Morath the authority to "delegate ministerial and executive functions to agency staff and may employ division heads and any other employees and clerks to perform the duties of the agency."  *Id.* at § 7.055(b)(5).    TEA's multiple divisions report to Mr. Morath in his role as Commissioner of Education.  *See* TEA's December 1, 2024, Agency Organizational

Chart, available at https://tea.texas.gov/about-tea/tea-agency-org-chart.pdf (last visited Nov. 27, 2025) ("TEA Organizational Chart").

22.     One of these divisions is Educator Investigations, which conducts investigations of teachers reported for misconduct.  Educator Investigations is within TEA's "Office of Governance," which itself reports directly to Mr. Morath.  *See* TEA Organizational Chart.  Based on TEA's investigation, and after a contested case, the State Board of Educator Certification ("SBEC") may take disciplinary action against TEA certificate holders as specified by 19 TAC 249.14(a), including reprimanding, suspending, or revoking (permanently or for a period of time) an educator's certificate. 19 Tex. Admin. Code § 249.15(a) & (c).

### The TEA Policy

23.     In a clear reaction to online views critical of Mr. Kirk, on September 12, 2025, Mr. Morath sent a letter (again, the "TEA Policy") to all Texas public school district superintendents requiring that school districts report employees making certain First Amendment-protected statements for investigation.  The TEA Policy stated, in relevant part:

> TEA has been made aware of some Texas public school educators that have posted and/or shared reprehensible and inappropriate content on social media related to the assassination of Charlie Kirk. . . .  In response to such posts, I am referring all documentation of educators that have proliferated [sic] such vile content to TEA's Educator Investigations Division.  Such posts could constitute a violation of the Educators' Code of Ethics. . . . If you are made aware of additional instances of inappropriate content being shared, it should be reported to the agency through TEA's Misconduct Reporting Portal.

Exhibit 1.

24.    The TEA Policy thereby directed school district superintendents across the state to report employees who engaged in protected speech regarding Mr. Kirk for TEA misconduct investigations.  Further, the TEA Policy unleashed an intense backlash against teachers across the state.  On information and belief, in a meeting held shortly after the policy was published, Mr. Morath threatened disciplinary action against principals and superintendents who failed to comply with the TEA Policy.

25.    After Mr. Morath's call for retaliation against teachers who shared "inappropriate content" about Mr. Kirk, Texas school districts referred Texas AFT members to TEA for investigation and began to discipline them for social media posts regarding Mr. Kirk's death made on both public accounts and private accounts, where viewers must be specifically approved by the account owners.

26.    Based on public reporting, more than 350 teachers have been reported for investigation, and are pending investigation by TEA as a result of the TEA Policy's directive.

27.    The following are examples of the harms suffered by Texas AFT members who were directly and adversely affected by the unconstitutional policy pushed by the TEA:

### Teacher 1

28.    Teacher 1 is a member of Texas AFT, and until recently served as a high school English teacher in an independent school district near Houston.  Teacher 1 has served as a teacher for twenty-seven years.

29.    On the day of Mr. Kirk's death, Teacher 1 posted questions on her public Facebook page prompting a debate about the assassination of Mr. Kirk and her viewpoint that karma played a role in his death.

30.    The following morning, Teacher 1's school administration placed her on administrative leave.  At no point did Teacher 1's post result in any disruption to school operations.

31.    The following week, after the TEA Policy was published, a human resources representative told Teacher 1 that the school district planned to refer her to the TEA for an ethics violation.

32.    Shortly thereafter, at its monthly board meeting, the local school board opened the floor for public comments on whether to fire Teacher 1 for her statements about Mr. Kirk.  Community members offered comments on whether Teacher 1 should be terminated.  After more than two hours of closed session, the school board terminated Teacher 1 for her statements, but without a majority of school board members supporting her termination.  Of the seven members of the board, five abstained from the vote and two voted in favor of the motion to fire Teacher 1.  After weeks of unemployment, Teacher 1 settled her claim for wrongful termination with the school district.

## Teacher 2

33.    Teacher 2 is a member of Texas AFT.  He is a high school social studies teacher in an independent school district in the San Antonio area.  Teacher 2 has been a teacher for sixteen years.  Teacher 2 is a U.S. Army veteran and a celebrated

educator who previously received the "Teacher of the Year" award in his school district.

