## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **TEXAS AMERICAN FEDERATION OF TEACHERS,** | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. **1:26-cv-00024-ADA** |
| **TEXAS EDUCATION AGENCY and MIKE MORATH, in his official capacity as Commissioner of the Texas Education Agency,** | |
| Defendants. | |

### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Karima Maloney
Texas Bar No. 24041383
Allison Standish Miller
Texas Bar No. 24046440
Alexander M. Wolf
Texas Bar No. 24095027
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Fax: (713) 221-2320
kmaloney@steptoe.com
amiller@steptoe.com
awolf@steptoe.com

Ida Adibi (*admitted pro hac vice*)
Kylie Clouse (*admitted pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
iadibi@steptoe.com
kclouse@steptoe.com

Manuel Quinto-Pozos
Texas Bar No. 24070459
DEATS DURST & OWEN PLLC
2901 Bee Caves Road, Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Fax: (512) 474-7896
mqp@ddollaw.com

*Counsel for Plaintiff Texas American Federation of Teachers*

## TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Index of Authorities ................................................................................................. ii

Introduction .............................................................................................................. 1

Statement of Facts .................................................................................................... 3

Argument ................................................................................................................... 6

I.    Defendants Are Properly Subject to Suit for Injunctive and Declaratory Relief and
Are Not Immune. ............................................................................................. 6

II.   Texas AFT Satisfies the Preliminary Injunction Standard. ............................ 7

A.    Texas AFT Is Substantially Likely to Prevail on the Merits. ................. 7

1.    The TEA Policy Violates the First Amendment on its Face. ..................... 7

a)    The TEA Policy Is an Impermissible Restriction on
Public Employee Speech ........................................................... 7

b)    The TEA Policy Is Unconstitutionally Overbroad. ........................ 11

c)    The TEA Policy Is Unconstitutionally Vague. .............................. 13

2.    The TEA Violates the First Amendment as Applied to Texas AFT
Members. ................................................................................... 14

a)    Affected Texas AFT Members Suffered Adverse Employment
Actions. .................................................................................. 14

b)    The TEA Policy Targeted Affected Texas AFT
Members for Commenting on a Matter of Public
Concern. ................................................................................. 15

c)    Texas AFT Members' Interest in Commenting on
Matters of Public Concern Outweighs the TEA's
Interest in Promoting Efficiency. .............................................. 15

d)    The Speech of the Affected Texas AFT Members Motivated the
Adverse Actions Taken by Their Employers. ............................... 17

3.    Texas AFT Members' Speech Does Not Incite Violence. ...................... 17

B.    Texas AFT Will Suffer Irreparable Harm Absent Injunctive Relief. .................. 18

C.    The Balance of Equities and Public Interest Weigh in Favor of Granting
Injunctive Relief. ...................................................................................... 19

III.  No Bond Should Be Required. ......................................................................... 20

Conclusion .................................................................................................................. 20

# INDEX OF AUTHORITIES

## Cases

*Bailey v. Iles*,
   87 F.4th 275 (5th Cir. 2023) .................................................................18

*Beckerman v. City of Tupelo*,
   664 F.2d 502 (5th Cir. 1981) .............................................................16

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969)...........................................................................18

*Branton v. City of Dallas*,
   272 F.3d 730 (5th Cir. 2001) .........................................................9, 15

*Clarke v. Commodity Futures Trading Comm'n*,
   74 F.4th 627 (5th Cir. 2023) ..............................................................19

*Connick v. Myers*,
   461 U.S. 138 (1983)...........................................................................7

*Crook v. Creston Cnty. School District*,
   No. 4:25-cv-00373-RGE-HCA, ECF No. 13 (S.D. Iowa Oct. 20, 2025) ....................... *passim*

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ............................................................18

*Fund Texas Choice v. Paxton*,
   658 F. Supp. 3d 377 (W.D. Tex. 2023)...............................................20

*Gaines v. Jefferson Cnty. Sch. Dist.*,
   705 F. Supp. 3d 664 (S.D. Miss. 2023)..............................................8

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006)......................................................................8, 10

*Gibson v. Kilpatrick*,
   773 F.3d 661 (5th Cir. 2014) .............................................................8

*Graziosi v. City of Greenville Miss.*,
   775 F.3d 731 (5th Cir. 2015) .............................................................9

*Green Valley Special Util. Dist. v. City of Schertz, Tex.*,
   969 F.3d 460 (5th Cir. 2020) (en banc) ..........................................6, 7

*Hess v. Indiana*,
   414 U.S. 105 (1973)...........................................................................18

*Hoffman Est. v. Flipside*,
    455 U.S. 489 (1982)...................................................................................................13

*Hook v. Rave*,
    2025 WL 2720978 (D.S.D. Sep. 24, 2025)............................................................8, 10, 15, 16

*Johnson v. United States*,
    576 U.S. 591 (2015)...................................................................................................13

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) .......................................................................................20

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) ................................................................................7, 14

*MacRae v. Mattos*,
    145 S. Ct. 2617 (2025)..................................................................................................9

*McLin v. Twenty-First Jud. Disc.*,
    79 F.4th 411 (5th Cir. 2023) ......................................................................................11

*NAACP v. Button*,
    371 U.S. 415 (1963)...................................................................................................13

