## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **TEXAS AMERICAN FEDERATION OF TEACHERS,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO. 1:26-cv-00024** |
| **MIKE MORATH, in his official capacity as Commissioner of the Texas Education Agency,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff Texas American Federation of Teachers ("Texas AFT"), on behalf of its membership, brings this action against Defendant Commissioner Mike Morath in his official capacity ("Mr. Morath") and requests relief from this Court based on the following:

## I.    INTRODUCTION

1.    Texas AFT brings this action to challenge a sweeping and unconstitutional policy enacted by Mr. Morath on behalf of the Texas Education Agency (the "TEA") that weaponizes the State's investigative and licensing authority to silence public school educators' protected speech.  Under the TEA's Policy, Texas teachers who post on their personal social media accounts about a matter of public concern—Charlie Kirk's death—in a manner disfavored by Morath, now face the looming threat of state investigation and potential revocation of their licenses—

ending their careers as a result. TEA's Policy further encouraged superintendents to take matters into their own hands and discipline educators for "reprehensible," "vile" or "inappropriate" social media posts about Charlie Kirk, sending a threatening message to Texas educators that they will face punishment on multiple levels. The result of the TEA Policy is predictable and intentional: teachers are chilled from speaking on matters of public concern at all. This harm is ongoing. Texas AFT brings this action to restore educators' right of free expression, including expression that Mr. Morath may find disagreeable.

2.    Texas AFT is a labor union dedicated to promoting the rights and advancing the interests of its members, all of whom are focused on the critical, all-important goal of educating the children of Texas. Its membership is composed of approximately 66,000 public school teachers and other employees—including teachers' aides, custodians, bus drivers, and cafeteria workers—in districts throughout Texas.

3.    Texas AFT works both through union locals and on a statewide level, as well as through its national affiliate, the American Federation of Teachers, to secure better public school funding, improve employee benefits, and ensure safer schools for its members and their students, reflecting its members' commitment to creating a stable, quality learning environment for students. Texas AFT also provides professional development and other services that enhance both its members' and students' school and classroom experiences, as well as enriching its members' professional lives overall. Texas AFT's priorities reflect the interests of its members,

and it prioritizes protecting its members from patently unfair policies or infringement of their legal rights.

4.     Although public school teachers and other employees are public servants, they do not surrender their First Amendment rights simply by virtue of their employment, especially with respect to their activities as private citizens outside of the school environment.  More specifically, the First Amendment rights granted to all American citizens, including public school teachers and other employees, protect their ability to comment on current events through their personal accounts on social media platforms, which are outside of their school roles and their official school duties.  Unfortunately, recent actions taken by the TEA through Mr. Morath have violated these fundamental rights and chilled the protected speech of public school teachers and other Texas AFT members.

5.     On September 12, 2025, in the wake of the death of public figure Charlie Kirk, Mr. Morath sent a Policy Letter to all superintendents in the state targeting allegedly "reprehensible and inappropriate content on social media" posted by "*some*" Texas public school educators, without specifically identifying the allegedly inappropriate content.   Exhibit 1, TEA Policy from Mr. Morath, dated September 12, 2025 (the "TEA Policy") (emphasis added).  After recognizing that "the exercise of free speech is a fundamental right we are all blessed to share," Mr. Morath immediately contradicted himself and stated his intention to violate that right, explaining that he would refer any educators whose Kirk-related posts he personally

considered "vile" to the TEA's Educator Investigations Division. *Id.* Mr. Morath mandated superintendents across Texas do the same, directing as follows:

> If you are made aware of additional instances of inappropriate conduct being shared, it should be reported to the agency through TEA's Misconduct Reporting Portal.

*Id.* The TEA Policy suggested Mr. Morath's admiration for Charlie Kirk, but it failed to identify or define "inappropriate conduct," or provide any other guidelines or protections to ensure that the due process and free speech rights of educators are preserved and protected. Texas AFT members are subject to the TEA Policy.

6.      The TEA Policy further pressured superintendents of Texas's school districts to take disciplinary action against educators for posts critical of Charlie Kirk. Specifically, Mr. Morath, who wields tremendous oversight authority and influence over the districts, stated: "I commend the swift action taken by leadership of the districts that employ these educators [who made inappropriate posts]." Ex. 1. This language also sent a threatening message to educators that they can expect their districts to take disciplinary actions against them for social media posts labelled "inappropriate" or "reprehensible" by Mr. Morath and the TEA.

7.      Predictably, the TEA Policy disseminated by Mr. Morath quickly unleashed a wave of retaliation and disciplinary actions against teachers based on their First Amendment protected speech. Some superintendents echoed the TEA Policy, emailing their teachers and employees about the policy and stating that teachers who violated it would be investigated. The natural consequence of these investigations is having an investigation "flag" on, and eventually losing, a teaching license, which prevents affected educators from working in Texas public schools.

Publicly threatening Texas educators with such a consequence deters them from speaking publicly for fear of retaliation. Mr. Morath's letter thus has a chilling effect on AFT members' political speech, causing them to self-censor and withdraw from political discussion. The letter thus implicates a core First Amendment concern.

