## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **TEXAS AMERICAN FEDERATION OF TEACHERS,**<br><br>            **Plaintiff,**<br><br>**v.**<br><br>**MIKE MORATH, in his official capacity as Commissioner of the Texas Education Agency,**<br><br>            **Defendant.** | **CIVIL ACTION NO. 1:26-cv-00024-ADA** |

### PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION

Karima Maloney
Texas Bar No. 24041383
David Isaak
Texas Bar No. 24012887
Allison Standish Miller
Texas Bar No. 24046440
Alexander M. Wolf
Texas Bar No. 24095027
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Fax: (713) 221-2320
kmaloney@steptoe.com
disaak@steptoe.com
amiller@steptoe.com
awolf@steptoe.com

Ida Adibi (*admitted pro hac vice*)
Kylie Clouse (*admitted pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
iadibi@steptoe.com
kclouse@steptoe.com

Manuel Quinto-Pozos
Texas Bar No. 24070459
DEATS DURST & OWEN PLLC
2901 Bee Caves Road, Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Fax: (512) 474-7896
mqp@ddollaw.com

*Counsel for Plaintiff Texas American Federation of Teachers*

## TABLE OF CONTENTS

Table of Contents ............................................................................................................ i

Table of Authorities ........................................................................................................ ii

Introduction ................................................................................................................... 1

Statement of Facts .......................................................................................................... 2

Argument ........................................................................................................................ 3

I.      Texas AFT Satisfies the Preliminary Injunction Standard. ................................ 3

    A.     Texas AFT Is Substantially Likely to Prevail on the Merits. ................................ 4

        1.    The TEA Policy Violates the First Amendment on its Face ...................... 4

            a)    The TEA Policy Is an Impermissible Restriction on Public Employee Speech. ................................................................................ 4

            b)    The TEA Policy Is Unconstitutionally Overbroad. ........................ 6

            c)    The TEA Policy Is Unconstitutionally Vague. ............................... 7

            d)    The TEA Policy Discriminates Based on Viewpoint. .................... 8

            e)    The TEA Policy Impermissibly Chills Speech .............................. 9

            f)    The TEA Policy Coerces and Encourages School Districts to Suppress Protected Speech ........................................................... 10

        2.    The TEA Policy Violates the First Amendment as Applied to Texas AFT's Members. ................................................................................... 12

            a)    Affected Texas AFT Members Suffered Adverse Actions. ........... 13

            b)    Texas AFT Members' Interest in Commenting on Matters of Public Concern Outweighs the TEA's Interest in Promoting Efficiency. ..................................................................................... 15

    B.     Texas AFT Will Suffer Irreparable Harm Absent Injunctive Relief ..................... 17

    C.     The Balance of Equities and Public Interest Weigh in Favor of Granting Injunctive Relief ............................................................................................... 18

II.     *Younger* Abstention Is Not Warranted. ......................................................... 18

Conclusion ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Am. Federation of Teachers v. Department of Education*,
796 F.Supp.3d 66 (D. Md. 2025) ............................................................. 4

*Beckerman v. City of Tupelo*,
664 F.2d 502 (5th Cir. 1981).................................................................. 17

*Benningfield v. City of Houston*,
157 F.3d 369 (5th Cir. 1998).................................................................. 14

*Blackwelder v. Safnauer*,
689 F. Supp. 106 (N.D.N.Y. 1988) ........................................................ 20

*Branton v. City of Dallas*,
272 F.3d 730 (5th Cir. 2001).................................................................. 15

*Chiu v. Plano Indep. Sch. Dist.*,
339 F.3d 273 (5th Cir. 2003)................................................................... 8

*City of Houston v. Hill*,
482 U.S. 451 (1987) ............................................................................... 19

*Clarke v. Commodity Futures Trading Comm'n*,
74 F.4th 627 (5th Cir. 2023)................................................................... 18

*Cooperrider v. Woods*,
127 F.4th 1019 (6th Cir. 2025)............................................................... 15

*Coszalter v. City of Salem*,
320 F.3d 968 (9th Cir. 2003)................................................................... 14

*Cripps v. La. Dep't of Agric. & Forestry*,
819 F.3d 221 (5th Cir. 2016)............................................................ 12, 15

*Crook v. Creston Cnty. School District*,
No. 4:25-cv-00373-RGE-HCA, ECF No. 13 (S.D. Iowa Oct. 20, 2025) ........................ 12, 16

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013).................................................................. 17

*Fund Texas Choice v. Paxton*,
658 F. Supp. 3d 377 (W.D. Tex. 2023).................................................... 18

*Gaines v. Jefferson Cnty. Sch. Dist.*,
705 F. Supp. 3d 664 (S.D. Miss. 2023)..................................................... 4

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ................................................................................................ 5

*Gbalazeh v. City of Dallas*,
    394 F. Supp. 3d 666 (N.D. Tex. 2019) ................................................................. 20

*Gibson v. Kilpatrick*,
    773 F.3d 661 (5th Cir. 2014) ................................................................................. 4

*Hodak v. City of St. Peters*,
    2006 WL 3004052 (E.D. Mo. Oct. 20, 2006) ...................................................... 14

*Hoffman Est. v. Flipside*,
    455 U.S. 489 (1982) ................................................................................................ 7

*Hook v. Rave*,
    2025 WL 2720978 (D.S.D. Sep. 24, 2025) ...................................................... 4, 16

*Johnson v. United States*,
    576 U.S. 591 (2015) ............................................................................................ 7, 8

*Keenan v. Tjeda*,
    290 F.3d 252 (5th Cir. 2002) ............................................................................... 12

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) .......................................................................... 12, 13

