# EXHIBIT 2

*PRIVILEGED AND CONFIDENTIAL*
*ATTORNEY WORK PRODUCT*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **TEXAS AMERICAN FEDERATION OF TEACHERS,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**MIKE MORATH, in his official capacity as Commissioner of the Texas Education Agency,**<br><br>    **Defendants.** | **CIVIL ACTION NO. 1:26-cv-00024** |

**DECLARATION OF ZEPH CAPO**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, Zeph Capo declares:

1. My name is Zeph Capo. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The following statements are made within my personal knowledge and are true and correct.

2. I am the president of Texas American Federation of Teachers ("Texas AFT"). I have held this position since 2019. Before holding this position, I was the president of the Houston Federation of Teachers, an affiliate of Texas AFT, from 2015 to 2019. Prior to that, I worked as a teacher for many years, and I was a Texas AFT member throughout that time. In all, I have been involved with Texas AFT for approximately twenty-eight years.

3. Texas AFT is made up of 37 chartered local unions and organizing committees, representing over 66,000 members. Our members are employees who contribute to the success of our schools, including teachers, counselors, librarians, diagnosticians, custodians, cafeteria workers, bus drivers, nurses, teaching assistants, and clerical employees.

4. Texas AFT is an affiliate of the American Federation of Teachers, a national union that advocates for public servants in a variety of roles, including preK-12 school employees, higher education faculty and staff, healthcare workers, and city and state employees.

5. Texas AFT's mission is to advocate for and protect the rights of its members across the state of Texas. Texas AFT thus represents its members before the Texas legislature and with other state leaders, focusing on issues affecting its members, including matters related to job security and other working conditions.

6. On September 12, 2025, in the wake of the assassination of public figure Charlie Kirk, Mike Morath, Commissioner of the Texas Education Agency, issued a letter setting forth a policy governing Texas AFT members' off-duty speech (the "TEA Policy").

7. The TEA Policy requires district superintendents to report teachers who post "reprehensible and inappropriate content on social media" about Mr. Kirk to the TEA's Educator Investigations Division and encourages district leadership to take "swift action" against educators. However, because the TEA Policy fails to explain what constitutes "reprehensible and inappropriate content," I cannot determine from the policy itself what speech is being prohibited.

8. When members are reported for investigation or are disciplined, Texas AFT gets involved by sending local representatives to assist, gather information, and attend meetings with the employee.  If necessary, Texas AFT will engage counsel to represent the educator's rights before the local and state agencies that have the authority to terminate and/or discipline employees.

9. Typical actions that are reported to the TEA's Educator Investigations Division include, but are not limited to the following conduct involving a student or minor: physical abuse, threats of violence, romantic or sexual relationships, and inappropriate communication or boundary violations.  TEA misconduct investigations can have significant repercussions for our

members.  Based on the TEA's findings, the state may revoke a teacher's certificate, which would effectively end their careers.  In my experience, an educator being reported to the Educator Investigations Division for social media activity that *does not* involve a student or sexually explicit content is very uncommon, if not unprecedented.

10. The ability of Texas AFT members to speak as private citizens and comment on matters of public concern is fundamental to their effective participation in public discourse.  Public school employees do not forfeit their right to engage in free speech simply by virtue of their employment as public school employees.  Nor do they forfeit that right in exchange for job security.

11. In the wake of the TEA Policy's publication, many Texas AFT members were reprimanded, placed on administrative leave, or terminated for speech that was made in their personal capacity off of school grounds.  In many cases, Texas AFT members' speech, via social media postings, was not even public, and only available to a small group of the educator's friends, contacts, or connections.

12. The TEA Policy's effect on Texas AFT members has been substantial.  Even those who have not personally been punished by their districts fear that engaging in protected speech could cost them their livelihoods, causing many to delete social media posts or refrain from commenting online altogether.

13. I am not aware of any instance in which a Texas AFT member's social media post following the death of Mr. Kirk impeded their ability to perform their job duties or directly disrupted their classroom or school environment.

14. The enforcement of the TEA Policy has been grossly inconsistent. Members accused of similar conduct have experienced very different outcomes, with no explanation for the

3

disparity. Some teachers have received verbal and written reprimands; some have been placed on administrative leave; some have been reported for investigation; and some have been terminated.

15.     The TEA has also escalated some investigations by placing a "flag" on members' teaching certificates in connection with alleged violations of the TEA Policy. This flag appears on the public, online Texas Educator Certificate for certain Texas AFT members, and states, "Note: This individual is currently under review by the TEA Educator Investigations Division." Such a flag impedes Texas AFT members from finding employment at other schools, both in Texas and elsewhere, and carries a significant stigma that should not be associated with expressing one's opinion on a personal social media account outside of school facilities and school hours. Additionally, flags are typically reserved for teachers who are under investigation for serious misconduct such as that listed in paragraph 9 above. By applying a flag to AFT members' records based on protected speech, the TEA unfairly associates these AFT members with teachers who may have engaged in serious or criminal misconduct, leading to an assumption that the AFT members also did so.

16.     In at least one instance, the TEA placed an already-disciplined Texas AFT member on the "Do Not Hire" list. This list is intended for teachers who are found to have had inappropriate relationships with minor students or are otherwise considered a threat to public safety. It is also used specifically for educators who do not hold Texas teachers' certifications. This teacher, however, *does* hold a teaching certificate and did not engage in any such behavior. He thus should not appear on this list at all.

17.     I have reviewed the posts of affected members who shared their posts with Texas AFT. In my opinion, none of the posts called for the incitement of violence, encouraged violence,

4

or posed any threat to school operations. To my knowledge, none of the posts directly disrupted school operations.

      18.    Texas AFT members across the state are reluctant to post on social media in light of this policy. Some Texas AFT members have deactivated their social media accounts altogether. Others have reduced the frequency of their posts and/or have deleted previous posts that they fear could come across as partisan.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 10th day of March, 2026.

                                                  */s/ Zeph Capo*  
                                                  Zeph Capo