**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| TEXAS AMERICAN FEDERATION OF TEACHERS<br><br>  *Plaintiff,*<br><br>v.<br><br>MIKE MORATH,<br><br>  *Defendant.* | CASE NO. 1:26-CV-00024-ADA |

**DEFENDANT'S FIRST AMENDED RESPONSE TO PLAINTIFF'S AMENDED
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................... iii

Introduction and Background ...............................................................................................1

Standard of Review ..............................................................................................................2

Argument ..............................................................................................................................2

    I. Plaintiff Lacks Standing to Bring Its Claims...........................................................2

        A. Plaintiff's Members Have Not Been Injured by Defendant. ...........................2

        B. Plaintiff's Alleged Injuries Are Not Traceable to Defendant. .......................3

    II. The *Younger* Abstention Doctrine Precludes the Court from Exercising
        Jurisdiction and Issuing a Preliminary Injunction. ...............................................3

        A. First Amendment Exception...........................................................................4

        B. Applicability of the Bad Faith Exception. .....................................................5

    III. Plaintiff Is Unlikely to Succeed on the Merits of its Claims..................................6

        A. The Letter Does Not Constitute an Unconstitutional Policy as Applied to
        Plaintiff's Members. .......................................................................................6

            1. Plaintiff has alleged no adverse employment action by Defendant..........6

                a. Investigations are not adverse employment actions...........................7

                b. Actions taken by individual school districts are not traceable to
                Defendant............................................................................................8

            2. *Pickering* Balancing Does Not Favor Plaintiff's Members' Interests.....................9

                a. Mr. Morath is not Plaintiff's members' employer. ...........................9

                b. Even if Mr. Morath were Plaintiff's members' employer, Plaintiff's
                members' interests would still fail under *Pickering*. .........................10

            3. Any alleged chilling effect is self-inflicted and no objective chill exists.................12

        B. The Letter Does Not Amount to a Facially Unconstitutional Policy. .........14

            1. Plaintiff's overbreadth challenge fails because *Pickering* balancing does not
            favor Plaintiff's members' interests...................................................................14

            2. The Letter Is Not Impermissibly Vague. ................................................15

            3. Plaintiff's viewpoint discrimination and coercion arguments fail because
            they are based on an unwarranted construction of the Letter.............................17

    IV. The Remaining Preliminary Injunction Factors Weigh Against Preliminary Relief. .........19

Conclusion ......................................................................................................................... 20

Certificate of Service..........................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*A & R Eng'g and Testing, Inc. v. Scott*,
  72 F.4th 685 (5th Cir. 2023)............................................................................3

*AbbVie, Inc. v. Fitch*,
  152 F.4th 635 (5th Cir. 2025) .......................................................................... 2

*Breaux v. City of Garland*,
  205 F.3d 150 (5th Cir. 2000)............................................................................7

*City of Houston v. Hill*
  482 U.S. 451 (1987) ..........................................................................................5

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................13

*Colorado River Water Conservation District v. United States*
  424 U.S. 800 (1976) ..........................................................................................5

*Colson v. Grohman*,
  174 F.3d 498 (5th Cir. 1999)............................................................................7

*Cripps v. Louisiana Dept. of Agric. and Forestry*,
  819 F.3d 221 (5th Cir. 2016)............................................................................ 8

*Crook v. Creston Cmty. School Dist.*,
  No. 4:25-cv-00373 (S.D. Iowa Oct. 20, 2025)........................................11, 12

*Daves v. Dallas Cnty.*,
  22 F.4th 522 (5th Cir. 2022) ............................................................................ 4

*Glass v. Paxton*,
  900 F.3d 233 (5th Cir. 2018) .........................................................................13

*Harris v. Victoria Indep. Sch. Dist.*,
  168 F.3d 216 (5th Cir. 1999).................................................................6, 10, 11

*Hersh v. U.S. ex rel. Mukasey*,
  553 F.3d 743 (5th Cir. 2008) .........................................................................14

*Hook v. Rave*,
  No. 4:25-CV-04188, 2025 WL 2720978 (D.S.D. Sep. 24, 2025).................11, 12

*Katherine Meija and Jennifer Smith v. Iowa Board of Educational Examiners and Michael Cavin*,
  Case No. 4:26-cv-0020 (S.D. Iowa Feb 23, 2026) .............................................5

*Kinney v. Weaver*,
  367 F.3d 337 (5th Cir. 2004) ........................................................................... 9

*Kirkland v. Northside Indep. Sch. Dist.*,
  890 F.2d 794 (5th Cir. 1989) .................................................................... 10, 11

*La Union Del Pueblo Entero v. Abbott*,
  151 F.4th 273 (5th Cir. 2025) ..........................................................................3

*Laird v. Tatum*,
  408 U.S. 1 (1972)............................................................................................13

*LIA Network v. City of Kerrville,*
  163 F.4th 147 (5th Cir. 2025) ................................................................. 6

*Lowery v. Mills,*
  157 F.4th 729 (5th Cir. 2025) ........................................................... 7, 13

*Mahmoud v. Taylor,*
  606 U.S. 522 (2025) ........................................................................... 17

*Maryland v. King,*
  567 U.S. 1301 (2012) ......................................................................... 20

*McClelland v. Katy Indep. Sch. Dist.,*
  63 F.4th 996 (5th Cir. 2023) .......................................................... 15, 16

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
  457 U.S. 423 (1982) ........................................................................ 4, 5

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) .......................................................... 2, 20

*Nat'l. Rifle Assn. of Am. v. Vullo,*
  602 U.S. 175 (2024) ..................................................................... 18, 19

*Nixon v. City of Houston,*
  511 F.3d 494 (5th Cir. 2007) .............................................................. 11

*PCI Transp., Inc. v. Fort Worth & W. R. Co.,*
  418 F.3d 535 (5th Cir. 2005).............................................................. 2