34.     After Mr. Kirk's death, Teacher 2 made multiple posts on his private Facebook page criticizing Mr. Kirk for his statements against Black Americans and noting the public's lack of outrage for other acts of violence.  No administrators, students, or teachers from Teacher 2's school were "friends" on his Facebook account.

35.     Teacher 2 deleted his Facebook posts after the TEA Policy was published for fear of punishment from the TEA.

36.     Despite removing the posts, Teacher 2's principal contacted him to let him know the principal had received a report regarding the Facebook posts.  The principal told Teacher 2 that the principal did not think Teacher 2 had done anything wrong, but wanted Teacher 2 to be aware of the complaint.

37.     Later that week, Teacher 2 was directed to report to the Human Resources Department of his district to discuss his posts.  Teacher 2 was accompanied by his local AFT Chapter President.  During this meeting, the Employee Relations personnel referenced Mr. Morath's letter and stated the meeting was required to comply with the TEA Policy.

38.     As directed by the TEA Policy, the school district then referred Teacher 2 to the TEA for disciplinary investigation.

39.     As of the date of this filing, Teacher 2's posts have not resulted in any disruption to school operations.  He is still teaching in his classroom, awaiting his fate from the TEA.

## Teacher 3

40.     Teacher 3 is a member of Texas AFT.  She is also a high school ESL teacher in an independent school district near San Antonio.  This year marks her second year of teaching.

41.     Shortly after Mr. Kirk's death, Teacher 3 commented on a viral TikTok post from her public account, criticizing Mr. Kirk's stance on immigration.

42.     An X (formerly Twitter) user posted screenshots of Teacher 3's comment, along with Teacher 3's TikTok profile, a photo of Teacher 3, a screenshot of Teacher 3's school directory, and Teacher 3's LinkedIn page, calling for her to lose her job.  On information and belief, the X user is not a parent or community member of Teacher 3's school district.

43.     The next day, Teacher 3's principal informed her that human resources wanted to speak with her.  The principal said that she did not think this was "right," but it was necessary that Teacher 3 meet with human resources.

44.     During the meeting with human resources, a human resources representative asked Teacher 3 to explain her post about Mr. Kirk and other reposts to her social media quoting Martin Luther King, Jr., and James Baldwin.  Teacher 3 was also told that her posts violated the school social media policy and that as required by TEA, the school district would report her to TEA for investigation.

45.     As of the date of this filing, Teacher 3's posts have not resulted in any disruption to school operations.  Indeed, she has been teaching students while she awaits the outcome of TEA's investigation.

## Teacher 4

46.     Teacher 4 is a member of Texas AFT.  She is a second-grade teacher in an independent school district near San Antonio.

47.     Teacher 4 posted several comments on social media criticizing the amount of public mourning for Mr. Kirk's death compared to the public mourning of children killed in school shootings.  Teacher 4 also criticized Mr. Kirk's controversial statements about people of color, immigrants, and women.  Teacher 4 later deleted these posts after she heard a rumor that Mr. Morath was planning to issue a policy regarding social media use and Mr. Kirk.

48.     On September 13, 2025, Teacher 4's principal received a phone call from a senior executive from the school district, notifying him that Teacher 4 had made several social media posts regarding the assassination of Mr. Kirk and that she was under investigation.

49.     On September 15, 2025, the principal spoke with Teacher 4 about the posts and referenced the TEA Policy.  During this conversation, Teacher 4 told the principal that she had deleted the posts.

50.     On September 30, 2025, the principal issued Teacher 4 a written reprimand titled "Memorandum of Expectation" stating that the school district human resources "determined [she] violated the following Board policies: Standard 1.7.  The educator shall comply with state regulations, written school board policies, and other state and federal laws."  *Id.*  The letter further stated: "Beginning immediately, you are to comply with the following administrative directives: As an employee, you are expected to conduct yourself in a professional and ethical manner.

This is to include inappropriate postings on social media as you are representing yourself as an educator of the District." *Id.*

51.    The reprimand warned Teacher 4 that "failure to follows these directives may result in further disciplinary action, including and up to termination" and that this "documentation may also be considered cumulative data for any future incidents." *Id.* The principal's use of the phrase "cumulative data," found in 19 Tex. Admin. Code § 150.1003, indicates the principal may factor this incident in Teacher 4's annual appraisal.

52.    Following these interactions with human resources, Teacher 4 removed all political posts from her social media, fearful of further reprisal.