*Nat'l Fed'n of Indep. Bus. v. Perez*,
    2016 WL 3766121 (N.D. Tex. June 27, 2016) ...........................................................19

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) ......................................................................................13

*Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*,
    112 F.4th 373 (6th Cir. 2024) ......................................................................................9

*Noto v. United States*,
    367 U.S. 290 (1961)...................................................................................................18

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ................................................................................7, 19

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)....................................................................................................10

*Palko v. Connecticut*,
    302 U.S. 319 (1937)......................................................................................................1

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*,
    391 U.S. 563 (1968)................................................................................................7, 14

*Pierce v. Tex. Dep't of Crim. Just., Inst. Div.*,
   37 F.3d 1146 (5th Cir. 1994) ................................................................14

*Rankin v. McPherson*,
   483 U.S. 378 (1987)..................................................................................9, 15

*Roark & Hardee LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) ................................................................13

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020)..................................................................................19

*Salge v. Edna Indep. Sch. Dist.*,
   411 F.3d 178 (5th Cir. 2005) ................................................................14

*Snyder v. Phelps*,
   562 U.S. 443 (2011)..................................................................................8, 9

*United States v. Hansen*,
   599 U.S. 762 (2023)..................................................................................11, 12

*United States v. Jubert*,
   139 F.4th 484 (5th Cir. 2025) ................................................................11

*United States v. Texas*,
   719 F. Supp. 3d 640 (W.D. Tex. 2024)..................................................20

*Victor v. McElveen*,
   150 F.3d 451 (5th Cir. 1998) ................................................................15

*Watson v. City of Memphis*,
   373 U.S. 526 (1963)..................................................................................16

*Ex Parte Young*,
   209 U.S. 123 (1908)..................................................................................6, 7

## Other Authorities

Alejandro Serrano & Colleen Deguzman, *Young Texas Conservatives say Charlie
   Kirk's Death is Galvanizing Their Religion-Forward Politics*................................10

Associated Press, *What to know about the aftermath of Charlie Kirk's
   assassination* ................................................................................................10

*Charlie Kirk Posts*, CBS NEWS (Jan. 6, 2026),
   https://www.cbsnews.com/texas/news/texas-teachers-union-sues-texas-
   education-agency-over-discipline-tied-to-charlie-kirk-posts................................18

Jaden Edison, *Texas Teachers Union Sues State Education Agency for Investigating Social Media Posts about Charlie Kirk* .............................................................5

Paul Steinhauser, *New Poll Reveals Majority of Voters Believe US is Experiencing Political Crisis after Kirk Assassination*, Fox News, Sep. 26, 2025...................................................................................................................10

PBS, Sep. 15, 2025, https://www.pbs.org/newshour/nation/what-to-know-about-the-aftermath-of-charlie-kirks-assassination; ..........................................10

Peggy Noonan, *Charlie Kirk's Assassination Feels Like a Hinge Point*, Wall St. J., Sep. 11, 2025&gaa_sig=EAxO4sezQD8wa4NF_c3J8i2xGOU9iMm47ST6Vf4T8Kem TyjlaxSNggWm8P5CfTxAkd-9lW2F2a57jXG2FuGMXg%3D%3D ...................10

Taylor Goldstein, *Charlie Kirk's Killing Adds to Rising Security Concerns Among Texas Politicians*, Houston Chron., Sep. 16, 2025...........................................10

Tex R. Civ. P. 65(c) ......................................................................................................20

Tex Trib., Jan. 6, 2026, https://www.texastribune.org/2026/01/06/texas-education-agency-charlie-kirk-investigations-lawsuit/#:~:text=Background%3A%20As%20of%20October%2C%20the,speaking%20at%20a%20Utah%20colleg .....................................................................5

Tex. Trib., Sep. 20, 2025, https://www.texastribune.org/2025/09/20/texas-youth-summit-republican-charlie-kirk-memorial/............................................10

Texas Education Agency, Investigations, https://tea.texas.gov/texas-educators/investigations ...........................................................................14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **TEXAS AMERICAN FEDERATION OF TEACHERS,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO. 1:26-cv-00024-ADA** |
| **TEXAS EDUCATION AGENCY and MIKE MORATH, in his official capacity as Commissioner of the Texas Education Agency,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Texas American Federation of Teachers ("Texas AFT") files this Motion for a Preliminary Injunction to enjoin Defendants from enforcing the September 12, 2025 TEA Policy (the "TEA Policy") in any manner, which would include suspending all investigations referred to the TEA following the TEA Policy's publication related to posts regarding Charlie Kirk. Defendants Texas Education Agency (the "TEA") and Commissioner Mike Morath ("Mr. Morath"; together, "Defendants") issued and enforce the unconstitutional TEA Policy challenged in this litigation. Texas AFT requests an evidentiary hearing on this Motion for a Preliminary Injunction at the Court's earliest convenience, during which Texas AFT looks forward to presenting evidence to establish its entitlement to such relief.

## INTRODUCTION

Freedom of speech "is the matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 326–27 (1937). Plaintiff Texas AFT represents 66,000 public school educators and other employees throughout Texas. These public servants do not leave their First Amendment rights at the schoolhouse door simply by virtue of their

employment. Unfortunately, the TEA has taken upon itself to violate Texas educators' constitutional rights, suppressing the speech of, and retaliating against, educators who express a viewpoint critical of Charlie Kirk.