8.      Retaliation against Texas AFT members did not stop at investigations. As a result of Mr. Morath encouraging action to be taken against those who posted "vile," "reprehensible," or "inappropriate" content about Charlie Kirk, Texas AFT members have been placed on administrative leave, reprimanded, and even in some cases terminated for expressing their views about Mr. Kirk and other matters of public concern in social media posts made on their own time and using their own resources. One teacher was placed on the TEA's "Do Not Hire" list. These teachers were disciplined solely for their speech, without any regard to whether the posts disrupted school operations in any way. In many cases, Texas AFT members made their posts on online profiles or pages that are "private," and can be viewed only by individuals who have been specifically approved by the account owner.

9.      Consistent with the TEA's mandate contained in the TEA Policy, Texas AFT members have been referred to the TEA for investigation based on their social media posts. These investigations are performed by the TEA Educator Investigations Division, which determines if sanctions should be placed on an educator's credentials and whether or not educators are employable. TEA's Educator Investigations Division has the power to determine whether a public school educator is hireable and

its investigations can result in revocation of an educator's teaching certificate—or put another way, the destruction of a career in education.

10.     Further, because of the TEA Policy and Mr. Morath's actions, educators and other employees have come under immediate, vicious attack and doxxing, often by outsiders who do not live in the educator's district or have children at the educator's school, and in some cases are not even residents of Texas.

11.     For one Texas AFT member, Teacher 6, TEA placed a public flag on his teacher's certificate warning the public that he was under investigation for misconduct.  TEA further punished Teacher 6 by publicly listing him on the "Do Not Hire" registry as "under investigation by TEA based on allegations that [he] abused or was involved in an inappropriate relationship with a student or minor."  Teacher 6 was involved in no such activity.  These actions made Teacher 6 unemployable as a public school teacher and were taken in direct retaliation for his post on his private Instagram story, which condemned Mr. Kirk's public statements about how gun deaths in America were "worth it" to keep the Second Amendment.[1]

12.     As a result of the TEA Policy, and based on information and belief, over 350 public school teachers and other public school employees have been reported to and/or are under investigation by the TEA.  These investigations are not merely employer-driven internal investigations to determine misconduct, they are conducted by a third-party regulatory authority—the TEA—which has authority to seek

---

[1] *See* IT'S BEEN A MINUTE: *How do we talk about Charlie Kirk?,* (NPR, Sept. 12, 2025), https://www.npr.org/transcripts/nx-s1-5538464#:~:text=I%20think%20it's%20worth%20 to,It%20is%20rational.

sanctions against educators, recommend revocation of their teaching certifications necessary for continued employment, and take-over entire school district management. Simply being under investigation negatively impacts an educator's reputation, requires resource expenditures for legal representation, and can have lasting detrimental impacts on an employee's long-term employment prospects, even outside of the education arena.

13.    Texas AFT denounces violence in every form, whether it is children killed in mass school shootings or a public figure like Mr. Kirk being shot and killed. Free speech under the First Amendment, however, is a fundamental right in a democratic society, and nonviolent speech, even when others strongly disagree with it, is protected.

14.    The TEA Policy violates the First Amendment rights of Texas AFT members because it retaliates against who engage in protected expression, and because it is impermissibly vague, overbroad, viewpoint-based, and chills educators' protected speech. It also unlawfully encourages and coerces school district leadership to punish educators for protected expression. Texas AFT therefore brings this action to prevent and enjoin further infringement of these dedicated public servants' protected rights.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

16.    The Court has personal jurisdiction over Defendant because he is a resident of Texas, has his principal place of business in Texas, and the acts giving rise to Plaintiff's claims have occurred in, and continue to occur in, this judicial district.

### III.    PARTIES

17.    Texas AFT is a labor union representing over 66,000 teachers and non-administrative public school employees across the state.  In addition to employees of K-12 schools, Texas AFT also represents employees of higher education institutions and retired teachers.  Texas AFT is organized in accordance with the laws of the state of Texas.  As required of labor organizations representing public employees in Texas, Texas AFT does not claim the right to strike.  As a labor union, Texas AFT is committed to enforcing and protecting the employment rights of its members, who work hard to provide an education to the schoolchildren who attend Texas schools.  Further, among the purposes of Texas AFT is the improvement of public education in Texas, which is tied inextricably to the improvement of the working conditions and professional standing of teachers and other public school employees.  Thousands of Texas AFT members are aggrieved by the actions of the defendant, and Texas AFT brings this action on their behalf.  Texas AFT's primary business address is 1106 Lavaca Street, Suite 100A, Austin, Texas, 78701.  Texas AFT members are subject to the TEA Policy described above.  As a central part of its mission, Texas AFT advocates for and protects the legal rights of its members.  Texas AFT appears through its undersigned counsel.