*Marie v. Moser*,
    65 F. Supp. 3d 1175 (D. Kan. 2014) ................................................................... 20

*Marshall v. Amuso*,
    571 F. Supp. 3d 412 (E.D. Pa. 2021) .................................................................... 8

*McLin v. Twenty-First Jud. Disc.*,
    79 F.4th 411 (5th Cir. 2023) .................................................................................. 5

*Meese v. Keene*,
    481 U.S. 465 (1987) ................................................................................................ 9

*Missouri v. Biden*,
    83 F.4th 350 (5th Cir. 2023), *rev'd on other grounds, Murtha v. Missouri*, 603
    U.S. 43 (2024) ................................................................................................ 10, 11

*NAACP v. Button*,
    371 U.S. 415 (1963) ................................................................................................ 7

*Nat'l Fed'n of Indep. Bus. v. Perez*,
    No. 5:16-cv-00066-C, 2016 WL 3766121 (N.D. Tex. June 27, 2016) .................. 17

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) .................................................................... 7

*NRA of Am. v. Vullo*,
    602 U.S. 175 (2024) ...................................................................... 10, 11

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ........................................................ 3, 17, 18

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ............................................................................. 5

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*,
    391 U.S. 563 (1968) ....................................................................... 4, 12

*Pierce v. Tex. Dep't of Crim. Just., Inst. Div.*,
    37 F.3d 1146 (5th Cir. 1994) ............................................................... 13

*Power v. Summers*,
    226 F.3d 815 (7th Cir. 2000) ............................................................... 14

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ....................................................................... 5, 15

*Rivera-Jimenez v. Pierluisi*,
    362 F.3d 87 (1st Cir. 2004) ................................................................. 14

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) ................................................................. 7

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ............................................................................ 17

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................................... 8

*RTM Media, L.L.C. v. City of Houston*,
    518 F. Supp. 2d 866 (S.D. Tex. 2007) ..................................................... 19

*RTM Media, L.L.C. v. City of Houston*,
    584 F.3d 220 (5th Cir. 2009) ............................................................... 19

*Salge v. Edna Indep. Sch. Dist.*,
    411 F.3d 178 (5th Cir. 2005) ............................................................... 12

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ........................................................................... 4

*Socialist Workers Party v. Attorney General*,
    419 U.S. 1314 (1974) .......................................................................... 9

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ................................................................... 9

*Tex. Entm't Ass'n v. Hegar*,
  10 F.4th 495 (5th Cir. 2021) ................................................................. 19

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................... 8

*Thomas v. State*,
  294 F.Supp.3d 576 (N.D. Tex. 2018) .................................................... 19

*United States v. Hansen*,
  599 U.S. 762 (2023) ............................................................................. 6, 7

*United States v. Texas*,
  719 F. Supp. 3d 640 (W.D. Tex. 2024) ................................................. 18

*Victor v. McElveen*,
  150 F.3d 451 (5th Cir. 1998) ................................................................ 15

*Watson v. City of Memphis*,
  373 U.S. 526 (1963) ............................................................................. 16

## Statutes

Tex. Educ. Code § 22A.051 ...................................................................... 20

Tex. Educ. Code § 22A.052 ...................................................................... 20

Tex. Educ. Code § 39.003 ......................................................................... 10

## Other Authorities

*Educator Misconduct & Investigations*,
  https://tea.texas.gov/texas-educators/investigations/educator-misconduct-
  investigations ........................................................................................ 3

TEXAS EDUCATION AGENCY, *Disciplinary Actions Taken Against Texas Educators*,
  https://tea.texas.gov/texas-educators/investigations/disciplinary-actions-taken-
  against-texas-educators ........................................................................ 15

TEXAS EDUCATION AGENCY, *Investigations*, https://tea.texas.gov/texas-
  educators/investigations ........................................................................ 12

**PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff American Federation of Teachers ("Texas AFT") seeks an order enjoining an egregious and sweeping violation of its members' First Amendment rights. On September 12, 2025, Defendant Texas Commissioner of Education Mike Morath issued a bulletin (the "TEA Policy") in the wake of the death of public figure Charlie Kirk directing public school administrators to report teachers who shared "inappropriate content" on social media and "commending" those school districts that had already "taken swift action" against teachers posting such content. Mr. Morath's directive unleashed a torrent of retaliation and disciplinary actions against teachers for their political speech on social media about a matter of social and political importance.

The First Amendment violation could not be clearer. Not only did Mr. Morath's directive sanction speech that did not comport with his personal political views, it also—with its overbroad and vague prohibition of speech that was "vile," "reprehensible," or "inappropriate"—unconstitutionally chilled the speech of teachers wishing to comment on the news of the day. As a result of Mr. Morath's actions, public school teachers withdrew as active participants in democracy and instead stayed on the sidelines for fear of discipline that could cost them their livelihoods. This chilling of public discourse and silencing of citizens was exactly the type of conduct the First Amendment was designed to protect against. For those reasons, at least two other federal courts have enjoined similar sanctions on educators' speech following Mr. Kirk's passing.

Texas AFT thus seeks to enjoin Mr. Morath from enforcing the TEA Policy in any manner, which would include suspending all investigations referred to the TEA for social media posts about Mr. Kirk's death. Texas AFT looks forward to presenting evidence to establish its entitlement to such relief at the hearing on this motion, currently scheduled for April 8, 2025.