*Pierce v. Texas Dept. of Crim. J., Institutional Div.,*
  37 F.3d 1146 (5th Cir. 1994) ............................................................... 7

*Rankin v. McPherson,*
  483 U.S. 378 (1987) .................................................................... 10, 11

*RTM Media, L.L.C. v. City of Houston*
  518 F.Supp.2d 866 (S.D. Tex. 2007) ................................................... 4

*Serafine v. Branaman,*
  810 F.3d 354 (5th Cir. 2016) .............................................................. 14

*Spivey v. Chitimacha Tribe of Louisiana,*
  79 F.4th 444 (5th Cir. 2023) ............................................................... 17

*Valentine v. Collier,*
  956 F.3d 797 (5th Cir. 2020) ............................................................. 20

*Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982)........................................................................... 16

*Waters v. Churchill,*
  511 U.S. 661 (1994)........................................................................... 11

*Younger v. Harris,*
  401 U.S. 37 (1971) ............................................................................. 2

## Constitutional Provisions & Statutes

Tex. Admin. Code § 247.2.................................................................12

**Other Authorities**

Antonin Scalia & Bryan A. Garner, Reading Law: the Interpretation of Legal Texts
112 (2012) .................................................................................................................................17

*Required Reporting of Educator Misconduct*, TEXAS EDUCATION AGENCY,
https://tea.texas.gov/texas-educators/investigations/educators-duty-to-protect-
students (last visited Feb. 4, 2026) .......................................................................................17

## INTRODUCTION AND BACKGROUND

On September 10, 2025, Charlie Kirk was murdered as he engaged in discourse on a college campus. As a public figure in a time when passions are high, the public reacted to his assassination in public forums. Some participants in the resulting dialogue happened to be teachers. The Texas Commissioner of Education, Mike Morath, sent a letter to school superintendents, not teachers, not principals, reminding superintendents that public school educators are held to a higher ethical standard, the Educators' Code of Ethics. He also told them that if the superintendents discover that any teachers may have been over the ethical line in their discourse, that the superintendents should refer those teachers to the Texas Education Agency's ("TEA") investigative division through the Misconduct Reporting Portal. Those complaints would then be thoroughly investigated to determine if a breach occurred.

It is important in these overheated times to step back and think for a moment about what exactly Mr. Morath said and to whom he said it. He simply asked for referrals for investigation of anything the superintendents believed was not within the ethical boundaries for a public-school teacher of Texas's children to publish to the world. Nothing more, nothing less.

No new policy was enunciated. Just a reminder of existing policy and how to refer complaints.

Plaintiff vastly overstates Mr. Morath's words. For instance, in its Amended Complaint, Plaintiff claims, "TEA's Policy [sic] further encouraged superintendents to take matters into their own hands and discipline educators for 'reprehensible,' 'vile,' or 'inappropriate' social media posts about Charlie Kirk, sending a threatening message to Texas educators that they will face punishment on multiple levels." ECF 26 at 2. The letter does no such thing. The sentence into which so much content has been poured merely thanks superintendents for their swift action. This sentence is a bit ambiguous, but it either thanks them for actions they have already taken that predated and had nothing to do with the letter, or for their future action in referring complaints for investigation consistent with existing policy. Either way, Plaintiff's reading is not within the scope of the actual words of the sentence.

1

Separate and apart from any letter by Mr. Morath, school districts governed by elected trustees, which are the actual employers of teachers, had their own reactions to their teachers' responses to the Charlie Kirk murder. Mr. Morath had nothing to do with these reactions including any school district terminations or formal reprimands.

For the reasons stated herein and in Defendant's Amended Motion to Dismiss, Plaintiff is not entitled to a preliminary injunction. Defendant has not taken any actions that would constitute harm to any of Plaintiff's members. Investigations alone are not harm. Thus, Plaintiff lacks standing. Finally, if the court finds that investigations are sufficient harm to confer standing, then the court should abstain from a collateral attack on the adequate state judicial processes under the *Younger* abstention doctrine. *Younger v. Harris*, 401 U.S. 37, 43–44, 53–54 (1971).

## STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 642 (5th Cir. 2025) (internal quotations omitted). To obtain a preliminary injunction, the movant must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Id.* (internal quotations omitted). "The government's and the public's interests merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023). A preliminary injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (internal quotations omitted).

## ARGUMENT

### I.    Plaintiff Lacks Standing to Bring Its Claims.

#### A.    Plaintiff's Members Have Not Been Injured by Defendant.

Plaintiff lacks standing because none of its members have suffered an Article III injury because of anything Defendant has done. "[P]laintiffs must establish standing for each and every

provision they challenge." *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 285 (5th Cir. 2025) (quoting *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019)). As shown in Defendant's Amended Motion to Dismiss, Plaintiff has not pled facts showing a credible threat of adverse employment action by Defendant exists. Furthermore, as discussed *infra*, the alleged chilling effect is insufficient to support standing because it does not amount to "a claim of specific present objective harm or a threat of specific future harm." *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

### B.     Plaintiff's Alleged Injuries Are Not Traceable to Defendant.

In addition, any alleged injuries are neither caused by nor traceable to Defendant. To establish standing, an injury must be fairly traceable to the defendant's conduct. *Nat'l Press Photographers Ass'n*, 90 F.4th at 781. "Traceability is particularly difficult to show where the proffered chain of causation turns on the government's speculative future decisions regarding whether and to what extent it will bring enforcement actions in hypothetical cases." *A & R Eng'g and Testing, Inc. v. Scott*, 72 F.4th 685, 690 (5th Cir. 2023) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412–14 (2013)). "[W]here the plaintiff fails to allege such actual or threatened enforcement, the Supreme Court has instructed [courts] to reject the mere potential for enforcement as a 'highly attenuated,' 'speculative chain of possibilities' that cannot trace an injury to the government." *Id.* (quoting *Clapper*, 568 U.S. at 410). As discussed in Defendant's Amended Motion to Dismiss, Plaintiff has not alleged facts showing Defendant has taken or will take any adverse employment action against Plaintiff's members.