53.    As of the date of this filing, Teacher 4 remains teaching in her classroom and her posts regarding Mr. Kirk have not resulted in any disruption to school operations.

## V.    CAUSES OF ACTION

### Count I: 42 U.S.C. § 1983, Violation of Free Speech Under the First and Fourteenth Amendments to the U.S. Constitution—Facial Challenge

54.    Plaintiff realleges all paragraphs above.

55.    Defendants are state actors operating under color of state law.

56.    Citizens have a vital interest in free and open discussion on issues of public interest and importance. The TEA Policy violates the First and Fourteenth Amendments of the U.S. Constitution.

###### i.    Impermissible Restriction on Public Employee Speech

57.    The First and Fourteenth Amendments to the U.S. Constitution prohibit state policies that infringe on public employees' speech when employees speak as private citizens on matters of public concern.  If a policy arguably infringes on these rights, the state actor must establish that its interest in an effective and efficient workplace outweighs those rights.

58.    The TEA Policy, on its face, violates the First and Fourteenth Amendment rights of Texas AFT members.  The Policy does not ask superintendents to assess such posts' impact on the school environment before requiring them to launch an investigation.  Instead, it includes a blanket mandate that schools report school employees for disciplinary investigations and it threatens adverse actions against all Texas public school personnel who, as private citizens, express viewpoints on their personal social media pages that the TEA deems "inappropriate" with respect to a matter of public concern—the assassination of a public figure.

59.    Moreover, the TEA Policy is an unconstitutional viewpoint-based restriction on speech, specifically targeting expressions with which the TEA Commissioner disagrees.  For example, the TEA did not issue similar letters with respect to teachers or other school personnel who posted about the assassinations of Democratic Minnesota lawmakers Melissa Hortman or John Hoffman in July 2025. Instead, the TEA appears to mandate investigations only for school personnel voicing criticism of the Commissioner's preferred political figure.  Indeed, Mr. Morath is well familiar with teachers' First Amendment rights; in 2019, he acknowledged and affirmed those rights when he overturned the termination of a teacher on First

Amendment grounds.  That teacher had been fired for her Twitter post, directed at President Trump's Twitter account, requesting the removal of "illegal students" from the school district.

### ii.    Overbreadth

60.    The First and Fourteenth Amendments to the U.S. Constitution prohibit state policies that are overbroad such that they punish a substantial amount of protected speech in the course of regulating unprotected speech.

61.    The TEA Policy mandates that superintendents report any "additional instances of inappropriate content" shared by their teachers and other school personnel on social media about Mr. Kirk's death to the TEA's Educator Investigations Division.  While this Policy may appropriately restrict some speech that could conceivably create a substantial disruption to the learning environment, it is overbroad because it also targets a wide swath of constitutionally protected speech that has no impact on school operations in violation of the First and Fourteenth Amendments.  Further, the policy fails to define or describe what is meant by "inappropriate content."

62.    This overbreadth unconstitutionally chills teachers and other school personnel from engaging in protected expressive activity.  As a result of the TEA policy, numerous members of Texas AFT deleted their social media posts of a political nature.  Members remain fearful about sharing their opinions on matters of public concern—whether online or in person—if their viewpoints do not seemingly align with the Texas State government.

### iii.    Vagueness

63.    The First and Fourteenth Amendments to the U.S. Constitution also prohibit state policies that are so impermissibly vague that an ordinary person would not understand what conduct the policy prohibited or that are so standardless as to invite arbitrary enforcement.

64.    The TEA Policy's language mandating that superintendents report "additional instances of inappropriate content" shared by their teachers or other school personnel about Mr. Kirk's death is so vague and open to varying interpretations that it has invited arbitrary and inconsistent enforcement, with some teachers and other school personnel who are referred for investigation and some who are not. For similar posts, some teachers have received warnings while others were terminated. The TEA Policy thereby fails to provide Texas AFT's members with adequate notice of their rights and obligations in violation of the First and Fourteenth Amendments.

65.    This vagueness unconstitutionally chills teachers and other school personnel from engaging in protected expressive activity. As a result of the TEA policy, numerous members of Texas AFT deleted their social media posts of a political nature. Members remain fearful about sharing their opinions on matters of public concern—whether online or in person—if their viewpoints do not seemingly align with the Texas State government.