Following the September 10, 2025 assassination of Charlie Kirk, a well-known political activist, Mr. Morath issued a Policy unleashing retaliation against Texas AFT members across the state who posted what he deemed "reprehensible and inappropriate content on social media" regarding Mr. Kirk's death. The TEA Policy, issued on September 12, 2025, directed Texas superintendents to refer these educators to the TEA's Educator Investigations Division—an enforcement arm empowered to investigate alleged misconduct and impose disciplinary sanctions. Simply being under investigation—which eventually becomes publicly-available information— can jeopardize teachers' professional credentials and have a negative impact on their future employment. The TEA Policy plainly infringes upon Texas educators' First Amendment rights.

The predictable and intended result of the TEA Policy has been widespread suppression of constitutionally protected speech. Public school educators across the state of Texas find themselves under investigation, reprimanded, and even terminated for publicly expressing their political opinions on their personal social media accounts. A preliminary injunction is necessary to prevent further violations of the rights of Plaintiff's members during the pendency of this case.

## STATEMENT OF FACTS

The First Amendment guarantees the right to free speech for all Americans, protecting their ability to express opinions and engage in public conversation without fear of government retaliation. These fundamental rights belong to everyone—including educators—and are not surrendered because of one's employment. Public school educators, like all citizens, retain their constitutional protections when speaking in a personal capacity, including on their personal social media accounts. When they express themselves as private individuals, they are engaging in the same protected activity afforded to every member of the public, even if their views may be disfavored by government actors.

Tragically, on September 10, 2025, political commentator Charlie Kirk was shot and killed while addressing an audience at Utah Valley University in Orem, Utah. Traditional media outlets and social media platforms were filled with news of the event and reactions to it, including highly charged discussions concerning political violence and the life and work of Mr. Kirk. Some of that discussion focused on the controversial statements he made throughout his life, which created large groups of both supporters and detractors across the political spectrum. Although Mr. Kirk described himself as a passionate proponent of First Amendment rights, individuals who, after Mr. Kirk's death, publicly expressed their belief that some of his statements were offensive were met with online harassment and hostility. This backlash extended to public school educators who, on their own time, posted about the event on their personal social media accounts, and who suffered professional consequences as a result.

In a clear reaction to online views critical of Mr. Kirk, on September 12, 2025, Defendant Morath, Texas's Commissioner of Education, sent a letter (the "TEA Policy") to all Texas public school district superintendents requiring that school districts report employees making certain First

Amendment-protected statements to TEA's Educator Investigations Division for investigation. The TEA Policy stated, in relevant part:

> TEA has been made aware of some Texas public school educators that have posted and/or shared reprehensible and inappropriate content on social media related to the assassination of Charlie Kirk. . . .  In response to such posts, I am referring all documentation of educators that have proliferated [sic] such vile content to TEA's Educator Investigations Division. Such posts could constitute a violation of the Educators' Code of Ethics. . . .  If you are made aware of additional instances of inappropriate content being shared, it should be reported to the agency through TEA's Misconduct Reporting Portal.

Exhibit 1.

The TEA Policy thereby directed school district superintendents across the state to refer employees who engaged in protected speech regarding Mr. Kirk to the TEA for misconduct investigations.  Misconduct that is typically referred to the TEA for investigation includes activities involving students or minors such as physical abuse, threats of violence, romantic or sexual relationships, or inappropriate boundary violations.  Ex. 2, Declaration of Zeph Capo ¶ 9. But here, Defendants required superintendents state-wide to report for investigation constitutionally-protected *speech*, not egregious misconduct involving students.

Further, the TEA Policy unleashed an intense backlash against teachers across the state. On information and belief, in a meeting held shortly after the policy was published, Mr. Morath threatened disciplinary action against principals and superintendents who failed to comply with the TEA Policy.

After Mr. Morath's call for retaliation against teachers who shared "inappropriate content" about Mr. Kirk, Texas school districts referred Texas AFT members to the TEA for investigation and began to discipline them for social media posts regarding Mr. Kirk made off campus and on both public accounts and private accounts, where viewers must be specifically approved by the

account owners.  Ex. 2 ¶ 11.  Based on public reporting, more than 350 teachers were referred for investigation.[1]

The enforcement of the TEA Policy has been inconsistent throughout the state, without rhyme or reason.  Texas AFT's Complaint sets forth four examples of educators who faced retaliation for exercising their constitutional right to engage in protected speech.  After 27 years of teaching in Texas Public Schools, Teacher 1 was placed on administrative leave and subsequently terminated for her Facebook post characterizing Mr. Kirk's death as karma.  ECF No. 1, ¶¶ 28–32.  Teacher 2, a U.S. Army veteran who won "Teacher of the Year" in his district, was directed to report to Human Resources and referred to the TEA for disciplinary investigation after commenting on the public's lack of outrage for other highly publicized acts of violence.  *Id.* ¶¶ 33–39.  Teacher 3 was reported to the TEA for investigation for her post criticizing Mr. Kirk's stance on immigration.  *Id.* ¶¶ 40–45.  Teacher 4 was issued a written reprimand for her post about the discrepancies in outrage for school shootings compared to Mr. Kirk's death.  *Id.* ¶ 47.