18.     Defendant Mike Morath is the Commissioner of the Texas Education Agency ("TEA") and is sued in his official capacity.  He has been served with process at the Office of the Texas Education Agency, 1701 N. Congress Avenue, Austin, Texas 78701.  The TEA is the state agency that oversees primary and secondary public education in Texas.  The TEA's Educator Investigations Division is responsible for investigating reports of misconduct by educators, school staff, and service providers on behalf of the State Board for Educator Certification.  Mr. Morath is TEA's head and is responsible for enforcing its policies and mandates, including the challenged TEA Policy he issued on September 12, 2025.  Texas AFT seeks only declaratory and injunctive relief against Defendant Morath.  Texas AFT does not seek monetary damages from Defendant Morath.

## IV.     FACTUAL BACKGROUND

### The First Amendment Protects the Free Speech of All Americans

19.     The First Amendment guarantees the right to free speech for all Americans, protecting their ability to express opinions and engage in public conversation without fear of government retaliation.  These fundamental rights belong to everyone—including educators—and are not surrendered because of one's employment.  Public school teachers, like all citizens, retain their constitutional protections when speaking in a personal capacity, including on their personal social media accounts.  When they express themselves as private individuals, they are engaging in the same protected activity afforded to every member of the public, even if their views may be disfavored by government actors.

## The Death of Charlie Kirk

20.     Tragically, on September 10, 2025, political commentator Charlie Kirk was shot and killed while addressing an audience at Utah Valley University in Orem, Utah.

21.     Traditional media outlets and social media platforms erupted with news of the event and reactions to it, including highly charged discussions concerning political violence and the life and work of Mr. Kirk.  Some of that discussion focused on the controversial statements he made throughout his life, which created large groups of both supporters and detractors across the political spectrum.  Although Mr. Kirk described himself as a passionate proponent of First Amendment rights, individuals who, after Mr. Kirk's death, publicly expressed their belief that some of his statements were offensive were met with online harassment and hostility.  This backlash extended to public school educators who, on their own time, posted about the event on their personal social media accounts, and who suffered professional consequences as a result.

## Mr. Morath and the TEA

22.     Mr. Morath, as Texas's Commissioner of Education, is "the educational leader of the state."  Tex. Educ. Code § 7.055(b)(1).  He is the "executive officer" of TEA.  *Id.* at § 7.055(b)(2).  State law gives Mr. Morath the authority to "delegate ministerial and executive functions to agency staff and may employ division heads and any other employees and clerks to perform the duties of the agency."  *Id.* at

§ 7.055(b)(5).    TEA's multiple divisions report to Mr. Morath in his role as Commissioner of Education.[2]

23.    As the "educational leader of the state," Mr. Morath is empowered to "authorize special investigations to be conducted" in response to complaints and as he "otherwise determines necessary."  Tex. Educ. Code § 39.003.  Mr. Morath may then decide to impose sanctions on school employees or districts, including appointing a conservator to "oversee the operations of a school district."  *See id*. § 39A.003.  In other words, superintendents who disregard the Commissioner's directives risk losing control of their districts' operations.

24.    One of the TEA's divisions is Educator Investigations, which conducts investigations of teachers reported for misconduct.  Educator Investigations is within TEA's "Office of Governance," which itself reports directly to Mr. Morath.  *See* TEA Organizational Chart cited at fn. 2, *supra*.  Based on TEA's investigation, the State Board of Educator Certification ("SBEC") may take disciplinary action against TEA certificate holders as specified by 19 TAC 249.14(a), including reprimanding, suspending, or revoking (permanently or for a period of time) an educator's certificate. 19 Tex. Admin. Code § 249.15(a) & (c).

### The TEA Policy

25.    In a clear reaction to online views critical of Mr. Kirk, on September 12, 2025, Mr. Morath sent a letter (again, the "TEA Policy") to all Texas public school

---

[2] *See* TEA's December 1, 2024, Agency Organizational Chart, available at https://tea.texas. gov/about-tea/tea-agency-org-chart.pdf (last visited March 2, 2026) ("TEA Organizational Chart").

district superintendents requiring that school districts report employees making certain First Amendment-protected statements for investigation.  The TEA Policy stated, in relevant part:

> TEA has been made aware of some Texas public school educators that have posted and/or shared reprehensible and inappropriate content on social media related to the assassination of Charlie Kirk. . . .  In response to such posts, I am referring all documentation of educators that have proliferated [sic] such vile content to TEA's Educator Investigations Division.  Such posts could constitute a violation of the Educators' Code of Ethics. . . . If you are made aware of additional instances of inappropriate content being shared, it should be reported to the agency through TEA's Misconduct Reporting Portal.

Exhibit 1.

26.     In the Policy, Mr. Morath expressed his own viewpoint on Mr. Kirk's assassination, stating: "Mr. Kirk was a father and a husband, and tragically, his children no longer have their father, and his wife no longer has her spouse.  As a father and husband myself, and as someone devoted to the education of children, it is heartbreaking." *Id.*

27.     The TEA Policy thereby directed school district superintendents across the state to report employees who engaged in protected speech regarding Mr. Kirk for TEA misconduct investigation and signaled to administrators that they should take disciplinary actions against these educators too by "commend[ing] the swift action" of districts that had already done so. Indeed, as discussed below, one school district told a teacher who had made a post critical of Mr. Kirk that the district would lose funding if it failed to discipline him.   As a result, the TEA Policy unleashed an intense backlash against teachers across the state.  On information and belief, in a meeting held shortly after the policy was published, Mr. Morath threatened

disciplinary action against principals and superintendents who failed to comply with the TEA Policy; encouraging administrators to weaponize the Educators' Code of Ethics against teachers who engaged in speech critical of Kirk.