**STATEMENT OF FACTS**

On September 12, 2025, following Mr. Kirk's death, Mr. Morath sent the TEA Policy to all superintendents in the state targeting allegedly "reprehensible and inappropriate content on social media" posted by "some" Texas public school educators, without specifically identifying the allegedly inappropriate content. Ex. 1, TEA Policy. After recognizing that "the exercise of free speech is a fundamental right we are all blessed to share," Mr. Morath immediately contradicted himself and stated his intention to violate that right, explaining that he would refer any educators whose Kirk-related posts he personally considered "vile" to the TEA's Educator Investigations Division. *Id.* Mr. Morath mandated superintendents across Texas do the same, directing as follows: "If you are made aware of additional instances of inappropriate conduct being shared, it should be reported to the agency through TEA's Misconduct Reporting Portal." *Id.* The TEA Policy failed to identify or define "inappropriate conduct."

Mr. Morath, who wields tremendous oversight authority and influence over the state's school districts, also "commended the swift action taken by leadership of the districts that employ these educators" who made inappropriate posts." Ex. 1. This language sent a threatening message to educators that they can expect their districts to take disciplinary actions against them for social media posts labelled "inappropriate" or "reprehensible" by Mr. Morath and the TEA.

Predictably, the TEA Policy unleashed a wave of retaliation and disciplinary actions against teachers based on their First Amendment protected speech. Some superintendents echoed the TEA Policy, emailing their teachers and employees about the policy and stating that teachers who violated it would be investigated. The natural consequence of these investigations is having a "flag" placed on, and eventually losing, one's teaching license, which prevents affected educators from working in

Texas public schools.[1] Publicly threatening Texas educators with such a consequence deters them from speaking publicly for fear of retaliation. Mr. Morath's letter thus had and continues to have a chilling effect on AFT members' political speech.

Retaliation against Texas AFT members did not stop at investigations. As a result of Mr. Morath encouraging action to be taken against those who posted "vile," "reprehensible," or "inappropriate" content about Mr. Kirk, Texas AFT members have been placed on administrative leave, reprimanded, and even in some cases terminated for expressing their views about Mr. Kirk on their private social media accounts.[2] One teacher was placed on the TEA's "Do Not Hire" list,[3] and other members have been referred to the TEA for investigation based on their social media posts.[4] These teachers were disciplined solely for their speech, without any regard to whether the posts disrupted school operations in any way. As a result of the TEA Policy, many educators have self-censored and withdrawn from political speech.[5]

## ARGUMENT

### I.    Texas AFT Satisfies the Preliminary Injunction Standard.

To obtain a preliminary injunction a plaintiff must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Texas AFT satisfies this test.

---

[1] *See* TEXAS EDUCATION AGENCY, *Educator Misconduct & Investigations*, https://tea.texas.gov/texas-educators/investigations/educator-misconduct-investigations; Ex. 2, Declaration of Zeph Capo, ¶ 9.

[2] *See* Ex. 3, Declaration of Teacher 4, at ¶ 11; Ex. 4, Declaration of Teacher 5, at ¶¶ 12-15; Ex. 5, Declaration of Teacher 6 , at ¶¶ 13-15.

[3] Ex. 5, at ¶ 18.

[4] Ex. 6, Declaration of Teacher 2, at ¶¶ 17, 20; Ex. 4, at ¶ 17; Ex. 5, at ¶ 17.  These investigations are performed by the TEA Educator Investigations Division, which determines if sanctions should be placed on an educator's credentials and whether educators are employable.

[5] Ex. 6, at ¶ 21; Ex. 3, at ¶ 12–13; Ex. 4, at ¶ 22; Ex. 5, at ¶ 21.

A.    **Texas AFT Is Substantially Likely to Prevail on the Merits.**

1.    **The TEA Policy Violates the First Amendment on its Face.**

a)    **The TEA Policy Is an Impermissible Restriction on Public Employee Speech.**

The First and Fourteenth Amendments to the United States Constitution prohibit state policies infringing on public employees' speech when employees speak as private citizens on matters of public concern, so long as their speech interest is not outweighed by the government's interest in avoiding workplace disruption. *See, e.g.*, *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968).[6] The TEA Policy violates this standard by targeting teachers posting on their personal social media pages as private citizens on a matter of public concern—the assassination of a public figure—without regard for whether such posts disrupted the school environment. Moreover, the TEA Policy offends the First Amendment on its face because its reach is overbroad and it is so vague that no reasonable educator or administrator can discern what speech is permissible and what speech is not.

First, the TEA policy punishes Texas AFT members for speech made as private citizens. There is no dispute that a public employee speaks as a private citizen when her speech is outside the scope of her official duties. *Gibson v. Kilpatrick*, 773 F.3d 661, 667 (5th Cir. 2014) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). That includes after-hours posts on an employee's personal social media page. *See, e.g.*, *Hook v. Rave*, No. 4:25-CV-04188-KES, 2025 WL 2720978, at *5-6 (D.S.D. Sep. 24, 2025); *Gaines v. Jefferson Cnty. Sch. Dist.*, 705 F. Supp. 3d 664, 672 (S.D. Miss. 2023).

Second, it is also undisputed that the TEA Policy targets speech on a matter of public concern—"the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (cleaned up). Mr. Kirk was a prominent political activist and media personality on the national

---

[6] A letter or informal policy issued by a state actor is properly subject to First Amendment challenges. *See Am. Federation of Teachers v. Department of Education*, 796 F.Supp.3d 66 (D. Md. 2025) (deeming a Department of Education letter unconstitutionally vague under the First Amendment).

stage whose assassination was widely discussed by media outlets in Texas and across the country. Posts criticizing Mr. Kirk's views about minority groups and immigrants, suggesting his assassination was "karmic" given his own statements about gun violence, or even celebrating his death, are not denied First Amendment protection merely because they may be offensive. To the contrary, courts must exercise "vigilance" in order "to ensure that public employers do not use authority over employees to silence discourse . . . simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987).