### II.     The *Younger* Abstention Doctrine Precludes the Court from Exercising Jurisdiction and Issuing a Preliminary Injunction.

For the reasons stated above, the Court should deny Plaintiff's Motion for Preliminary Injunction. It is too early in the process for any actual harm to have occurred, and if harm eventually occurs, it will not be the doing of this Defendant. Nonetheless, if the Court believes that opening investigations alone is sufficient harm, then that harm is also sufficient to find that a state judicial process has begun that is entitled to continue without collateral actions from a federal court.

The *Younger* abstention doctrine is animated by two principles: "equity and comity." *Daves v. Dallas Cnty.*, 22 F.4th 522, 547 (5th Cir. 2022) (citing *Younger*, 401 U.S. at 43–44, 53–54). It precludes federal courts from interfering with ongoing, parallel state proceedings where there is an ongoing state court proceeding that implicates important state interests, and plaintiffs have an adequate opportunity to raise their federal challenges. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

As shown in Defendant's Amended Motion to Dismiss, each of these preconditions are present here. The required process for TEA to follow when conducting a disciplinary investigation is similar to the bar disciplinary proceedings in *Middlesex County Ethics Comm.*, that were entitled to *Younger* abstention. *Id.* Detailed administrative rules and statutes govern the TEA's disciplinary process, which ensure due process and provide an adequate opportunity to challenge the evidentiary basis and raise and have timely decided any legal defenses for any disciplinary action.

The Plaintiff in its response seems to agree that *Younger* abstention is applicable to this case, except it asserts a bad faith and an alleged First Amendment exception. ECF 23 at 14. To the contrary, Plaintiff's own subsequent case history demonstrates *Younger* applies when First Amendment claims can be brought in the state action, and Plaintiff has made no showing of the kind of bad faith that would preclude *Younger's* application.

## A.     First Amendment Exception

There is no First Amendment exception to the *Younger* abstention doctrine. Plaintiff relies on *RTM Media, L.L.C. v. City of Houston* for the proposition that *Younger* abstention should not be applied in First Amendment cases. 518 F.Supp.2d 866, 871 (S.D. Tex. 2007). However, that case is distinguishable in that Houston passed an ordinance regarding the content of billboards within the city. *Id.* at 868. This was a direct act limiting some commercial speech. In the instant case, there is no state action directly impinging upon speech. Instead, there is a reminder from the state to school superintendents that teachers are held to the Educators' Code of Ethics and to report violations thereof to TEA for investigation.

4

*Colorado River Water Conservation District v. United States* is not to the contrary. 424 U.S. 800, 813 (1976). At the time, *Younger* abstention had not yet been extended to cover civil administrative proceedings that are judicial and criminal in nature. *Id.* at 816; *see Middlesex County Ethics Committee v. Garden State Bar Assn*, 457 U.S. at 423, 433-35. Likewise, *City of Houston v. Hill* does not discuss the applicability of the *Younger* abstention. 482 U.S. 451, 452 (1987). The abstention at issue in *City of Houston* was the general principle of allowing state courts the opportunity to narrow the construction of an ambiguous statute in the first instance. *Id.* There was no state case pending at the time of the Federal suit. *Id.*

The *Middlesex* case is directly on point and compels this court to abstain from interfering with a perfectly procedurally adequate state process.

### B.    Applicability of the Bad Faith Exception.

The bad faith exception was extensively explained in the recent similar case from the Central District of Iowa. *Katherine Meija and Jennifer Smith v. Iowa Board of Educational Examiners and Michael Cavin*, Case No. 4:26-cv-0020 (S.D. Iowa Feb 23, 2026) (copy attached as Exhibit A). The bad faith exception is narrow and has primarily been found in criminal cases where there was prosecutorial misconduct. *Id.* at 9. As in Iowa, the Texas process outlined in Defendants' Amended Motion to Dismiss consists of neutral rules and processes that "bear the ordinary markings of a professional licensing regime." *Id.* The Iowa Court went on to state that the bad faith exception asks a different question than whether the First Amendment Claim is meritorious or strong. *Id* at 10. The bad faith question is "whether the state forum itself is so tainted by bad faith or so structured to harass that it cannot be trusted to adjudicate those claims fairly." *Id.*

As in the Iowa case, Plaintiff has produced no evidence of bad faith on that narrower question. Plaintiff's members will have the full procedural protections of Texas's contested case process and there is nothing in the record before this court to indicate that the forums available are incapable of hearing and vindicating a First Amendment defense. The Iowa Court even noted that the chilling effect of state government action on First Amendment rights does not justify intervention. *Id.* (citing *Younger v. Harris*, 401 U.S. 37, 50 (1971) ("Moreover, the existence of a

'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.")).

### III.    Plaintiff Is Unlikely to Succeed on the Merits of its Claims.

Mr. Morath's letter to school district superintendents is not a new policy at all, nor does it constitute an unconstitutional policy as applied to Plaintiff's members or on its face. In a First Amendment case, the plaintiff bears the burden to "demonstrate[] that the government is infringing her speech." *LIA Network v. City of Kerrville*, 163 F.4th 147, 161 (5th Cir. 2025). Because an as-applied challenge provides narrower grounds for relief, Courts should address an as-applied challenge before a facial challenge. *U.S. v. Nat'l Treas. Employees Union*, 513 U.S. 454, 477–78 (1995). Here, because Plaintiff has not shown a likelihood of success on the merits, and because the other preliminary injunction factors weigh in Defendant's favor, this Court should deny Plaintiff's Motion for Preliminary Injunction.