**Count II: 42 U.S.C. § 1983, Violation of Free Speech Under the First and Fourteenth Amendments to the U.S. Constitution—As Applied Challenge**

66.    Plaintiff realleges all paragraphs above.

18

67.    Defendants are state actors operating under color of state law.

68.    The First and Fourteenth Amendments prohibit government employers from taking adverse action against their employees for protected speech. The Constitution protects public employees' right to speak freely about matters of public concern unless the government can demonstrate that the employer's interest in an effective and efficient workplace outweighs the employee's First Amendment rights.

69.    Texas AFT members engaged in constitutionally-protected speech when they spoke as private citizens on their personal social media pages on a matter of public concern—the assassination of a public figure who sought a public forum to engage in what he consistently stated was protected First Amendment speech. Plaintiff's members' speech, which was also protected, did not create any known disruption to their places of employment or impede their employers' ability to maintain an efficient and effective workplace—at least until the TEA Policy went into effect.

70.    Additionally, Plaintiff's members' speech did not sow, encourage, or incite violence in any way.

71.    At the direction of the TEA, Plaintiff's members were subject to adverse actions for their protected speech. As a result of expressing viewpoints the TEA deemed in vague terms "reprehensible and inappropriate," Texas AFT members have been referred for investigations that may result in sanction or revocation of their certifications, issued verbal and written reprimands, placed on administrative leave,

threatened with future termination if they continued to engage in protected speech, and at least one member was terminated.

72.    Members also deleted their posts and closed their social media accounts for fear of being disciplined, demonstrating the true chilling effect the TEA Policy has had on the constitutionally protected speech of Texas AFT members.

73.    The TEA and Mr. Morath's publication of the Policy also pressured superintendents and principals to report teachers and other school personnel who had posted about Mr. Kirk's death, which similarly chilled the constitutionally protected speech of Texas AFT members.

74.    The TEA Policy violates the First and Fourteenth Amendments to the U.S. Constitution as applied to Plaintiff because Defendants have denied AFT members' right to speak, discriminated against their viewpoints and expression of their viewpoints, and retaliated against them for the exercise of their right to speak about their viewpoints on a matter of public concern.

## Irreparable Harm

75.    As a result of the unconstitutional TEA Policy, Texas AFT's members have already suffered irreparable harm, including disciplinary actions taken against them, being referred for and subjected to investigations by TEA, and receiving permanent black marks on their employment records for their purely private viewpoint expression.  There is no adequate remedy at law for the violation of the constitutional rights of Texas AFT and its members.  Unless the requested injunctive relief is granted, Texas AFT members will continue to suffer irreparable harm.

76.    The TEA Policy has a chilling effect on the exercise of Texas AFT members' constitutional rights.  The TEA Policy thereby causes Texas AFT members irreparable injury each day it is in effect.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and issue the following forms of relief:

a.    A permanent injunction[1] enjoining Defendants from enforcing the TEA Policy in any manner; compelling Defendants to retract the Policy; compelling Defendants to terminate all investigations referred to TEA following the Policy's publication related to posts regarding Charlie Kirk; and compelling Defendants to issue a new letter advising superintendents that the TEA does not require reports to the Misconduct Reporting Portal regarding the conduct targeted in the TEA Policy;

b.    A declaratory judgment under 28 U.S.C. § 2201(a) holding that the TEA Policy is unconstitutional, void, and of no effect;

c.    An award of Plaintiff's attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

d.    Any such other or further relief as is necessary, proper, and just under the circumstances.

---

[1] Plaintiff will file a separate motion for a preliminary injunction and requesting a preliminary injunction hearing.

DATED: January 6, 2026

Respectfully submitted,

/s/ *Karima Maloney*

Karima Maloney
Texas Bar No. 24041383
Allison Standish Miller
Texas Bar No. 24046440
Alexander M.  Wolf
Texas Bar No. 24095027
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Fax: (713) 221-2320
kmaloney@steptoe.com
amiller@steptoe.com
awolf@steptoe.com

Ida Adibi (*pro hac vice forthcoming*)
Kylie Clouse (*pro hac vice forthcoming*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
iadibi@steptoe.com
kclouse@steptoe.com

Manuel Quinto-Pozos
Texas Bar No. 24070459
DEATS DURST & OWEN PLLC
2901 Bee Cave Road, Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Fax: (512) 474-7896
mqp@ddollaw.com

*Counsel for Plaintiff Texas American Federation of Teachers*