Beyond the examples highlighted in the complaint, there are at least two other Texas AFT members who were reprimanded or terminated for similar posts.  One member who teaches in an Independent School District near Dallas received a written reprimand for her post criticizing Mr. Kirk's comments about minorities, the LGBTQ+ community, and women.  Another member who teaches in an Independent School District near Houston was terminated after reposting the following quote from Mr. Kirk: "I think it's worth to have a cost of, unfortunately, some gun deaths

---

[1] According to reporting, TEA is still investigating 95 complaints.  *See* Jaden Edison, *Texas Teachers Union Sues State Education Agency for Investigating Social Media Posts about Charlie Kirk*, Tex. Trib., Jan.   6, 2026, https://www.texastribune.org/2026/01/06/texas-education-agency-charlie-kirk-investigations-lawsuit/#:~:text=Background%3A%20As%20of%20October%2C%20the,speaking%20at%20a%20Utah%20college.

every single year, so that we can have the Second Amendment to protect our other God given rights," with an animated sticker identifying the irony between Mr. Kirk's statement and his death.

At no point did any of these six teachers' posts result in any alleged disruption to school operations.  Still, all six teachers were reported for investigation, faced discipline—or both—for their protected speech because of the TEA Policy.  The TEA Policy's chilling effect on educators was unmistakable and likely the TEA's point in issuing it.  Some teachers deleted their posts out of fear of punishment from the TEA even before they were contacted by their schools.  *See Id.* ¶¶ 35, 47; Ex. 2 ¶ 18.  Some members now feel apprehensive about engaging in political speech on social media altogether, fearful that *any* viewpoint they express could result in further reprisal. *See e.g.,* ECF No. 1 *Id.* ¶ 52; Ex. 2 ¶ 18.

## ARGUMENT

### I.    Defendants Are Properly Subject to Suit for Injunctive and Declaratory Relief and Are Not Immune.

In *Ex Parte Young*, the U.S. Supreme Court allowed lawsuits to proceed against government officials, in their official capacity, when the lawsuits seek injunctive relief to prevent unconstitutional acts.  209 U.S. 123 (1908).  For a suit against a state official to proceed under *Ex Parte Young*, "three criteria must be satisfied: (1) A 'plaintiff must name individual state officials as defendants in their official capacities'; (2) the plaintiff must 'allege an ongoing violation of federal law'; and (3) the relief sought must be 'properly characterized as prospective.'"  *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc). Here, all three criteria are satisfied because: (1) Mr. Morath is named in his official capacity as Commissioner of the TEA; (2) Texas AFT alleges that Mr. Morath's continuing enforcement of the TEA Policy violates the U.S. Constitution; and (3) the injunctive relief sought is properly prospective in that it seeks to end a violation of the law causing ongoing harm.  And because Texas

AFT seeks "prospective relief for ongoing harm, the fact that a current violation can be traced to a past action does not bar relief under *Young*." *Id.* at 471-72 (quoting *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 738 (5th Cir. 2020)).

## II.    Texas AFT Satisfies the Preliminary Injunction Standard.

To obtain a preliminary injunction a plaintiff must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Texas AFT satisfies this test.

### A.    Texas AFT Is Substantially Likely to Prevail on the Merits.

Texas AFT is substantially likely to prevail on the merits because the action taken by Commissioner Morath and the TEA violates the First and Fourteenth Amendments of the United States Constitution.

#### 1.    The TEA Policy Violates the First Amendment on its Face.

##### a)    The TEA Policy Is an Impermissible Restriction on Public Employee Speech.

The First and Fourteenth Amendments to the United States Constitution prohibit state policies infringing on public employees' speech when employees speak as private citizens on matters of public concern, so long as their speech interest is not outweighed by the government's interest in avoiding workplace disruption. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004). The TEA Policy violates this standard. The TEA Policy targets teachers posting on their personal social media pages as private citizens on a matter of public concern—the assassination of a public figure—without regard for whether such posts disrupted the school

environment.  Moreover, the TEA Policy offends the First Amendment on its face because its reach is overbroad and it is so vague that no reasonable educator or administrator can discern what speech is permissible and what speech is not.

First, the TEA policy punishes Texas AFT members for speech made as private citizens.  A public employee speaks as a private citizen when their speech is outside the scope of the employee's official duties. *Gibson v. Kilpatrick*, 773 F.3d 661, 667 (5th Cir. 2014) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  Federal courts have found that when an employee posts on their personal social media page "at home" and "off work," while not "purport[ing] to speak as an employee" of the school, that speech is made in their capacity as a private citizen. *See* Order Granting in Part Plaintiff's Motion for Temporary Restraining Order at 9, *Crook v. Creston Cmty. School Dist.,* No. 4:25-cv-00373-RGE-HCA, ECF No. 13 (S.D. Iowa Oct. 20, 2025) ("Crook Order") (granting temporary restraining order enjoining school district from taking adverse actions against teacher for their speech sharply criticizing Mr. Kirk after his death); *Hook v. Rave*, No. 4:25-CV-04188-KES, 2025 WL 2720978, at *5-6 (D.S.D. Sep. 24, 2025) (same); *see also Gaines v. Jefferson Cnty. Sch. Dist.*, 705 F. Supp. 3d 664, 672 (S.D. Miss. 2023).  Here, the TEA Policy targets such speech.  Those affected by the Policy were not reprimanded for posting about Mr. Kirk at school, during school hours, or on school-affiliated social media pages.  Nor were they reprimanded for speaking about Mr. Kirk in school, during a class they were teaching.  Rather, they were punished for making posts on their personal social media pages on their own time.  Such posts are plainly outside the scope of the employees' official duties and thereby satisfy this element of the test.