28.     Importantly, requiring superintendents and principals to report teachers who post about Charlie Kirk is a misuse of TEA's Misconduct Reporting Portal.  According to the TEA's own website, principals are required to report the following "types of misconduct *involving a student or minor*": physical abuse; threats of violence; romantic or sexual relationships; and inappropriate communication or boundary violations.[3]

29.     After Mr. Morath's call for retaliation against teachers who shared "inappropriate content" about Mr. Kirk, Texas school districts referred Texas AFT members to TEA for investigation and began to discipline them for social media posts regarding Mr. Kirk's death made on both public accounts and private accounts, where viewers must be specifically approved by the account owners.

30.     Based on public reporting, more than 350 teachers have been reported for investigation, and are pending investigation by TEA as a result of the TEA Policy's directive.

31.     Texas AFT is still learning of the harms experienced by its members across the state, including scores of members whose speech has been chilled by Mr. Morath's threats and the punitive actions taken against their colleagues for

---

[3] *Educator Misconduct & Investigations*, TEX. ED. AGENCY, https://tea.texas.gov/texas-educators/investigations/educator-misconduct-investigations (last visited Feb. 23, 2026).

expressing views critical of Mr. Kirk in contradiction to Mr. Morath's views. The following are examples of the harms suffered by Texas AFT members who were directly and adversely affected by the unconstitutional policy pushed by the TEA:

### Teacher 1

32.     Teacher 1 is a member of Texas AFT, and until recently served as a high school English teacher in an independent school district near Houston. Teacher 1 has served as a teacher for twenty-seven years.

33.     On the day of Mr. Kirk's death, Teacher 1 posted questions on her public Facebook page prompting a debate about the assassination of Mr. Kirk and her viewpoint that karma played a role in his death.

34.     The following morning, Teacher 1's school administration placed her on administrative leave. At no point did Teacher 1's post result in any disruption to school operations.

35.     The following week, after the TEA Policy was published, a human resources representative told Teacher 1 that the school district planned to refer her to the TEA for an ethics violation.

36.     Shortly thereafter, at its monthly board meeting, the local school board opened the floor for public comments on whether to fire Teacher 1 for her statements about Mr. Kirk. Community members offered comments on whether Teacher 1 should be terminated. After more than two hours of closed session, the school board terminated Teacher 1 for her statements, but without a majority of school board members supporting her termination. Of the seven members of the board, five abstained from the vote and two voted in favor of the motion to fire Teacher 1. After

weeks of unemployment, Teacher 1 settled her claim for wrongful termination with the school district.

## Teacher 2

37.     Teacher 2 is a member of Texas AFT.  He is a middle school United States history teacher in an independent school district in the San Antonio area. Teacher 2 has been a teacher for sixteen years.  Teacher 2 is a U.S. Army veteran and a celebrated educator who previously received the "Teacher of the Year" award in his school district.

38.     After Mr. Kirk's death, Teacher 2 made multiple posts on his private Facebook page criticizing Mr. Kirk for his statements against Black Americans and noting the public's lack of outrage for other acts of violence.  No administrators, students, or teachers from Teacher 2's school were "friends" on his Facebook account.

39.     Teacher 2 deleted his Facebook posts after the TEA Policy was published for fear of punishment from the TEA and his school district.  His posts regarding Mr. Kirk did not result in any disruption to school operations.

40.     Despite removing the posts, Teacher 2's principal contacted him to let him know the principal had received a report regarding the Facebook posts.  The principal told Teacher 2 that the principal did not think Teacher 2 had done anything wrong, but wanted Teacher 2 to be aware of the complaint.

41.     Later that week, Teacher 2 was directed to report to the Human Resources Department of his district to discuss his posts.  Teacher 2 was accompanied by his local AFT Chapter President.  During this meeting, the Employee Relations

personnel referenced Mr. Morath's letter and stated the meeting was required to comply with the TEA Policy.

42.     As directed by the TEA Policy, the school district then referred Teacher 2 to the TEA for disciplinary investigation.

43.     Teacher 2 did not hear anything from the TEA about his posts until two weeks after Texas AFT filed its original Complaint in this action, when he was notified that he was under formal investigation for failing to comply with laws or school policies.  The letter also informed Teacher 2 that an investigation notice would be publicly placed on his online certification record.  After weeks of investigation, the TEA informed Teacher 2 that its investigation was concluded.  The damage had been done, however; Teacher 2's speech—along with his desire to engage in further protected speech—was chilled.

## Teacher 3

44.     Teacher 3 is a member of Texas AFT.  She is also a high school ESL teacher in an independent school district near San Antonio.  This year marks her second year of teaching.

45.     Shortly after Mr. Kirk's death, Teacher 3 commented on a viral TikTok post from her public account, criticizing Mr. Kirk's stance on immigration.