Third, Texas AFT members' speech interests here are not outweighed by the TEA's interest in avoiding workplace disruption. The ability to freely express one's political views on social media is a cornerstone of modern free speech. *See Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Although "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions," they can regulate their employees' private speech about "matters of public concern" only to the extent "necessary . . . to operate efficiently and effectively." *Garcetti*, 547 U.S. at 418-19. When determining whether a public employee's speech is protected by the First Amendment, the Fifth Circuit evaluates "whether the speech has caused disruption, impeded performance, or 'affected working relationships necessary to the department's proper functioning.'" *McLin v. Twenty-First Jud. Disc.*, 79 F.4th 411, 419 (5th Cir. 2023).

Mr. Morath failed to properly tailor the TEA Policy to meet these goals. It does not even ask superintendents to assess the impact of such posts on the school environment before requiring them to launch an investigation. Instead, it includes a blanket mandate that schools report educators for disciplinary investigations and threatens adverse actions against all Texas public school educators engaging in protected speech that expresses a viewpoint that Mr. Morath in his sole discretion deems "inappropriate." For all of these reasons, the TEA Policy is an impermissible restriction on protected speech.

b)       **The TEA Policy Is Unconstitutionally Overbroad.**

The TEA Policy is also impermissibly overbroad.  The "overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications . . . on the ground that it provides breathing room for free expression." *United States v. Hansen*, 599 U.S. 762, 769 (2023). Overbroad laws "'may deter or chill constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *Id.* (citation omitted). "To guard against those harms, the overbreadth doctrine allows a litigant [] to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak"—even if it is speech that "provokes, disturbs, or even offends." *Id.* at 770 (citation omitted); *United States v. Jubert*, 139 F.4th 484, 487 (5th Cir. 2025). The overbreadth doctrine is therefore vital to protecting "the 'breathing space' the First Amendment requires to function in practice." *Id.* (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973)). "If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen*, 599 U.S. at 770 (citation omitted).

The TEA Policy fails this test. By mandating that superintendents refer to the TEA's Educator Investigations Division any "additional instances of inappropriate content" shared by their educators on social media about Mr. Kirk's death, Ex. 1, the TEA Policy includes within its ambit a wide swath of constitutionally protected speech that has no impact on school operations in violation of the First and Fourteenth Amendments. Further, the Policy fails to define or describe what is meant by "inappropriate content."

As a result of this overbreadth, the TEA Policy fails to provide the "breathing room for free expression" required under the law. *Id.* at 769. Rather, the TEA Policy unconstitutionally chills teachers from engaging in protected expressive activity, causing numerous members of Texas AFT to

delete their social media posts of a political nature.[7] Members remain fearful about sharing their opinions on matters of public concern—whether online or in person—if their viewpoints do not align with the Texas state government's viewpoints.[8] The TEA Policy is therefore unconstitutionally overbroad as it deprives society "of an uninhibited marketplace of ideas." *Hicks*, 539 U.S. at 119.

The Court should also consider the effect on parties not presently before the Court. *See Hansen*, 599 U.S. at 770 (explaining that the "overbreadth doctrine allows a litigant … to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak"). Here, the Policy threatens to impinge on the constitutional rights of educators across the state, including those who are not members of Texas AFT. The TEA Policy fails for overbreadth as well. *See id.*

        **c)**        **The TEA Policy Is Unconstitutionally Vague.**

A policy is impermissibly vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008). A "more stringent vagueness test" applies where a policy "interferes with the right of free speech" such as to create a chilling effect. *Hoffman Est. v. Flipside*, 455 U.S. 489, 499 (1982); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024). The government may regulate conduct that affects speech "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

The TEA Policy fails these requirements because it is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The TEA Policy's language mandating that superintendents report "additional instances of inappropriate content" shared by their educators about Mr. Kirk's death is so vague and open to varying interpretations that it has inevitably

---

[7] *See* Ex. 6, at ¶ 11; Ex. 3, at ¶ 6; Ex. 4, at ¶ 22; Ex. 5, at ¶ 21.

[8] *Id.*

caused inconsistent enforcement. For similar posts, some educators have received warnings while others were terminated. *See Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) (deeming policies restricting "inappropriate" speech to be "vague because they are irreparable clothed in subjectivity," as what may be considered "'inappropriate' varie[s] from speaker to speaker, and listener to listener").

This vagueness unconstitutionally chills educators from engaging in protected expressive activity. As a result of the TEA policy, Texas AFT members deleted their social media posts of a political nature.[9] Members remain fearful about sharing their opinions on matters of public concern––whether online or in person—if their viewpoints are inconsistent with those of the current Texas State administration.[10] Because this law leaves "grave uncertainty" about what kind of speech is proscribed—and impermissibly chills significant amounts of constitutionally protected speech—the challenged provisions are impermissibly void for vagueness. *Johnson*, 576 U.S. at 597.

d)    **The TEA Policy Discriminates Based on Viewpoint.**

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "Discrimination against speech because of its message is presumptively unconstitutional." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 284 (5th Cir. 2003) (citing *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 641–42 (1994)). Accordingly, "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Strict scrutiny applies to any school policy limiting the speech of educators in a public forum outside their official work duties based on viewpoint. *See id.*

---

[9] *See* Ex. 6, at ¶ 11; Ex. 3, at ¶ 6; Ex. 4, at ¶ 22.

[10] *See* Ex. 6, at ¶ 21; Ex. 3, at ¶ 13; Ex. 4, at ¶ 22; Ex. 5, at ¶ 21.