### A.    The Letter Does Not Constitute an Unconstitutional Policy as Applied to Plaintiff's Members.

A plaintiff must plead four elements to assert a retaliation claim cognizable under the First Amendment: (1) the plaintiff has suffered an adverse employment action; (2) the plaintiff was speaking as a citizen on a matter of public concern; (3) the plaintiff's interests in free speech on matters of public concern outweighs the defendant's interests in efficiently managing a public function; and (4) the defendant's action was motivated by the plaintiff's speech. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999). Here, Defendant agrees that the assassination of Charlie Kirk is a matter of public concern and that teachers were referred for investigation because of their speech, but without an adverse employment action, and because Plaintiff has failed to show how *Pickering* balancing weighs in its favor, Plaintiff has not carried its burden.

#### 1.    Plaintiff has alleged no adverse employment action by Defendant.

As shown in Defendant's Amended Motion to Dismiss, Plaintiff has not pled facts showing any of its members has suffered an adverse employment action by Defendant. Plaintiff nonetheless argues that its members have suffered adverse employment actions at the hands of Defendant in

6

two ways: directly, through TEA-initiated investigations, and indirectly, through actions by individual school districts. Defendant addresses each argument in turn.

### a. Investigations are not adverse employment actions.

The Fifth Circuit has consistently taken a narrow view of adverse employment actions. *Pierce v. Texas Dept. of Crim. J., Institutional Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994). "Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Id.* And even when actions may have "the effect of chilling protected speech," they are not necessarily actionable. *Id.* at 1150.

The Fifth Circuit's "*Breaux*-completed-adverse-employment-decision" standard further defines what is *not* an adverse employment action. *Lowery v. Mills*, 157 F.4th 729, 741 (5th Cir. 2025) (citing *Breaux v. City of Garland*, 205 F.3d 150, 157–58 (5th Cir. 2000)). Pertinently here, the Fifth Circuit has explicitly excluded investigations from the adverse employment action category. *Id.* (citing *Pierce*, 37 F.3d at 1150); *Lowery*, 157 F.4th at 743. The ultimate result determines whether an adverse employment action has occurred. *See Pierce*, 37 F.3d at 1150 (despite two separate investigations, the Fifth Circuit found no adverse employment action because "[n]either investigation resulted in any action being taken against Pierce."); *Colson v. Grohman*, 174 F.3d 498, 511 (5th Cir. 1999) (citing *Benningfield v. City of Houston,* 157 F.3d 369, 376 (5th Cir. 1998)) (distinguishing verbal reprimands from formal reprimands and concluding that only the latter is an adverse employment action).

To evade the exacting *Breaux* standard, Plaintiff makes an artificial distinction between "employer-driven internal investigations" and "investigations conducted by a third-party regulatory authority . . . ." ECF 28 at 14. Only the former, Plaintiff argues, falls short of the adverse employment action standard, while the latter allows for a cognizable retaliation claim. *Id.* Plaintiff does not cite any binding authority that supports this distinction but rather cites three other federal circuits that apply an extremely lenient standard compared to the Fifth Circuit's emphatic and consistent completed-adverse-employment-decision test. *See id.*; *Lowery*, 157 F.4th at 741.

7

The Fifth Circuit's standard for an adverse employment action applies to this case. Plaintiff concedes that TEA—and by extension, Mr. Morath—is not Texas AFT members' employer. ECF 28 at 14. But, under the test for non-employment cases, Plaintiff has not shown Defendant's actions *caused* Plaintiff's members to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. *See Cripps v. Louisiana Dept. of Agric. and Forestry*, 819 F.3d 221, 229 (5th Cir. 2016) (citing *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).  Mr. Morath's Letter did not cause Plaintiff's members to suffer any injury, let alone one that would cause a chilling effect. Although Teachers 1, 4, 5, and 6 may have suffered an adverse employment action through termination or formal reprimand, those actions are not fairly traceable to any conduct by Defendant but were caused by the independent conduct of the respective local school boards. Plaintiff has failed to show any adverse employment action as to Teachers 2 and 3. Even under this other standard, investigations by the TEA, much like the hearing in *Cripps*, do not satisfy the second prong because, like the hearing in *Cripps* resulted in "no change in [the plaintiff's] license and registration status," no investigation here has resulted in revocation of a teacher's license on the basis of that teacher's exercise of her right to free speech. *See* 819 F.3d at 231. Although initiating the misconduct review process met the Sixth Circuit's less stringent standard in *Cooperrider v. Woods*, it fails the Fifth Circuit's completed-adverse-employment-decision test. *Lowery*, 157 F.4th at 741. The independent actions of school district officials caused the alleged injuries, and Mr. Morath is not responsible for those harms.

### b.     Actions taken by individual school districts are not traceable to Defendant.

Mr. Morath is not responsible for any alleged adverse employment actions taken by individual school districts or superintendents. Plaintiff seeks to scapegoat Mr. Morath for other officials' actions, arguing that "Mr. Morath used his oversight authority . . . to pressure Texas AFT's members' employers to target them for their protected speech." ECF 28 at 13. Plaintiff's claim incorrectly assumes Mr. Morath's Letter is a policy carrying force of law.

Evidence that school districts responded to the Letter by referring teachers for investigation does not prove Mr. Morath used government power to exert pressure on the teachers' employers to retaliate against them. Rather, the plain text of the Letter is devoid of coercive language. The Letter clearly states, "such posts *could* constitute a violation *of the Educators' Code of Ethics*[,]" and any "additional instances of inappropriate content being shared [] should be reported to the agency through TEA's Misconduct Reporting Portal." Ex. 1 (emphasis added). Mr. Morath did not require superintendents to do anything apart from their preexisting duties but simply reminded superintendents of existing procedures and asked them to use their discretion in determining what crosses the line. Although one school district responded with a letter explaining why the superintendent believed certain posts by its teachers did not fall within any reporting requirements, ECF 28-7, Mr. Morath's Letter plainly approves of that school district's decision to not report instances the superintendent believed did not cross a line. Mr. Morath has not taken any action against the teachers identified in this letter. Plaintiff has not shown how Mr. Morath is responsible for any adverse actions taken by school districts.