Second, the TEA Policy targets speech on a matter of public concern.  "Speech on matters of public concern is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S.

443, 451-52 (2011) (cleaned up).  "Matters of public concern are those which can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).  The Fifth Circuit has found that speech in the form of social media postings weighs in favor of finding that the plaintiff spoke on a matter of public concern.  *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 739 (5th Cir. 2015).  Importantly, "the inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."  *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).  "Accordingly, [the Supreme Court] ha[s] declined to 'affor[d] less than full First Amendment protection' even for speech that we have deemed 'particularly hurtful.'"  *MacRae v. Mattos*, 145 S. Ct. 2617, 2619 (2025) (quoting *Snyder*, 562 U.S. at 454-56)); *see also, e.g., Rankin*, 483 U.S. 378 (ruling that terminating a public employee for the following remark about the attempted murder of President Ronald Regan—"if they go for him again, I hope they get him"—violated the employee's First Amendment rights); *Snyder*, 562 U.S. 443 (deeming that signs held by Westboro Baptist Church members reading "Thanks God for Dead Soldiers" and "God Hates You" near a military funeral constituted protected speech on a matter of public concern); *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373 (6th Cir. 2024) (holding that a public employee's speech in reposting a meme following the killing of George Floyd, depicting people being run over by a vehicle with the words "All Lives Splatter" and "Nobody Cares About Your Protest," was protected under the First Amendment).

Courts must exercise "vigilance" in order "to ensure that public employers do not use authority over employees to silence discourse . . . simply because superiors disagree with the content of employees' speech."  *Rankin*, 483 U.S. at 384.  In line with this reasoning, in the past several months, federal courts have twice ruled that teachers' social media posts about Charlie

Kirk's death constitute speech on a matter of public concern.  Crook Order at 9; *Hook*, 2025 WL 2720978, at *5-6 .

Mr. Kirk was a prominent political activist and media personality on the national stage. His assassination was widely discussed by media outlets in Texas and across the country.[2]  Posts criticizing Mr. Kirk for his views about minority groups and immigrants, or suggesting his assassination was "karmic" given his own statements about gun violence, or even celebrating his death, are not denied First Amendment protection merely because they may be offensive Texas AFT members' speech regarding Mr. Kirk's death therefore clearly constitutes speech on a matter of public concern.

Third, Texas AFT members' speech interests here are not outweighed by the TEA's interest in avoiding workplace disruption.  The ability to freely express one's political views on social media is a cornerstone of modern free speech.  *See Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (recognizing "social media" as one of "the most important places" for the "exercise of First Amendment rights").  Although "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions," they can regulate their employees' private speech about "matters of public concern" only to the extent "necessary . . .  to operate efficiently and effectively."  *Garcetti*, 547 U.S. at 418-19.  When determining whether a

---

[2] *See, e.g.*, Associated Press, *What to know about the aftermath of Charlie Kirk's assassination*, PBS, Sep. 15, 2025, https://www.pbs.org/newshour/nation/what-to-know-about-the-aftermath-of-charlie-kirks-assassination;  Peggy Noonan, *Charlie Kirk's Assassination Feels Like a Hinge Point*, WALL ST. J., Sep. 11, 2025, https://www.wsj.com/opinion/charlie-kirks-assassination-feels-like-a-hinge-point-01dd4f72?gaa_at=eafs&gaa_n =AWEtsqd5kj_QnEMivXhPbAVSR8ZQcd8NrjP08xZDxhYFhHAPofpKldfyotAeo3OtnzQ%3D&gaa_ts=695ecdd9 &gaa_sig=EAxO4sezQD8wa4NF_c3J8i2xGOU9iMm47ST6Vf4T8KemTyjlaxSNggWm8P5CfTxAkd-9lW2F2a57jXG2FuGMXg%3D%3D; Paul Steinhauser*, New Poll Reveals Majority of Voters Believe US is Experiencing Political Crisis after Kirk Assassination*, FOX NEWS, Sep. 26, 2025, https://www.foxnews.com/politics/new-poll-reveals-majority-voters-believe-us-experiencing-political-crisis-after-kirk-assassination; Taylor Goldstein, *Charlie Kirk's Killing Adds to Rising Security Concerns Among Texas Politicians*, HOUSTON CHRON., Sep. 16, 2025, https://www.foxnews.com/politics/new-poll-reveals-majority-voters-believe-us-experiencing-political-crisis-after-kirk-assassination; Alejandro Serrano & Colleen Deguzman, *Young Texas Conservatives say Charlie Kirk's Death is Galvanizing Their Religion-Forward Politics*, TEX. TRIB., Sep. 20, 2025, https://www.texastribune.org/2025/09/20/texas-youth-summit-republican-charlie-kirk-memorial/.

public employee's speech is protected by the First Amendment, the Fifth Circuit evaluates "whether the speech has caused disruption, impeded performance, or 'affected working relationships necessary to the department's proper functioning.'" *McLin v. Twenty-First Jud. Disc.*, 79 F.4th 411, 419 (5th Cir. 2023) (quoting *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 192 (5th Cir. 1988)).  Mr. Morath and the TEA failed to properly tailor the TEA Policy to meet these goals.  The TEA Policy does not even ask superintendents to assess the impact of such posts on the school environment before requiring them to launch an investigation.  Instead, it includes a blanket mandate that schools report educators for disciplinary investigations and threatens adverse actions against all Texas public school educators engaging in protected speech that expresses a viewpoint that the TEA deems "inappropriate."