46.     An X (formerly Twitter) user posted screenshots of Teacher 3's comment, along with Teacher 3's TikTok profile, a photo of Teacher 3, a screenshot of Teacher 3's school directory, and Teacher 3's LinkedIn page, calling for her to lose her job.  On information and belief, the X user is not a parent or community member of Teacher 3's school district.

16

47.     The next day, Teacher 3's principal informed her that human resources wanted to speak with her.  The principal said that she did not think this was "right," but it was necessary that Teacher 3 meet with human resources.

48.     During the meeting with human resources, a human resources representative asked Teacher 3 to explain her post about Mr. Kirk and other reposts to her social media quoting Martin Luther King, Jr., and James Baldwin.  Teacher 3 was also told that her posts violated the school social media policy and that as required by TEA, the school district would report her to TEA for investigation.

49.     As of the date of this filing, Teacher 3's posts have not resulted in any disruption to school operations.  Indeed, she has been teaching students while she awaits the outcome of TEA's investigation.

### Teacher 4

50.     Teacher 4 is a member of Texas AFT.  She is a second-grade teacher in an independent school district near San Antonio.

51.     Teacher 4 posted several comments on social media criticizing the amount of public mourning for Mr. Kirk's death compared to the public mourning of children killed in school shootings.  Teacher 4 also criticized Mr. Kirk's controversial statements about people of color, immigrants, and women.  Teacher 4 later deleted these posts, as well as other political posts, after she heard that Mr. Morath was planning to issue a policy regarding social media use and Mr. Kirk.

52.     On September 13, 2025, Teacher 4's principal received a phone call from a senior executive from the school district, notifying him that Teacher 4 had made

17

several social media posts regarding the assassination of Mr. Kirk and that she was under investigation.

53.    On September 15, 2025, the principal spoke with Teacher 4 about the posts and referenced the TEA Policy.  During this conversation, Teacher 4 told the principal that she had deleted the posts.

54.    On September 30, 2025, the principal issued Teacher 4 a written reprimand titled "Memorandum of Expectation," which explicitly referenced the TEA Policy.  The written reprimand further stated: "Beginning immediately, you are to comply with the following administrative directives: As an employee, you are expected to conduct yourself in a professional and ethical manner.  This is to include inappropriate postings on social media as you are representing yourself as an educator of the District."

55.    The reprimand warned Teacher 4 that "failure to follows these directives may result in further disciplinary action, including and up to termination" and that this "documentation may also be considered cumulative data for any future incidents."  The principal's use of the phrase "cumulative data," found in 19 Tex. Admin. Code § 150.1003, indicates the principal may factor this incident in Teacher 4's annual appraisal.

56.    Following these interactions with human resources, Teacher 4 removed all political posts from her social media, fearful of further reprisal such as the TEA placing a flag on or even revoking her certification.

57.     As of the date of this filing, Teacher 4 remains teaching in her classroom and her posts regarding Mr. Kirk have not resulted in any disruption to school operations.

**<u>Teacher 5</u>**

58.     Teacher 5 is a member of Texas AFT.  She is a high school math teacher in an independent school district near Dallas.

59.     Shortly after Mr. Kirk's death, Teacher 5 made two posts on her personal, private Facebook account criticizing Mr. Kirk for his controversial statements about marginalized groups.

60.     None of Teacher 5's students or their parents had access to Teacher 5's Facebook posts at the time.  Teacher 5's posts did not impede her ability to perform her job duties.

61.     Teacher 5 was put on administrative leave on September 15, 2025, while her school investigated her posts.  Teacher 5 was out of the classroom for nine workdays.

62.     On September 24, 2025, Teacher 5 received a written reprimand from her principal that referenced the Educator Code of Ethics.  When Teacher 5 received the reprimand, the human resources representative told her that he did not believe her posts negatively impacted her work at school, but conveyed that HR needed to investigate.

63.     When Teacher 5 returned to work, she learned that her colleagues thought she had been put on leave because she engaged in misconduct with a

student—likely of a sexual nature—because that is the typical reason why an educator is placed on leave for such an extended period.

64.    Teacher 5's school reported her to the TEA, and in that report, her written reprimand is referenced.

65.    After this experience, Teacher 5 uninstalled Facebook from her phone, and refrains from posting anything political on social media.  She feels like she does not have the security to share her opinions online without facing professional consequences.

**Teacher 6**

66.    Teacher 6 is a member of Texas AFT.  He is a middle school art teacher in an independent school district near Houston.  In his five years as a teacher, he has never been disciplined.

67.    On the evening of Mr. Kirk's death, September 10, 2025, Teacher 1 reposted on his private Instagram story an article highlighting a statement by Mr. Kirk, in which Mr. Kirk asserted, "I think it is worth [it] to have a cost of, unfortunately, some gun deaths every single year, so that we can have the Second Amendment to protect our other God given rights."

68.    On Friday, September 12, 2025, the same day the TEA Policy was issued, Teacher 6 was removed from teaching, placed on paid leave, and informed that his post was being investigated.  At no point did Teacher 6's post result in any disruption to school operations.

69.    The following Monday, September 15, 2025, Teacher 6 was called into a meeting to discuss the investigation, which had only begun the prior business day.