The TEA Policy impermissibly discriminates based on viewpoint given that it specifically targets educators who voiced critical opinions of Mr. Kirk following his death. In the TEA Policy, Mr. Morath shared his own viewpoint—praising Mr. Kirk as "a father and a husband" and describing his death as "heartbreaking." He then instructed superintendents to refer for investigations and act against any educator who criticized Mr. Kirk in what he deemed a "reprehensible" or "inappropriate" manner. This constitutes regulation of speech based on the speaker's opinion or perspective. Because the TEA Policy is not narrowly tailored and instead targets a wide range of constitutionally protected speech that has no impact on school operations, it plainly violates the First Amendment. *See id.*

### e)    The TEA Policy Impermissibly Chills Speech.

The chilling of a speech is, in itself, a constitutional harm where Plaintiff can demonstrate "more than a subjective chill" and show that a state policy "threatens to cause him cognizable injury." *Meese v. Keene*, 481 U.S. 465, 473 (1987); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). For example, the Supreme Court ruled that the proposed FBI surveillance of a student political convention presented a justiciable claim where such action would dissuade potential attendees from participating. *Socialist Workers Party v. Attorney General*, 419 U.S. 1314, 1318-19 (1974) (denying relief on other grounds). Here, the TEA Policy imposes a comparable chill. Given the Policy's threat to initiate investigations that could lead to the revocation of Plaintiff's members' teaching licenses, Texas AFT members reasonably felt compelled to self-censor their speech and avoid voicing their political views.[11] This harm is ongoing and can only be redressed through injunctive relief. *See, e.g., Meese*, 481 U.S. at 473.

---

[11] *See* Ex. 6, at ¶ 11; Ex. 3, at ¶ 12; Ex. 4, at ¶ 22; Ex. 5, at ¶ 21.

   f)  **The TEA Policy Coerces and Encourages School Districts to Suppress Protected Speech.**

A state actor may not circumvent the First Amendment by coercing or encouraging a third party into suppressing disfavored speech on their behalf. *NRA of Am. v. Vullo*, 602 U.S. 175 (2024); *Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023), *rev'd on other grounds, Murtha v. Missouri*, 603 U.S. 43 (2024). To determine "whether a challenged communication is reasonably understood to be a coercive threat," courts utilize a "totality-of-the circumstances analysis," examining factors such as "word choice and tone," "existence of regulatory authority," "whether the speech was perceived as a threat," and "whether the speech refers to adverse consequences." *NRA of Am.*, 602 U.S. at 189-90; *Biden*, 83 F. 4th at 378.

Here, Mr. Morath's word choice and tone in describing the targeted content as "inappropriate," "vile," and "reprehensible" and mandating that school districts "should" report teachers cannot be described in any way other than coercive. Mr. Morath also has extensive regulatory authority over school districts. As the "educational leader of the state," Mr. Morath is empowered to "authorize special investigations to be conducted" in response to complaints and as he "otherwise determines necessary." Tex. Educ. Code § 39.003. Mr. Morath may then decide to impose sanctions on school employees or districts, including appointing a conservator to "oversee the operations of a school district." *See id.* § 39A.003. In other words, superintendents who disregard the Commissioner's directives risk losing control of their districts' operations.

Given this regulatory backdrop, school districts reasonably perceived the TEA letter as a threat. Indeed, a human resources representative from Teacher 6's school district informed him that the superintendent recommended his termination and said the district would lose funding if it did not comply with the TEA Policy.[12] Administrators in other districts told members that they did not think

---

[12] Ex. 5, at ¶ 15.

the teachers did anything wrong or disrupted the school environment, but nonetheless referred them for investigation based on the TEA Policy's directive.[13]

Further, on October 14, 2025, a general counsel of a large school district wrote to Mr. Morath to report six district employees to the TEA Educator Investigations Division, even though the district had independently determined that the educators' conduct was protected by the First Amendment and did not fall within Texas Education Code's reporting requirements. Ex. 7.

The general counsel's letter makes clear that "none of the posted comments violated District policies," that the posts fell "within the First Amendment rights of each employee," and therefore, that "the complaints do not fall within the reporting requirements of Chapter 22A of the Education Code." "However," the general counsel's letter continued, "based on the Superintendent's Bulletin on September 12, 2025, indicating superintendents should report situations that appear to fall outside of Chapter 22A, the District is making this notification to the Educator Investigations Division." Ex. 7. The fact that this district followed Mr. Morath's direction—despite independently concluding that its employees had not violated the Education Code and that their speech was protected by the First Amendment—demonstrates the TEA policy's coercive effect.

Mr. Morath did not explicitly reference adverse consequences in the text of the TEA Policy. But he did not have to. The statements of both TEA members and administrators made clear that the district's saw the TEA's actions as a threat. *See NRA of Am.,* 602 U.S. at 190; *Missouri v. Biden*, 83 F.4th at 377 (noting that "no one factor is dispositive" and that coercion "may be more subtle"). It is clear here that "the government [here, the TEA] compelled the decision, through threats or otherwise, intimating that some form of punishment will follow a failure to comply." *Biden*, 83 F.4th at 380.

---

[13] Ex. 6, at ¶¶ 16, 19; Ex. 4, at ¶ 15.

### 2. The TEA Policy Violates the First Amendment as Applied to Texas AFT's Members.

The TEA Policy violates the First Amendment as applied to Texas AFT members because the TEA unconstitutionally retaliated against public school educators for engaging in protected speech. To prevail on a First Amendment employment retaliation claim, an employee must establish: (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) his speech motivated the employer's adverse action. *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968)).[14] Each of these elements is satisfied here.

So far, two federal courts have weighed these factors and granted temporary restraining orders enjoining school districts from retaliating against teachers for their posts about Mr. Kirk's death. *See Crook* Order; *Hook*, 2025 WL 2720978. In both cases, the courts found that the plaintiffs were substantially likely to prevail in their First Amendment retaliation claims. *Id.* The same is true in this case.