### 2.    *Pickering* Balancing Does Not Favor Plaintiff's Members' Interests.

On balance, Plaintiff's members' interests do not prevail. Courts must weigh the free speech interest of public employees against the efficiency interests of public employers to determine whether the alleged adverse employment action violates the First Amendment. In performing *Pickering* balancing, the proper analysis is between the school districts and the teachers, but Plaintiffs have failed to sue the proper defendants. Thus, this Court cannot adequately perform a *Pickering* analysis. In any case, Plaintiff has failed to show how its members' interests prevail under any formulation of the test.

### a.    Mr. Morath is not Plaintiff's members' employer.

Mr. Morath does not stand in the place of the employer for the purposes of this analysis. Plaintiff points to *Kinney v. Weaver*, in which the Fifth Circuit applied *Pickering* balancing to an independent contractor and government employer relationship because "the relationship is sufficiently 'analogous to an employment relationship.'" 367 F.3d 337, 359 (5th Cir. 2004) (citing

*Blackburn v. City of Marshall,* 42 F.3d 925, 932 (5th Cir. 1995)). The leap to an employer-employee relationship in this case would be far greater than it was in *Kinney*. In *Kinney*, the court concluded that "[l]aw enforcement agencies have a legitimate interest in exercising discretion over the choice of the instructors who train the officers who will, in turn, carry out the agencies' public duties." *Kinney*, 367 F.3d at 360. Here, the TEA does not have similar discretion. School districts are responsible for hiring and firing teachers, and each school district is independent, locally elected, and politically accountable.  Contrary to Plaintiff's claim, an oversight and disciplinary agency is not sufficiently analogous to an employer for *Pickering* purposes. Mr. Morath is no more like an employer to teachers than the President of the Texas Bar Association is an employer to attorneys.

> **b.      Even if Mr. Morath were Plaintiff's members' employer, Plaintiff's members' interests would still fail under *Pickering*.**

But even if *Pickering* applied between Mr. Morath and the individual teachers, the scales would still tip in favor of Mr. Morath. *Pickering* analysis requires "'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968) and citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)). Courts should not scrutinize the speech at issue in a vacuum; courts should consider the "manner, time, and place of the employee's expression, as well as the context in which the dispute arose." *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 799 (5th Cir. 1989) (citing *Rankin*, 483 U.S. at 388 and collecting cases). Among a court's considerations should be "whether the speech was likely to generate controversy and disruption, impeded the school's general performance and operation, and affected working relationships necessary to the department's proper functioning." *Harris*, 168 F.3d at 223 (citing *Brawner v. Richardson,* 855 F.2d 187, 192 (5th Cir. 1988)).

The Fifth Circuit has held that "a teacher's free speech protection, even as to a matter of public concern, is not absolute." *Kirkland*, 890 F.2d at 799 (citing *Ferrara v. Mills*, 781 F.2d 1508, 1513 (11th Cir. 1986)). "Consequently, a public-school employer who retaliates against a teacher for

10

engaging in protected speech does not *automatically* violate the Constitution." *Id.* (citing *Ferrara*, 781 F.2d at 1513). Public employers occupy a "dual role . . . as a provider of public services and as a government entity operating under the constraints of the First Amendment." *Rankin*, 483 U.S. at 384. Even though public employers cannot act in certain ways that would violate the First Amendment, they are still employers that are responsible for the efficient performance of a certain public function. *Id.* Thus, second-guessing every decision related to educator investigation made by a state education agency would burden that performance. *Id.*

This concern is especially evident in the educational context. The Fifth Circuit has recognized that federal courts should be "extremely hesitant to 'invade and take over' in the area of education." *Harris*, 168 F.3d at 220–21 (citing *Dorsett v. Bd. of Trustees for State Colleges & Universities*, 940 F.2d 121, 124 (5th Cir. 1991)).

Part of the calculus is whether the employee's speech caused a disruption. The Fifth Circuit recognizes reasonable predictions of disruption as sufficient. *Nixon v. City of Houston*, 511 F.3d 494, 499 n.4 (5th Cir. 2007). "[A] government employer need not produce evidence of actual harm or disruption to governmental operations." *Id.* (quoting *Connick*, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office . . . is manifest before taking action.")). Courts have therefore given "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill*, 511 U.S. 661, 673 (1994).

Plaintiff cites two cases in which a federal court granted a temporary restraining order against a public education employer after notice of intent to fire an educator. ECF 12 at 8, 10, 14–16 (citing Order Granting in Part Plaintiff's Motion for Temporary Restraining Order at 9, *Crook v. Creston Cmty. School Dist.*, No. 4:25-cv-00373 (S.D. Iowa Oct. 20, 2025) ("*Crook* Order") and *Hook v. Rave*, No. 4:25-CV-04188, 2025 WL 2720978, at *5–6 (D.S.D. Sep. 24, 2025)). Although all three cases involve educators' social media posts about Charlie Kirk's, the similarities end there. Both *Crook* and *Hook* involved an actual adverse employment action because in both cases, the educator was given notice of intent to terminate their employment. *Crook* Order at 3; *Hook*, 2025

11

WL 2720978, at *2. Additionally, in both cases, the individual plaintiffs sued their employer instead of suing the state education agency. *Crook* Order at 1; *Hook*, 2025 WL 2720978, at *1. Here, Plaintiff's members' have not suffered any adverse employment action by Defendant, and thus, they have failed to sue the proper Defendant. *Crook* and *Hook* are hardly analogous to this case and should not inform this Court's decision.