### b)    The TEA Policy Is Unconstitutionally Overbroad.

The "overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications . . . on the ground that it provides breathing room for free expression."  *United States v. Hansen*, 599 U.S. 762, 769 (2023).  Overbroad laws "'may deter or chill constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *Id.* (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).  "To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Id.* at 770 (citing *United States v. Williams*, 553 U.S. 285, 292 (2008)).  "The First Amendment protects speech that provokes, disturbs, or even offends."  *United States v. Jubert*, 139 F.4th 484, 487 (5th Cir. 2025).  The overbreadth doctrine is therefore vital to protecting "the 'breathing space' the First Amendment requires to function in practice."  *Id.* at 493 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973)).  "If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then

society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen*, 599 U.S. at 770 (quoting *Williams*, 553 U.S. at 292).

The TEA Policy fails this test. The Policy mandates that superintendents refer to the TEA's Educator Investigations Division any "additional instances of inappropriate content" shared by their educators on social media about Mr. Kirk's death. This Policy may appropriately restrict some speech that could conceivably create a substantial disruption to the learning environment, but it is overbroad because it also targets a wide swath of constitutionally protected speech that has no impact on school operations in violation of the First and Fourteenth Amendments. Further, the Policy fails to define or describe what is meant by "inappropriate content."

As a result of this overbreadth, the TEA Policy fails to provide the "breathing room for free expression" required under the law. *Hansen*, 599 U.S. at 769. Rather, the TEA Policy unconstitutionally chills teachers from engaging in protected expressive activity, causing numerous members of Texas AFT to delete their social media posts of a political nature. Members remain fearful about sharing their opinions on matters of public concern—whether online or in person—if their viewpoints do not align with the Texas State government's viewpoints. The TEA Policy is therefore unconstitutionally overbroad, depriving society "of an uninhibited marketplace of ideas." *Hicks*, 539 U.S. at 119.

The Court should also consider the effect on parties not presently before the Court. *Hansen*, 599 U.S. at 770 (explaining that the "overbreadth doctrine allows a litigant … to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak"). Here, the Policy also threatens to impinge on the constitutional right of educators across the state, including those who are not members of Texas AFT.

        **c)**        **The TEA Policy Is Unconstitutionally Vague.**

A law is impermissibly vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008). Moreover, a "more stringent vagueness test" applies where a statute "interferes with the right of free speech" such as to create a chilling effect. *Hoffman Est. v. Flipside*, 455 U.S. 489, 499 (1982); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024). The government may regulate conduct that affects speech "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

The TEA Policy fails these requirements because it is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The Policy's language mandating that superintendents report "additional instances of inappropriate content" shared by their educators about Mr. Kirk's death is so vague and open to varying interpretations that it has inevitably caused inconsistent enforcement. For similar posts, some educators have received warnings while others were terminated.

This vagueness unconstitutionally chills educators from engaging in protected expressive activity. As a result of the TEA policy, numerous members of Texas AFT deleted their social media posts of a political nature. Ex. 2 ¶ 18. Members remain fearful about sharing their opinions on matters of public concern—whether online or in person—if their viewpoints are inconsistent with those of the current Texas State administration. *Id.* Because this law leaves "grave uncertainty" about what kind of speech is proscribed—and impermissibly chills significant amounts of constitutionally protected speech—the challenged provisions are impermissibly void for vagueness. *Johnson*, 576 U.S. at 597.

## 2.    The TEA Violates the First Amendment as Applied to Texas AFT Members.

The TEA Policy violates the First Amendment as applied to Texas AFT members because the TEA unconstitutionally retaliated against public school educators for engaging in protected speech.  To prevail on a First Amendment employment retaliation claim, an employee must establish (1) they suffered an adverse employment action; (2) their speech involved a matter of public concern; (3) their interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) their speech motivated the employer's adverse action.  *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968)).[3]  Each of these elements is satisfied here.

So far, two federal courts have weighed these factors and granted temporary restraining orders enjoining school districts from retaliating against teachers for their posts about Mr. Kirk's death.  *See* Crook Order; *Hook*, 2025 LX 448931.  In both cases, the courts found that the plaintiffs were substantially likely to prevail in their First Amendment retaliation claims.  *Id.* The same is true in this case.