During the meeting, a human resources representative informed Teacher 6 that the superintendent recommended his termination, citing the TEA Policy. Teacher 6 was told that if the school district did not comply with the TEA Policy, it would lose funding.

70.    The termination letter that Teacher 6 received accused him of "condon[ing], if not celebrat[ing] the recent assassination of a political activist." This was cited as the reason for his termination.

71.    TEA placed a flag on Teacher 6's Texas Educator Certificate, stating that "[t]his individual is currently under review by the TEA Educator Investigations Division." Such a flag effectively prevents teachers from seeking any other public teaching jobs within the State of Texas.

72.    Teacher 6 was also placed on the TEA's "Do Not Hire" registry as "under investigation by TEA based on allegations that the individual abused or was involved in an inappropriate relationship with a student or minor" for months, despite never engaging in inappropriate conduct with a student. While on the Do Not Hire Registry listed for this serious and likely criminal type of conduct, Teacher 6 understood that he was not hireable as a public school teacher in Texas.

73.    As of the date of this filing, Teacher 6's employment has been reinstated and he has been removed from the Do Not Hire Registry. Aa a result of these punishments, however, his speech remains chilled, and he is fearful that engaging in further political speech online could again result in his termination or revocation of his teaching certificate.

## V.     CAUSES OF ACTION

**Count I: 42 U.S.C.  § 1983, Violation of Free Speech Under the First and Fourteenth Amendments to the U.S.  Constitution—Facial Challenge**

74.     Plaintiff realleges all paragraphs above.

75.     Defendant is a state actor operating under color of state law.

76.     Citizens have a vital interest in free and open discussion on issues of public interest and importance.  The TEA Policy violates the First and Fourteenth Amendments of the U.S.  Constitution.

### i.     Impermissible Restriction on Public Employee Speech

77.     The First and Fourteenth Amendments to the U.S. Constitution prohibit state policies that infringe on public employees' speech when employees speak as private citizens on matters of public concern.  If a policy arguably infringes on these rights, the state actor must establish that its interest in an effective and efficient workplace outweighs those rights.

78.     The TEA Policy, on its face, violates the First and Fourteenth Amendment rights of Texas AFT members.  The Policy does not ask superintendents to assess such posts' impact on the school environment before requiring them to launch an investigation.  Instead, it includes a blanket mandate that schools report school employees for disciplinary investigations and it threatens adverse actions against all Texas public school personnel who, as private citizens, express viewpoints on their personal social media pages that the TEA deems "inappropriate" with respect to a matter of public concern—the assassination of a public figure.

22

79.    The possibility of being investigated by the TEA, and facing the risk that such an investigation will result in the revocation of one's teaching license, would deter any educator of ordinary firmness from engaging in protected speech.  When the natural consequence of an investigation is potential to lose one's livelihood, educators cannot be reasonably expected to speak freely.  Instead, the looming threat of losing one's license creates a powerful chilling effect, discouraging teachers from participating in the public conversation regarding Mr. Kirk's death and other politically charged matters.

80.    Moreover, the TEA Policy is an unconstitutional viewpoint-based restriction on speech, specifically targeting expressions with which the TEA Commissioner disagrees.  For example, Mr. Morath did not issue similar letters with respect to teachers or other school personnel who posted about the assassinations of Democratic Minnesota lawmakers Melissa Hortman or John Hoffman in July 2025. Instead, the TEA appears to mandate investigations only for school personnel voicing criticism of the Commissioner's preferred political figure.  Indeed, Mr. Morath is well familiar with teachers' First Amendment rights; in 2019, he acknowledged and affirmed those rights when he overturned the termination of a teacher on First Amendment grounds.  That teacher had been fired for her Twitter post, directed at President Trump's Twitter account, requesting the removal of "illegal students" from the school district.

### ii.    Overbreadth

81.    The First and Fourteenth Amendments to the U.S. Constitution prohibit state policies that are overbroad such that they punish a substantial amount of protected speech in the course of regulating unprotected speech.

82.    The TEA Policy mandates that superintendents report any "additional instances of inappropriate content" shared by their teachers and other school personnel on social media about Mr. Kirk's death to the TEA's Educator Investigations Division.  While this Policy may appropriately restrict some speech that could conceivably create a substantial disruption to the learning environment, it is overbroad because it also targets a wide swath of constitutionally protected speech that has no impact on school operations in violation of the First and Fourteenth Amendments.  Further, the policy fails to define or describe what is meant by "inappropriate content."

83.    This overbreadth unconstitutionally chills teachers and other school personnel from engaging in protected expressive activity.  As a result of the TEA policy, numerous members of Texas AFT deleted their social media posts of a political nature.  Members remain fearful about sharing their opinions on matters of public concern—whether online or in person—if their viewpoints do not seemingly align with the Texas State government.

### iii.    Vagueness

84.    The First and Fourteenth Amendments to the U.S.  Constitution also prohibit state policies that are so impermissibly vague that an ordinary person would

not understand what conduct the policy prohibited or that are so standardless as to invite arbitrary enforcement.