---

[14] While the TEA is not the direct employer of Texas AFT's members, the Fifth Circuit applies the *Pickering* balancing test in cases where the relationship between the defendant and the employee "implicate[s] governmental interest similar to those involved in the public employment context." *Kinney v. Weaver*, 367 F.3d 337, 360 (5th Cir. 2004). That is the case here. The TEA asserts that its Educator Investigations Department has an interest in "ensuring that Texas educators meet the highest standards of professionalism and ethical behavior," and thus shares the "interest in promoting the efficiency of public services" that *Pickering* contemplates. *See* TEXAS EDUCATION AGENCY, *Investigations*, https://tea.texas.gov/texas-educators/investigations. Accordingly, the TEA stands in the place of the employer (the school district) for the purpose of this analysis.

In the alternative, the Court may apply the "ordinary citizen" test used to assess used to assess First Amendment retaliation claims in which the defendant does not stand in the place of the plaintiff's public employer. See *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 229 (5th Cir. 2016); *Keenan v. Tjeda*, 290 F.3d 252, 254 (5th Cir. 2002). To prevail on a First Amendment retaliation claim, a party must establish: (1) that they were engaged in a constitutionally protected activity; (2) that the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendants' adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. *Id.* Plaintiff has shown all three of these elements.

a)    **Affected Texas AFT Members Suffered Adverse Actions.**

i)    **Adverse Actions through School Districts.**

The Fifth Circuit has held that "discharges, demotions, refusals to hire, refusals to promote, and reprimands" are considered adverse employment actions in the context of First Amendment retaliation cases. *Pierce v. Tex. Dep't of Crim. Just., Inst. Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994). Several Texas AFT members received reprimands for violating the TEA Policy and at least two were discharged.[15]

Importantly, "First Amendment protection does not depend on whether the governmental action at issue is 'direct' or indirect." *Kinney*, 367 F.3d at 360. To hold that a government official's "conduct cannot constitute a First Amendment violation because they did not directly" impose an adverse action, "but instead used governmental power" to exert "pressure" on Plaintiff's employer "in order to achieve that same result, would allow the government to produce a result which [it] could not command directly." *Id.* at 357-58. (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

Mr. Morath used his oversight authority over Texas school districts to pressure Texas AFT's members' employers to target them for their protected speech. As a result of this pressure, school districts issued formal reprimands against teachers (e.g. Teacher 4 and Teacher 5) and terminated teachers (e.g. Teacher 1 and Teacher 6). Many adverse actions were taken within a week of the TEA Policy's publication. At least one teacher's formal reprimand specifically referenced the TEA Policy.[16] Whether accomplished through "direct" or "indirect" actions, Mr. Morath used his agency's "governmental power" to "achieve the same result" that he "could not command directly." *See Kinney*, 367 F.3d at 357-58.

---

[15] Ex. 3, at ¶ 11; Ex. 4, at ¶ 15; Ex. 5, at ¶ 15.

[16] Ex. 3, at Ex. B.

ii)     **Adverse Actions by the TEA.**

The TEA has imposed adverse actions on Texas AFT members. At least one such member had his certificate flagged and was placed on the TEA's "Do Not Hire" registry, constituting a refusal to hire.[17]

Moreover, TEA investigations are adverse actions in and of themselves. It is true that the Fifth Circuit has held that employer-driven *internal* investigations are not adverse employment actions. *E.g.*, *Benningfield v. City of Houston*, 157 F.3d 369 (5th Cir. 1998). But this case involves misconduct investigations conducted by a third-party regulatory authority—the TEA—that has the power to recommend revocation of AFT members' teaching certification. Simply being under investigation by the TEA negatively impacts an educator's reputation, requires resource expenditures for legal representation, and can have lasting detrimental impacts on an employee's long-term employment prospects, even outside of the education arena.[18] This is especially true here since TEA investigations are intended for inappropriate sexual relationships with students, and other teachers and administrators assume that this (and not unpopular speech) is the subject of an investigation.[19] Such consequences constitute adverse actions under the "reasonably likely to deter" standard employed by courts across the country. *See e.g.*, *Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004); *Coszalter v. City of Salem*, 320 F.3d 968, 974-77 (9th Cir. 2003); *Power v. Summers*, 226 F.3d 815, 820-21 (7th Cir. 2000).

Further, the TEA is not Texas AFT members' employer and thus, the standard for what constitutes an adverse action is lower than in the employment context. *E.g. Hodak v. City of St. Peters*, 2006 WL 3004052 at *7 (E.D. Mo. Oct. 20, 2006) ("The standard for what constitutes an 'adverse employment action' is different than the standard relating to 'adverse actions' in non-employment

---

[17] Ex. 5, at ¶ 18.

[18] Ex. 2, at ¶ 15.

[19] *Id.* at 9, 15; Ex. 4, at ¶ 19.

settings"). In a non-employment context, Texas AFT simply must show "the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 229 (5th Cir. 2016). Initiating the misconduct review process that could result in the revocation of an educator's certification meets this standard. *See Cooperrider v. Woods*, 127 F.4th 1019, 1038 (6th Cir. 2025) (ruling that the "complaint's allegation that Defendants made the decision to commence license-revocation proceedings against [Plaintiff], on its face, supports a reasonable inference that [Plaintiff] suffered an adverse action"). TEA investigations are proceedings that can result in such revocations.[20] Indeed, Texas AFT members who have been subject to discipline by school districts or investigation and other actions by the TEA routinely report that they are much less likely to post political content on social media because of the potential repercussions from the TEA Policy.[21]

### b)    Texas AFT Members' Interest in Commenting on Matters of Public Concern Outweighs the TEA's Interest in Promoting Efficiency.