Here, Plaintiff has failed to show that its members' interests prevail under *Pickering*. As Plaintiff's highlight, the TEA's Educator Investigations Department has an interest in "ensuring that Texas educators meet the highest standards of professionalism and ethical behavior." ECF 28 at 12 n.14 (quoting Texas Education Agency, Investigations, TEXAS EDUCATION AGENCY, https://tea.texas.gov/texas-educators/investigations). Thus, as Plaintiff points out, Mr. Morath, as Commissioner of the TEA, is interested in "promoting the efficiency of public services" for *Pickering* purposes. ECF 28 at 12 n.14. Although this interest does not make Mr. Morath the employer, his interest in regulating teacher professionalism and ethical behavior, which includes promoting a safe and efficient learning environment for students and maintaining community trust, outweighs the interests of Plaintiff's members.

This is especially true when the speech at issue involves openly celebrating someone's death. A teacher who shows support for political violence likely violates school ethics codes and demonstrates their unfitness to teach impressionable children. *See* 19 Tex. Admin. Code § 247.2(1)(J) (2018) ("The educator shall be of good moral character and be worthy to instruct or supervise the youth of this state."). And when, as here, principals receive reports about a teacher's speech, a reasonable prediction of disruption is warranted. *See* ECF 28-4 at 11 (parents and community members voiced their concerns in response to Teacher 5's posts: "I do not feel comfortable with my children or any child being educated by this individual" and "this is inappropriate coming from an educator who interacts with students on a daily basis.").

### 3. Any alleged chilling effect is self-inflicted and no objective chill exists.

Plaintiff has failed to carry its burden to show an objective and unlawful chilling effect. Instead, Plaintiff shows only the product of an unsubstantiated fear of retaliation. *See Clapper v.*

*Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013). Such fear is insufficient to support standing. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ."). "[T]he challenged exercise of governmental power [must be] regulatory, proscriptive, or compulsory in nature," and the plaintiff must be "either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). The alleged chill must be objective—a reasonable response to an "objective harm or a threat of specific future harm." *Lowery*, 157 F.4th at 739 (quoting *Laird*, 408 U.S. at 14).

Furthermore, alleging "[a] challenged governmental action that rest[s] on a 'chain of contingencies,' some of which were dependent on the discretion or decisions of independent actors[,]'" is insufficient. *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018) (quoting *Clapper*, 568 U.S. at 410). "Each link in the chain of contingencies must be 'certainly impending' to confer standing." *Id.* (citing *Clapper*, 568 U.S. at 410–14).

This is a classic example of a chain of indefinite contingencies that involve the discretion of independent actors. First, the Letter is not a policy that is "regulatory, proscriptive, or compulsory in nature." Rather, the Letter is simply a reminder for superintendents to report conduct that may violate the Educators' Code of Ethics through the existing report system. Any reporting is contingent upon the discretion of independent actors, not on the Defendant. Second, a superintendent would have to independently become aware of a teacher's social media post (e.g., when a concerned parent or community member reports the post). Third, the superintendent would have to decide, in his discretion, whether the post may violate the Educators' Code of Ethics. Fourth, the superintendent would have to choose to report the teacher to the TEA. Fifth, the TEA would have to choose to begin an investigation. Sixth, the TEA would have to decide to file a petition with the State Board of Education ("SBEC"). Seventh, the administrative law judge would have to evaluate the claims and defenses and make a recommendation. And finally, SBEC would have to make a decision. In short, many independent decisionmakers must exercise discretion before any adverse employment action occurs. Plaintiff has failed to show that the actions of its

13

teachers were a reasonable response to an "objective harm or a threat of specific future harm," and consequently, any self-chilling is not actionable against Mr. Morath.[1]

**B.    The Letter Does Not Amount to a Facially Unconstitutional Policy.**

Plaintiff's facial challenge does not fare any better. To mount a facial challenge in the First Amendment context, a plaintiff must show that the policy at issue is overbroad, meaning that its impermissible applications outnumber its permissible ones. However, as Plaintiff acknowledges, the TEA Educators' Code of Ethics appropriately restricts some speech, and Plaintiff bears the burden of showing that a substantial number of the Letter's applications are unconstitutional. Plaintiff has failed to meet its burden.

**1.    Plaintiff's overbreadth challenge fails because *Pickering* balancing does not favor Plaintiff's members' interests.**

The Letter is not facially unconstitutional. Plaintiff asserts the Letter is overbroad because it "targets a wide range of constitutionally protected speech that has no impact on school operations. . . ." ECF 28 at 9. But Plaintiff has not provided any evidence to support this claim.

"First Amendment facial challenges should be granted 'sparingly and only as a last resort.'" *Lowery*, 157 F.4th at 746 (quoting *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008)). A plaintiff must demonstrate "'a realistic danger that the [policy] itself will significantly compromise recognized First Amendment protections of parties not before the [c]ourt' before a statute will be struck down as facially overbroad." *Hersh*, 553 F.3d at 762 (quoting *Shackelford v. Shirley*, 948 F.2d 935, 940 (5th Cir. 1991)). The policy at issue may be invalidated as overbroad only if "'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Lowery*, 157 F.4th at 745–46 (quoting *United States v. Stevens*, 559 U.S. 460, 472–73 (2010)) (citations omitted); *Serafine v. Branaman*, 810 F.3d 354, 363 (5th Cir. 2016).

---

[1] Plaintiff argument that "the TEA Policy impermissible chills speech" in its facial challenge to the Letter, ECF 28 at 9 (Section I.A.1.e)), but that section makes an as-applied challenge and focuses only on the alleged chilling effect on Plaintiff's members' speech. Thus, Defendant responds to Plaintiff's chilled speech argument as part of Plaintiff's as-applied challenge. To the extent Plaintiff intends to allege chilling in its facial challenge, Defendant's response to Plaintiff's overbreadth challenge also covers that base.