### a)    Affected Texas AFT Members Suffered Adverse Employment Actions.

Adverse employment actions can be discharges, demotions, refusals to hire, refusals to promote, or reprimands.  *Pierce v. Tex. Dep't of Crim. Just., Inst. Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994) (citing *Rutan v. Republican Party*, 497 U.S. 62, 74 (1990)).  Several Texas AFT

---

[3] While the TEA is not the direct employer of Texas AFT members, the Fifth Circuit applies the *Pickering* balancing test in cases where the relationship between the defendant and the employee "implicate[s] governmental interest similar to those involved in the public employment context." *Kinney v. Weaver*, 367 F.3d 337, 360 (5th Cir. 2004). That is the case here.  The TEA asserts that its Educator Investigations Department has an interest in "ensuring that Texas educators meet the highest standards of professionalism and ethical behavior," and thus shares the "interest in promoting the efficiency of public services" that *Pickering* contemplates. *See* Texas Education Agency, Investigations, https://tea.texas.gov/texas-educators/investigations.  Accordingly, the TEA stands in the place of the employer (the school district) for the purpose of this analysis.

members received reprimands for violating the TEA Policy.  At least two were discharged, and at least one such member was placed on TEA's "Do Not Hire" registry.

b) **The TEA Policy Targeted Affected Texas AFT Members for Commenting on a Matter of Public Concern.**

As discussed above, the TEA Policy targets speech involving a matter of public concern— the assassination of a public figure.  Courts have routinely held that similar events were matters of public concern.  *See supra* at 12-14.

c) **Texas AFT Members' Interest in Commenting on Matters of Public Concern Outweighs the TEA's Interest in Promoting Efficiency.**

Texas AFT members' interest in commenting on matters of public concern outweighs the TEA's interest in promoting efficiency in the workplace.  "In performing the balancing . . .  the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose."  *Victor v. McElveen*, 150 F.3d 451, 457 (5th Cir. 1998) (quoting *Rankin*, 483 U.S. at 388).  The Supreme Court has recognized as pertinent considerations whether the statement impairs "harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Rankin*, 483 U.S. at 388.  However, "real, not imagined, disruption is required."  *Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001).

As seen in *Crook* and *Hook*, two federal courts analyzing this question at the temporary restraining order stage both concluded that school districts' interests did not outweigh teachers' free speech rights.  *See Crook* Order at 10; *Hook*, 2025 WL 2720978, at *5.  In *Crook*, the plaintiff, Crook, commented on a social media post about Mr. Kirk: "He is a terrible human being . . . terrible.  I do not wish death on anyone, but he is [sic] him not being here is a blessing."  Crook

15

Order at 3.  Crook was then placed on administrative leave and given notice she may be terminated. In justifying this adverse action, defendants alleged that "the district received '111 emails and 140 phone calls,' the vast majority of which originated from parents 'asking for Crook's termination or requesting that children be removed from Crook's class.'"  Even so, the court found that the school district had "not produced sufficient evidence to demonstrate that Crook's speech had an adverse impact on the operations of the District," as "mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." *Id.* at *10 (citing *Lindsey v. City of Orrick*, 491 F.3d 892, 899 (8th Cir. 2007)).  The *Crook* court reasoned that denying Crook's motion on "such vague and conclusory concerns runs the risk of constitutionalizing a heckler's veto." *Id.* (citing *Melton v. City of Forrest City, Ark.*, 147 F.4th 896, 903 (8th Cir. 2025) (discussing that outsider complaints that have no actual effect on government workplaces are insufficient to demonstrate disruption)).

Similarly, in *Hook*, the plaintiff was disciplined for his Facebook post, stating in part, "I have no thoughts or prayers for this hate spreading Nazi." *Hook*, 2025 WL 2720978, at *1.  The court found that "the hundreds of calls and messages" Defendants alleged they received speaking "negatively regarding the comment or calling for the removal of Professor Hook" did not constitute evidence that Hook's "speech had an adverse impact on the efficiency of the University's operations." *Id.* at *10.

In sum, without sufficient evidence of actual disruption from the speech itself, an employee's free speech rights plainly trump the employer's purported interests in promoting workplace efficiency.  *See also Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise"); *Beckerman v. City of Tupelo*, 664 F.2d 502, 509–10 (5th Cir. 1981) ("In almost every

instance it is not acceptable for the state to prevent a speaker from exercising his constitutional rights because of the reaction to him by others.").

Likewise, the speech interests of Texas AFT's members outweigh the TEA's interest in preventing disruptions in the school system. Texas AFT's member's speech caused no actual disruption in schools or interference with Texas AFT members' ability to work, nor did their speech interfere with the harmony among co-workers. In some instances, the complaints about educators' social media posts did not even come from anyone affiliated with their schools. In at least one case, a Texas AFT member's principal went so far as to inform the Texas AFT member that the principal did not see a problem with the member's posts, but felt the principal had to refer the teacher for investigation in order to comply with the TEA Policy. *See* ECF No. 1, ¶ 43. It is clear that the only disruption to the school systems came not from the teachers' speech but from the unconstitutional witch hunt and disciplinary proceedings launched by the TEA itself.

        **d)**      **The Speech of the Affected Texas AFT Members Motivated the Adverse Actions Taken by Their Employers.**

In each example cited above, the AFT member was explicitly told the adverse action taken against them was a result of their social media posts about Mr. Kirk. *See supra* at 5-6. Further, the adverse actions in all the cases were taken in close temporal proximity to the members' social media posts about Mr. Kirk, which demonstrates that the adverse actions were motivated by the members' constitutionally-protected speech.

        **3.**      **Texas AFT Members' Speech Does Not Incite Violence.**

Importantly, Texas AFT members' speech did not incite violence, and therefore does not forfeit its constitutionally protected status. Texas Governor Greg Abbott addressed Texas AFT's lawsuit at a recent campaign stop, claiming that Texas did not need people "inciting violence

against humans in the United States of America" to be "educating our students."[4]  Without offering a single example to support this allegation, Governor Abbott's reasoning is inapplicable to the facts of this case.