85.    The TEA Policy's language labeling posts as "reprehensible" and "vile" and mandating that superintendents report "additional instances of inappropriate content" shared by their teachers or other school personnel about Mr. Kirk's death is so vague and open to varying interpretations that it has invited arbitrary and inconsistent enforcement, with some teachers and other school personnel who are referred for investigation and some who are not.  For similar posts, some teachers have received warnings while others were terminated.  The TEA Policy thereby fails to provide Texas AFT's members with adequate notice of their rights and obligations in violation of the First and Fourteenth Amendments.

86.    This vagueness unconstitutionally chills teachers and other school personnel from engaging in protected expressive activity.  As a result of the TEA policy, numerous members of Texas AFT deleted their social media posts of a political nature.  Members remain fearful about sharing their opinions on matters of public concern—whether online or in person—if their viewpoints do not seemingly align with Mr. Morath.

### iv.    Viewpoint Discrimination

87.    The First and Fourteenth Amendments to the U.S. Constitution prohibit state policies that discriminate on the basis of the speaker's viewpoint without satisfying strict scrutiny.

88.     In the TEA Policy, Mr. Morath takes a clear favorable position on Mr. Kirk, praising him as "a father and a husband" and describing his death as "heartbreaking."

89.     In targeting only speech unlike his own that is critical of Mr. Kirk—what Mr. Morath has characterized as "reprehensible and inappropriate content … related to the assassination of Charlie Kirk"—the TEA Policy restricts the constitutionally protected speech of Texas AFT members based on viewpoint and is not narrowly tailored to serve a compelling state purpose.

90.     Moreover, the TEA Policy is an unconstitutional application of the Educator's Code of Ethics because it calls for use of the Code to target speech of a specific viewpoint, again without a compelling government purpose.

**v.      Impermissible Chilling of Speech**

91.     Texas AFT members have a constitutionally protected right to voice their opinions about a public figure, both critical and complimentary.

92.     When speaking on matters of public concern like the death of Mr. Kirk, Texas AFT members have a right to present their opinions in the way they choose, including in ways that others, like Mr. Morath, might find disagreeable or even offensive.

93.     Mr. Morath's threats to investigate members who engage in speech that Mr. Morath characterizes as "reprehensible and inappropriate" are designed to silence Texas AFT members' criticisms or change the content of their speech to make it less critical, disagreeable, or offensive.

94.    TEA investigations are intended and publicly known to address serious and potentially criminal misconduct involving minors, including physical abuse, threats of violence, romantic or sexual relationships, and inappropriate communication or boundary violations.

95.    Texas educators under investigation by the TEA are also listed on TEA's website, meaning affected educators can be publicly associated with the stigma attached to misconduct involving minor children—all because they engaged in protected speech that Mr. Morath disfavors.

96.    This reputational harm, in addition to the real risk of losing one's teaching certificate as a result of the TEA investigation, creates a substantial chilling effect on Texas AFT members who want to engage in constitutionally-protected speech on politically charged matters of public concern. Doing so, however, would reasonably subject these educators to further threats and implementation of previous threats by Defendant.

97.    The risk of future threats and the implementation of previous threats is substantial.

98.    By chilling Texas AFT members' freedom of speech, Mr. Morath, under color of law, violated and continues to violate Texas AFT members' free speech rights under the First and Fourth Amendments of the United States Constitution.

vi.    **Encouraging and Directing School Districts to Take Action Against Educators Posting "Inappropriate Content"**

99.    Not only did the TEA Policy directly weaponize the TEA's investigative process against educators engaging in political speech of which Mr. Morath

disapproved, the TEA Policy also unconstitutionally directed and encouraged school districts to punish teachers who posted content critical of Mr. Kirk.

100. The TEA's directive to school districts was clear. Additional instances of "inappropriate content . . . should be reported to the agency through the TEA's Misconduct Reporting Portal." Furthermore, the TEA Policy "commend[s] the swift action taken by district who employ these educators," thus encouraging districts themselves to target teachers whose speech Mr. Morath found "inappropriate."

101. This type of "jawboning," where a state actor encourages or coerces another party to punish or censor speech, violates the First Amendment. The Constitution does not allow the State to indirectly—through another party—censor speech any more than it allows the State to do so directly. As discussed above, the TEA wields immense power over school districts, up to and including the power to appoint a conservator to oversee a non-compliant district. Thus, any district that ignores the TEA Policy does so at its own peril.

102. Here, the TEA Policy has both encouraged and coerced school districts into punishing educators. The TEA Policy has a close nexus with the school districts' actions—indeed, as alleged above, school districts have referenced the TEA policy in disciplining AFT members.

103. The TEA Policy's tone—which described the targeted content as "inappropriate," "vile," and "reprehensible," made clear that the First Amendment does not provide "carte blanche," and told school districts that they "should" report teachers—cannot be described in any way other than coercive. In light of the TEA's

extensive regulatory authority, school districts reasonably understood this as a threat—even to the extent that they could lose funding. By encouraging and coercing school districts to censor the speech of their employees, the TEA Policy violates the First and Fourteenth Amendments.