Texas AFT members' interest in commenting on matters of public concern outweighs the TEA's interest in promoting efficiency in the workplace. "In performing the balancing . . . the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Victor v. McElveen*, 150 F.3d 451, 457 (5th Cir. 1998) (quoting *Rankin*, 483 U.S. at 388). The Supreme Court has recognized as pertinent considerations whether the statement impairs "harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. "[R]eal, not imagined, disruption is required." *Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001).

---

[20]    TEXAS EDUCATION AGENCY, *Disciplinary Actions Taken Against Texas Educators*, https://tea.texas.gov/texas-educators/investigations/disciplinary-actions-taken-against-texas-educators;    see Ex. 2, at ¶ 9.

[21] *See* Ex. 6, at ¶ 21; Ex. 3, at ¶¶ 12–13; Ex. 4, at ¶ 22; Ex. 5, at ¶ 21.

As seen in *Crook* and *Hook*, two federal courts analyzing this question at the temporary restraining order stage both concluded that school districts' interests did not outweigh teachers' free speech rights. *See Crook* Order at 10; Hook, 2025 WL 2720978, at *5. In *Crook*, the plaintiff, Crook, commented on a social media post about Mr. Kirk: "He is a terrible human being . . . terrible. I do not wish death on anyone, but . . . him not being here is a blessing." *Crook* Order at 3. Crook was then placed on administrative leave and given notice she may be terminated. In justifying this adverse action, defendants alleged that "the district received '111 emails and 140 phone calls,' the vast majority of which originated from parents 'asking for Crook's termination or requesting that children be removed from Crook's class.'" Even so, the court found that the school district had "not produced sufficient evidence to demonstrate that Crook's speech had an adverse impact on the operations of the District," as "mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." *Id.* at *10 (citing *Lindsey v. City of Orrick*, 491 F.3d 892, 899 (8th Cir. 2007)). The *Crook* court reasoned that denying Crook's motion on "such vague and conclusory concerns runs the risk of constitutionalizing a heckler's veto." *Id.* (citing *Melton v. City of Forrest City, Ark.*, 147 F.4th 896, 903 (8th Cir. 2025) (discussing that outsider complaints that have no actual effect on government workplaces are insufficient to demonstrate disruption)).

Similarly, in *Hook*, the plaintiff was disciplined for his Facebook post, stating in part, "I have no thoughts or prayers for this hate spreading Nazi." *Hook*, 2025 WL 2720978, at *1. The court found that "the hundreds of calls and messages" Defendants alleged they received speaking "negatively regarding the comment or calling for the removal of Professor Hook" did not constitute evidence that Hook's "speech had an adverse impact on the efficiency of the University's operations." *Id.* at *10.

In sum, without sufficient evidence of actual disruption from the speech itself, an employee's free speech rights plainly trump the employer's purported interests in promoting workplace efficiency. *See also Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) ("[C]onstitutional rights may not be

denied simply because of hostility to their assertion or exercise"); *Beckerman v. City of Tupelo*, 664 F.2d 502, 509–10 (5th Cir. 1981) ("In almost every instance it is not acceptable for the state to prevent a speaker from exercising his constitutional rights because of the reaction to him by others.").

Likewise, the speech interests of Texas AFT's members outweigh the TEA's interest in preventing disruptions in the school system. Texas AFT's members' speech caused no actual disruption in schools or interference with its members' ability to work, nor did their speech interfere with the harmony among co-workers. In some instances, the complaints about educators' social media posts did not even come from anyone affiliated with their schools. In at least one case, a member's principal went so far as to inform the member that the principal did not see a problem with the member's posts but had to refer the teacher for investigation in order to comply with the TEA Policy.[22] The only disruption to the school systems came not from the teachers' speech but from the unconstitutional witch hunt and disciplinary proceedings launched by the TEA itself.

### B.    Texas AFT Will Suffer Irreparable Harm Absent Injunctive Relief.

Texas AFT has met its burden of showing irreparable harm resulting from deprivation of its members' First Amendment rights. A showing of irreparable harm requires a demonstration of "harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (citing *Winter v. Natural Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008)). In cases implicating the First Amendment, courts assume irreparable injury because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"); *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, 2016 WL

---

[22] Ex. 6, at ¶ 16–17.

3766121, at *44 (N.D. Tex. June 27, 2016) ("The chilling of speech protected by the First Amendment is in and of itself an irreparable injury.").

Texas AFT's members have already suffered irreparable harm, including disciplinary actions taken against them, being referred for and subjected to investigations by TEA, and receiving black marks on their employment records for expressing their political views as private citizens. The TEA Policy also continues to have a chilling effect on the exercise of Texas AFT members' constitutional rights, thereby causing Texas AFT's members irreparable injury each day that it remains in effect. There is no adequate remedy at law for the violation of the constitutional rights of Texas AFT and its members. Unless the requested injunctive relief is granted, Texas AFT members will continue to suffer irreparable harm.

### C.    The Balance of Equities and Public Interest Weigh in Favor of Granting Injunctive Relief.

The injury to Texas AFT outweighs any harm the injunction might cause to the Defendant, and the public interest favors granting injunctive relief. In cases where the government is the opposing party, courts have held that the "balance of the equities" and "the public interest" factors "merge" together and are analyzed as one. *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298. The public interest and balance of equities thus decisively favor an injunction. By contrast, neither Defendant nor the public have a legitimate interest in the enforcement of an unconstitutional policy. *See United States v. Texas*, 719 F. Supp. 3d 640, 699 (W.D. Tex. 2024); *Fund Texas Choice v. Paxton*, 658 F. Supp. 3d 377, 415 (W.D. Tex. 2023).