That would be true only if "applications of the code frequently failed *Pickering*." *Lowery*, 157 F.4th at 746. *Pickering*, as discussed *supra*, requires "a delicate balancing of the competing interests surrounding [an employee's] speech and its consequences," which considers "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lowery*, 157 F.4th at 747 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022)) (citation modified).

Here, Plaintiff has not shown it is likely to succeed on its overbreadth claim. Specifically, Plaintiff failed to properly examine whether a substantial number of the Letter's applications fail *Pickering*. Plaintiff merely asserts that the Letter is overbroad because it does not "ask superintendents to assess the impact of such posts on the school environment before requiring them to launch an investigation." ECF 28 at 5. However, because the Letter merely contemplates investigation, which is not an adverse employment action, it does not require superintendents "to launch an investigation." Neither does it prohibit the superintendent from assessing the impact of such posts on the school environment before reporting. Rather, it asks for reporting if the superintendent believes that the post at issue may violate the Educator's Code of Conduct. In determining whether the conduct would violate the Code of Conduct, the superintendent can assess the impact of such posts on school environment. In this way, the Policy is properly tailored to the government's interests and is not overbroad. Plaintiff has not shown otherwise.

### 2.    The Letter Is Not Impermissibly Vague.

To the extent the Letter recommends that superintendents act, the Letter provides notice and explicit standards. Plaintiff argues that the Letter is so vague that it has caused a chilling effect and has led to inconsistent enforcement. Plaintiff's claim fails for two reasons. First, the Letter clearly defines applicable social media posts. Second, school district superintendents typically have discretion in determining when to report teachers for ethics code violations, and the Letter is nothing other than an alert that certain social media posts *could* constitute such a violation.

The void for vagueness standard is heightened in the education context. *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023), *cert. denied* 144 S. Ct. 348 (2023). The typical

15

test is whether a law "(1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* (quoting *A.M ex rel. McAllum v. Cash*, 585 F.3d 214, 224–25 (5th Cir. 2009) (internal quotation marks omitted)). The standard is stricter in the education context because of "the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process." *Id.* (quoting *Fraser*, 478 U.S. at 676). Thus, in the education context, "[a] regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* And although a law that "interferes with the right of free speech" is scrutinized more closely, *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982), laws with "civil rather than criminal penalties" receive less scrutiny "because the consequences of imprecision are qualitatively less severe." *Id.* (citation omitted).

The Letter is clear. First, the Letter is no more than a reminder to superintendents of existing policies considering current events. The existing Educators' Code of Ethics has been in place since 1988, and the Misconduct Reporting Portal has existed since 2020—well before Charlie Kirk's murder. The absence of vagueness challenges to these policies tend to show educators understand their meaning. Plaintiff argues that "the Policy's [sic] language mandating that superintendents report 'additional instances of inappropriate content' . . . is so vague and open to varying interpretations that it has inevitably caused inconsistent enforcement." ECF 28 at 7–8. Yet the letter clearly references only social media posts discussing Charlie Kirk's assassination in a "reprehensible" manner that "*could* constitute a violation of the Educators' Code of Ethics." Ex. 1 (emphasis added). The Letter does not reference, nor seek, all posts about Charlie Kirk's assassination, nor political posts about Charlie Kirk's assassination—only those posts that could constitute a violation of the Code of Ethics and therefore fall under the remit of the TEA. People of common intelligence can ascertain the Letter's meaning.

The Letter also does not impose a mandatory duty on superintendents to do anything. Superintendents already have a mandatory duty to report certain categories of educator

16

misconduct to the TEA under existing policies. *See Required Reporting of Educator Misconduct*, TEXAS EDUCATION AGENCY, https://tea.texas.gov/texas-educators/investigations/educators-duty-to-protect-students (last visited Feb. 4, 2026) ("superintendents . . . are legally required to report certain types of educator misconduct to TEA . . . ."). This Letter, by contrast, does not mandate that superintendents do anything at all. *See* Ex. 1. Rather, the Letter merely flags a recent trend that the TEA found concerning so that superintendents are advised of their options. *See id*. Because the Letter imposes no duty, claims of vagueness are irrelevant.

        **3.**      **Plaintiff's viewpoint discrimination and coercion arguments fail because they are based on an unwarranted construction of the Letter.**

Mr. Morath's Letter is not unlawful viewpoint discrimination because it is not an exercise of government power. Without any force of law behind the Letter, Mr. Morath's impression of what may violate the Educators' Code of Ethics does not trigger heightened scrutiny. Plaintiff claims the Letter "specifically targets educators who voiced critical opinions of Mr. Kirk following his death." ECF 28 at 9. On the contrary, Mr. Morath does not require an action. His opinion that "[s]uch posts *could* constitute a violation of the Educators' Code of Ethics" and his suggestion that "[i]f you are made aware of additional instances of inappropriate content being share, it *should* be reported to the agency through TEA's Misconduct Reporting Portal" do nothing more than remind superintendents of existing standards and procedures. Ex. 1 (emphasis added). Furthermore, the Court should interpret the Letter's conditional language (i.e., could and should) as advisory, not mandatory. *See* Antonin Scalia & Bryan A. Garner, Reading Law: the Interpretation of Legal Texts 112 (2012) ("Mandatory words impose a duty; permissive words grant discretion."); *see e.g.*, *Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444, 447 (5th Cir. 2023) (concluding that the word "shall" is mandatory and thus the regulated party "must" do something as instructed by the statute).