It is true that incitement of violence is not protected speech under the First Amendment. *See Brandenburg v. Ohio*, 395 U.S. 444 (1969).  However, in order for speech to be considered incitement, it must meet "the stringent bar for words intended to produce, and likely to produce, imminent disorder."  *Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023) (holding that a Facebook post joking about committing terrorist actus during the COVID-19 pandemic was constitutionally protected speech); *Noto v. United States*, 367 U.S. 290, 297-98 (1961) (reasoning that incitement cannot be "abstract" or "theoretical"; there must be "some substantial direct or circumstantial evidence of a call to violence" such that the speaker is "preparing a group for violent action and steeling it to such action"); *see also Hess v. Indiana*, 414 U.S. 105, 109 (1973).  The speech of Texas AFT members disciplined under the TEA policy comes nowhere close to this stringent standard.  Their speech cannot be considered "incitement of violence" and remains protected under the First Amendment.

### B.    Texas AFT Will Suffer Irreparable Harm Absent Injunctive Relief.

Texas AFT has met its burden of showing irreparable harm resulting from deprivation of its members' First Amendment rights.  A showing of irreparable harm requires a demonstration of "harm for which there is no adequate remedy at law."  *Daniels Health Scis., L.L.C.  v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  In cases implicating the First Amendment, courts assume irreparable

---

[4] Bo Evans, *Texas Teachers Union Sues Texas Education Agency Over Discipline Tied to Charlie Kirk Posts*, CBS News (Jan. 6, 2026), https://www.cbsnews.com/texas/news/texas-teachers-union-sues-texas-education-agency-over-discipline-tied-to-charlie-kirk-posts.

injury because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"); *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, 2016 WL 3766121, at *44 (N.D. Tex. June 27, 2016) ("The chilling of speech protected by the First Amendment is in and of itself an irreparable injury.").

Texas AFT's members have already suffered irreparable harm, including disciplinary actions taken against them, being referred for and subjected to investigations by TEA, and receiving black marks on their employment records for expressing their political views as private citizens. The TEA Policy also continues to have a chilling effect on the exercise of Texas AFT members' constitutional rights, thereby causing Texas AFT's members irreparable injury each day it remains in effect. There is no adequate remedy at law for the violation of the constitutional rights of Texas AFT and its members. Unless the requested injunctive relief is granted, Texas AFT members will continue to suffer irreparable harm.

## C.    The Balance of Equities and Public Interest Weigh in Favor of Granting Injunctive Relief.

The injury to Texas AFT outweighs any harm the injunction might cause to the Defendants, and the public interest favors granting said relief. In cases where the government is the opposing party, courts have held that the "balance of the equities" and "the public interest" factors "merge" together and are analyzed as one. *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298. The public interest and balance of equities thus decisively favor enjoining the TEA in order

19

to prevent infringement upon Texas AFT's members' First and Fourteenth Amendment rights.  By contrast, neither Defendants nor the public have a legitimate interest in the enforcement of an unconstitutional policy.  *See United States v. Texas*, 719 F. Supp. 3d 640, 699 (W.D. Tex. 2024); *Fund Texas Choice v. Paxton*, 658 F. Supp. 3d 377, 415 (W.D. Tex. 2023).

### III.    No Bond Should Be Required.

"[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,'" and the court "'may elect to require no security at all.'" *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996) (citations omitted).  Because this case concerns constitutional freedoms and Defendants will not suffer monetary harm from any preliminary injunction, Texas AFT respectfully requests that the Court require no bond.

### CONCLUSION

For the foregoing reasons, Plaintiff Texas AFT respectfully requests that the Court preliminarily enjoin Defendants from enforcing the TEA Policy in any manner, which would include suspending all investigations referred to TEA following the TEA Policy's publication related to posts regarding Mr. Kirk, and grant such additional relief that the Court finds just and proper.

Dated: January 26, 2026                    Respectfully submitted,

/s/ *Karima Maloney*
Karima Malone
Texas Bar No. 24041383
Allison Standish Miller
Texas Bar No. 24046440
Alexander M.  Wolf
Texas Bar No. 24095027
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Fax: (713) 221-2320
kmaloney@steptoe.com
amiller@steptoe.com
awolf@steptoe.com

Ida Adibi (*admitted pro hac vice*)
Kylie Clouse (*admitted pro hac vice pending*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
iadibi@steptoe.com
kclouse@steptoe.com

Manuel Quinto-Pozos
Texas Bar No. 24070459
DEATS DURST & OWEN PLLC
2901 Bee Caves Road, Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Fax: (512) 474-7896
mqp@ddollaw.com

*Counsel for Plaintiff Texas American*
*Federation of Teachers*

## CERTIFICATE OF CONFERENCE

Plaintiff files this Motion before counsel for Defendants have appeared, but will promptly send them a copy and seek their position on the requested relief once that occurs.

*/s/ Karima Maloney*
Karima Maloney


## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above document will be served on Defendants via personal service at the same address that service was completed for the Complaint. Additionally, a true and correct copy of the above was served via the CM/ECF system to all counsel of record on the 26th day of January 2026.

*/s/Karima Maloney*
Karima Maloney