### Count II: 42 U.S.C. § 1983, Violation of Free Speech Under the First and Fourteenth Amendments to the U.S. Constitution—As Applied Challenge

104.    Plaintiff realleges all paragraphs above and specifically realleges the legal theories in Paragraphs 77-103.

105.    Defendant is a state actor operating under color of state law.

106.    The First and Fourteenth Amendments prohibit government employers from taking adverse action against their employees for protected speech. The Constitution protects public employees' right to speak freely about matters of public concern unless the government can demonstrate that the employer's interest in an effective and efficient workplace outweighs the employee's First Amendment rights.

107.    Texas AFT members engaged in constitutionally-protected speech when they spoke as private citizens on their personal social media pages on a matter of public concern—the assassination of a public figure who sought a public forum to engage in what he consistently stated was protected First Amendment speech. Plaintiff's members' speech, which was also protected, did not create any known disruption to their places of employment or impede their employers' ability to maintain an efficient and effective workplace—at least until the TEA Policy went into effect.

108.    Additionally, Plaintiff's members' speech did not sow, encourage, or incite violence in any way.

109.    At the direction of the TEA, Plaintiff's members were subject to adverse actions for their protected speech.  As a result of expressing viewpoints Mr. Morath deemed in vague terms "reprehensible and inappropriate," Texas AFT members have been referred for investigations that may result in sanction or revocation of their certifications, issued verbal and written reprimands, placed on administrative leave, threatened with future termination if they continued to engage in protected speech, and at least one member was terminated.

110.    Members also deleted their posts and closed their social media accounts for fear of being disciplined, demonstrating the true chilling effect the TEA Policy has had on the constitutionally protected speech of Texas AFT members.

111.    Mr. Morath's publication of the Policy also pressured superintendents and principals to report teachers and other school personnel who had posted about Mr. Kirk's death, which similarly chilled the constitutionally protected speech of Texas AFT members.

112.    The TEA Policy violates the First and Fourteenth Amendments to the U.S. Constitution as applied to Plaintiff because Defendant has denied AFT members' right to speak, discriminated against their viewpoints and expression of their viewpoints, and retaliated against them for the exercise of their right to speak about their viewpoints on a matter of public concern.

**Irreparable Harm**

113.   As a result of the unconstitutional TEA Policy, Texas AFT's members have already suffered irreparable harm, including disciplinary actions taken against them, being referred for and subjected to investigations by TEA, and receiving permanent black marks on their employment records for their purely private viewpoint expression.  There is no adequate remedy at law for the violation of the constitutional rights of Texas AFT and its members.  Unless the requested injunctive relief is granted, Texas AFT members will continue to suffer irreparable harm.

114.   The TEA Policy has a chilling effect on the exercise of Texas AFT members' constitutional rights.  The TEA Policy thereby causes Texas AFT members irreparable injury each day it is in effect.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and issue the following forms of relief:

a.    A permanent injunction[4] enjoining Defendant from enforcing the TEA Policy in any manner; compelling Defendant to retract the Policy; compelling Defendant to terminate all investigations referred to TEA following the Policy's publication related to posts regarding Charlie Kirk; and compelling Defendant to issue a new letter advising superintendents that the TEA does not require reports to the Misconduct Reporting Portal regarding the conduct targeted in the TEA Policy;

b.    A declaratory judgment under 28 U.S.C. § 2201(a) holding that the TEA Policy is unconstitutional, void, and of no effect;

---

[4] Plaintiff has filed a separate motion for a preliminary injunction and requested a preliminary injunction hearing. ECF No. 12.

    c.      An award of Plaintiff's attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

    d.      Any such other or further relief as is necessary, proper, and just under the circumstances.

DATED: March 2, 2026               Respectfully submitted,

                                       /s/ *Karima Maloney*
                                       Karima Maloney
                                       Texas Bar No. 24041383
                                       Allison Standish Miller
                                         Texas Bar No. 24046440
                                       Alexander M. Wolf
                                       Texas Bar No. 24095027
                                       STEPTOE LLP
                                       717 Texas Avenue, Suite 2800
                                       Houston, TX 77002
                                       Telephone: (713) 221-2300
                                       Fax: (713) 221-2320
                                       kmaloney@steptoe.com
                                       amiller@steptoe.com
                                       awolf@steptoe.com

                                       Ida Adibi (*admitted pro hac vice*)
                                       Kylie Clouse (*admitted pro hac vice*)
                                       STEPTOE LLP
                                       1330 Connecticut Avenue, NW
                                       Washington, DC 20036
                                       Telephone: (202) 429-3000
                                       Fax: (202) 429-3902
                                       iadibi@steptoe.com
                                       kclouse@steptoe.com

                                       Manuel Quinto-Pozos
                                       Texas Bar No. 24070459
                                       DEATS DURST & OWEN PLLC
                                       2901 Bee Cave Road, Suite L
                                       Austin, TX 78746
                                       Telephone: (512) 474-6200
                                       Fax: (512) 474-7896
                                       mqp@ddollaw.com

                                       *Counsel for Plaintiff Texas American Federation of Teachers*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the above document was served via the CM/ECF system to all counsel of record on the 2nd day of March, 2026.

*/s/Karima Maloney*
Karima Maloney