### II.    *Younger* Abstention Is Not Warranted.

The Court should reject Defendant's argument that the Court should abstain from exercising jurisdiction under the *Younger v. Harris* abstention doctrine. 401 U.S. 37 (1971); ECF No. 17 at 9.

First, facial challenges to state policies brought "on First Amendment grounds have been exempted from the abstention doctrine, which, itself is 'the exception and not the rule.'" *RTM Media, L.L.C. v. City of Houston*, 518 F. Supp. 2d 866, 871 (S.D. Tex. 2007)[23] (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976))). "In such cases to force the plaintiff who has commenced a federal action to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *City of Houston v. Hill*, 482 U.S. 451, 468 (1987).

Even assuming *arguendo* that one of the "highly exceptional circumstances" warranting abstention under *Younger* exists—and one does not—a federal court should nonetheless assert jurisdiction if the state proceeding was brought in bad faith or for purposes of harassment. *Tex. Entm't Ass'n v. Hegar*, 10 F.4th 495, 508 (5th Cir. 2021). The bad faith exception applies in two major circumstances: "first, when a state commences a prosecution or proceeding to retaliate for or to deter constitutionally protected conduct; and second, when the prosecution or proceeding is taken in bad faith or for the purpose to harass." *Thomas v. State*, 294 F.Supp.3d 576, 595 (N.D. Tex. 2018) (citing *All Am. Check Cashing, Inc. v. Corley*, 191 F. Supp. 3d 646 (S.D. Miss. 2016)).

Any ongoing TEA investigations against Texas AFT's members present precisely such circumstances here, where a top state official issued a politically motivated, one-sided policy seeking to retaliate against those who do not share his viewpoints, and directing superintendents to misuse the TEA's Misconduct Reporting Portal to suppress educators' First Amendment rights to speak on

---

[23] Defendant's Reply in Support of his Motion to Dismiss paints a misleading picture of *RTM*'s subsequent history. He writes that "Plaintiff neglects to mention that in the exact same case before the exact same Court, abstention was granted a few months later," ECF 25 at 3, but neglects to mention that the *RTM* Court *never* granted abstention on the plaintiff's First Amendment claim. Instead, in a later decision, the Court in *RTM* granted abstention on a separate Due Process claim that did not implicate the First Amendment claim at issue in the first *RTM* opinion. *RTM Media, L.L.C.*, 578 F.Supp.2d 875, 885 (S.D. Tex. 2008). Defendant then writes that "[t]he abstention issue in the case was then specifically upheld by the Fifth Circuit." This too is misleading; the Fifth Circuit upheld abstention on the *Due Process* claim—not the First Amendment claims—and did not even reach the merits on the abstention issue on the Due Process claim. Instead, it held that the plaintiff had failed to preserve that claim for appeal. *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 228-29 (5th Cir. 2009).

matters of public concern. *See* Tex. Educ. Code §§ 22A.051, 22A.052. Such infringement on core constitutional rights is precisely the kind of danger federal courts are entrusted to prevent.

Moreover, "abstention is mandated under *Younger* only when the federal plaintiff is actually a party to the state proceeding; the doctrine does not bar non-parties from raising constitutional claims in federal court, even if the same claims are being addressed in a concurrent state proceeding involving similarly situated parties." *Blackwelder v. Safnauer*, 689 F. Supp. 106, 119 (N.D.N.Y. 1988) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928-29 (1975)); *Marie v. Moser*, 65 F. Supp. 3d 1175, 1197 (D. Kan. 2014). Because Texas AFT is not a party to any of the TEA disciplinary proceedings at issue and cannot vindicate its membership's rights through the state process, there is no basis for the Court to abstain from exercising jurisdiction over this case. Indeed, the TEA's investigation process has no procedure to ensure forward-looking injunctive relief. *See Gbalazeh v. City of Dallas*, 394 F. Supp. 3d 666, 670 (N.D. Tex. 2019). Here, AFT not only seeks to stop the ongoing investigations but to discontinue the TEA Policy and any further enforcement. As the TEA investigative process cannot grant this relief, abstention is not appropriate. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiff Texas AFT respectfully requests that the Court preliminarily enjoin Defendant from enforcing the TEA Policy in any manner, which would include suspending all investigations referred to TEA following the TEA Policy's publication related to posts regarding Mr. Kirk, and grant such additional relief that the Court finds just and proper.

Dated: March 10, 2026                    Respectfully submitted,

*/s/ Allison Standish Miller*
Karima Maloney
Texas Bar No. 24041383
David Isaak
Texas Bar No. 24012887
Allison Standish Miller
Texas Bar No. 24046440
Alexander M. Wolf
Texas Bar No. 24095027
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Fax: (713) 221-2320
kmaloney@steptoe.com
amiller@steptoe.com
awolf@steptoe.com

Ida Adibi (*admitted pro hac vice*)
Kylie Clouse (*admitted pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
iadibi@steptoe.com
kclouse@steptoe.com

Manuel Quinto-Pozos
Texas Bar No. 24070459
DEATS DURST & OWEN PLLC
2901 Bee Caves Road, Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Fax: (512) 474-7896
mqp@ddollaw.com

*Counsel for Plaintiff*
*Texas American Federation of Teachers*

21

## CERTIFICATE OF CONFERENCE

Plaintiff conferred with Defendant about the requested relief in this Motion, and Defendant is opposed to the requested relief.

*/s/ Allison Standish Miller*
Allison Standish Miller

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above document was served via the CM/ECF system to all counsel of record on the 10th day of March 2026.

*/s/ Allison Standish Miller*
Allison Standish Miller