But even if the Court concluded the Letter engages in unconstitutional viewpoint discrimination, the Letter would pass strict scrutiny. First, schools "have a 'compelling interest in having an undisrupted school session conducive to the students' learning.'" *Mahmoud v. Taylor*, 606 U.S. 522, 566 (2025) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972)). Teachers

posting on social media—where students, parents, and the community at large can see—and openly celebrating any person's death—let alone the political assassination of a public figure—threatens this interest. To be clear, many of these posts did not merely "criticize Charlie Kirk's views" as Plaintiff suggests. Many posts celebrated Kirk's murder, affirmed the shooter's motivation, and implied the same harm should befall other people who share Kirk's worldview. Furthermore, even if the Letter were read to announce an policy, that policy would be narrowly tailored because it would call on superintendents to use their discretion to determine whether posts violate the Educators' Code of Ethics and report for them investigation if so. Contrary to Plaintiff's claim, the Letter does not "target[] a wide range of constitutionally protected speech that has no impact on school operations." ECF 28 at 9. Rather, the Letter only concerns speech that "celebrate[s] or sow[s] violence against those that share differing beliefs and perspectives." Ex. 1. Such speech, by an individual charged by the State of Texas with educating children, certainly implicates the State's interest in avoiding classroom disruption, and asking for referrals for investigation is a close means-end fit.

Plaintiff's coercion argument suffers from the same interpretive flaw. While it is true that "a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf," to state a claim for coercion, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Nat'l. Rifle Assn. of Am. v. Vullo*, 602 U.S. 175, 190–91 (2024). Courts apply a multifactor test as a "useful, though nonexhaustive guide." *Id*. Some of the factors include "word choice and tone," "existence of regulatory authority," "whether the speech was perceived as a threat," and "whether the speech refers to adverse consequences." *Id*. at 189–90.

Applying the test, the Letter lacks any indicia of coercion. Plaintiff claims "Mr. Morath's word choice and tone in describing the targeted content as 'inappropriate,' 'vile,' and 'reprehensible' and mandating that school districts 'should' report teachers cannot be described in any way other than coercive." ECF 28 at 10. But as discussed *supra*, "should" does not

18

communicate a mandatory duty and the Letter does not otherwise mandate anything. Neither is Mr. Morath's regulatory authority over school districts a reason to read coercion into the Letter. Simply having oversight authority over someone does not render everything one says coercive.

The Letter also does not refer to adverse consequences. Although Plaintiff alleges some school districts misinterpreted the Letter and reported teachers out of fear that the district would lose its funding if it did not comply, considering the Letter's plain text, school districts should not have assumed this. Plaintiff argues that through the Letter, Mr. Morath wielded his authority to coerce superintendents by suppressing the speech of teachers. Yet the Letter refers to no adverse consequences for superintendents if they choose not to report an instance of inappropriate content. Unlike the "loud and clear" threat or inducement in *Vullo*, the Letter is silent as to consequences for superintendents. *Vullo*, 602 U.S. at 192–93. Mr. Morath's statement that he "commend[s] the swift action taken by leadership of the districts that employ these educators" is not an inducement, as it does not attach a reward or consequence to the commendation.

## IV. The Remaining Preliminary Injunction Factors Weigh Against Preliminary Relief.

The Plaintiff has also not "clearly carried the burden of persuasion" on the remaining preliminary injunction factors. First, Plaintiff has failed to show a "substantial threat of irreparable injury if the injunction is not issued" because Plaintiff has failed to clearly show that Defendant has violated the First Amendment rights of its members. Nor has the Plaintiff shown an adverse employment action sufficient to support its public employment First Amendment retaliation claim. Second, Plaintiff has not shown that "the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted." Not one of Plaintiff's members has received a sanction from the SBEC or has been placed on the Do Not Hire Registry because of any comments made in relation to the Charlie Kirk shooting.[2] After concluding its investigation, the TEA may decide that a petition for sanctions is not warranted. Furthermore, parties under investigation have

---

[2] To the best of our knowledge, only one individual has an investigative warning on his or her certificate. In accordance with Tex. Educ. Code Sec. 22A.054(c), this individual is also listed as "Under Investigation" on the Do Not Hire Registry.

substantial due process rights before any formal admonishment is issued by the SBEC and may seek judicial review. *See* Def's Motion to Dismiss at 3-5 (describing the due process rights of individuals under investigation).

On the other hand, the public and Mr. Morath will be irreparably harmed if an injunction is granted. *See Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) ("The government's and the public's interests merge when the government is a party."). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And if a statute by the "Texas Legislature assigned . . . prerogatives" to a government agency, an injunction that prohibits the agency from exercising its prerogatives "prevents the State from effectuating the Legislature's choice and hence imposes irreparable injury." *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020). In the present case, the TEA is trying to fulfil its lawful duties to investigate allegedly improper conduct, and if warranted, refer the action to the State Office of Administrative Hearings. *See also* Def's Motion to Dismiss at 3-5 (describing the TEA's procedures). An injunction that prohibits Mr. Morath from fulfilling his duties will irreparably harm the public and the state.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's Amended Motion for Preliminary Injunction.

Date: March 24, 2026

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D WALTERS
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS

Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

_/s/ Keith Ingram_
BRIAN KEITH INGRAM
Special Counsel
Texas State Bar No. 00787746
keith.ingram@oag.texas.gov

BRIAN B. TUNG
Assistant Attorney General
Texas State Bar No. 24145179
brian.tung@oag.texas.gov

LAUREN E. SAEGER
Assistant Attorney General
Texas State Bar No. 24149365
lauren.saeger@oag.texas.gov

COUNSEL FOR DEFENDANT, MIKE MORATH

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on March 24, 2026, a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel and parties of record.

Alexander M. Wolf
Texas Bar No. 24095027
Allison Standish Miller
Texas Bar No. 24046440
Steptoe LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2309
Facsimile: (713) 221-2320
awolf@steptoe.com
amiller@steptoe.com

Manuel Alfonso Quinto-Pozos
Texas Bar No. 4070459
Deats, Durst & Owen PLLC
2901 Bee Caves Rd., Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Facsimile: (512) 474-7896
mqp@ddollaw.com

COUNSEL FOR PLAINTIFF, TAFT

_/s/ Keith Ingram_
BRIAN KEITH INGRAM
Special Counsel

21