**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **TEXAS AMERICAN FEDERATION OF TEACHERS,**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**MIKE MORATH, in his official capacity as Commissioner of the Texas Education Agency,**<br><br>        **Defendant.** | **CIVIL ACTION NO. 1:26-cv-00024-ADA** |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS AMENDED MOTION FOR**
**PRELIMINARY INJUNCTION**

Karima Maloney
Texas Bar No. 24041383
David Isaak
Texas Bar No. 24012887
Allison Standish Miller
Texas Bar No. 24046440
Alexander M. Wolf
Texas Bar No. 24095027
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Fax: (713) 221-2320
kmaloney@steptoe.com
disaak@steptoe.com
amiller@steptoe.com
awolf@steptoe.com

Ida Adibi (*admitted pro hac vice*)
Kylie Clouse (*admitted pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
iadibi@steptoe.com
kclouse@steptoe.com

Manuel Quinto-Pozos
Texas Bar No. 24070459
DEATS DURST & OWEN PLLC
2901 Bee Caves Road, Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Fax: (512) 474-7896
mqp@ddollaw.com

*Counsel for Plaintiff Texas American Federation of Teachers*

**Introduction**

On September 12, 2025, Defendant Morath introduced a sweeping policy calling for the referral of teachers whose social media posts about the death of Charlie Kirk he considered to be "vile" to the TEA Teacher Investigation Division. ECF No. 28-1. The Policy also directed administrators to report teachers sharing "inappropriate content" to the TEA's Misconduct Reporting Portal—normally reserved for reporting abuse of students or other serious misconduct. Finally, the Policy "commended" administrators who had taken "swift action" against "these educators"—presumably the ones sharing inappropriate content.

There can be no doubt that Defendant's directive was a policy. Defendant does not contradict Plaintiff's evidence that school districts did, in fact, view the Policy as mandatory and that it chilled educators' speech. Finally, there can be no doubt that the Policy harmed Texas educators and that these effects can be traced back to the Policy. The Court should, therefore, enjoin Defendant's unconstitutional Policy.

I.      **Plaintiff Has Standing.**

   A.      **Plaintiff's Members Have Suffered Injuries in Fact.**

The Fifth Circuit has consistently held that "a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006); *see also Justice v. Hosemann*, 771 F.3d 285, 294 (5th Cir. 2014) ("[S]tanding rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief."); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (standing exists—even before a policy is enforced—if enforcement could chill protected speech).

Here, there is no question that the Policy chills speech. In the Policy, Defendant, in vague and overbroad terms, threatens to launch TEA misconduct investigations against educators for their

constitutionally protected speech. ECF No. 28-1. These investigations can result in the loss of an educator's certificate, thereby ending their careers. ECF No. 28-2 ¶ 9. This would—and did—reasonably chill Texas AFT members and cause them to self-censor out of fear of reprisal. *See* ECF Nos. 28-3 ¶ 13, 28-4 ¶ 22, 28-5 ¶ 21, 28-6 ¶ 21. Further, Plaintiff has also shown the Policy was in fact used to enforce actual adverse actions against its members. *See* ECF No. 28 at 19-21. Plaintiff has thus proven its members suffered harm.  *See, e.g.*, *Carmouche*, 449 F.3d at 660.

**B.      Plaintiff's Injury is Traceable to the Defendant's Actions.**

The standing requirement is a "low causation bar"; indeed, "uncertain" or "indirect causal relationship will suffice for standing, and plaintiffs may satisfy the requirement by alleging a chain of causation between defendant['s] conduct and plaintiffs' injuries." *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 236-37 (5th Cir. 2025). "Standing exists where the purported injury is connected to allegedly unlawful government conduct. The defendant's conduct does not need to be the very last step in the chain of causation." *Reule v. Jackson,* 114 F.4th 360, 367 (5th Cir. 2024).

Here, the injuries suffered by Plaintiff's members are plainly traceable to Defendant's challenged actions. First, several of the injuries suffered by Texas AFT members—the chilling of members' speech, flags placed on certificates, and placement on the Do Not Hire registry—were direct actions taken by the TEA in accordance with the Policy. *See* ECF Nos. 28-6 ¶ 31; 28-3 ¶ 12–13; 28-3C; 28-4 ¶ 22; 28-5 ¶¶ 17–18, 21. Second, Defendant used his oversight authority over Texas school districts to pressure Texas AFT's members' employers to target them for their protected speech. *See* ECF Nos. 28-1; 28-3B; 28-¶ 15. The Policy states that instances of inappropriate content…should be reported to the agency through TEA's Misconduct Reporting Portal" and "commend[s] the swift action taken by leadership of the districts that employ these educators." ECF No. 28-1. This language not only mandates superintendents to report educators to the TEA for investigations but also encourages them to take independent disciplinary "action"

against educators who engage in protected speech. These actions were not merely "speculative" or "hypothetical" as Defendant alleges. ECF No. 32 at 8. Rather, as a result of the Policy, school districts in fact issued formal reprimands against at least Teachers 4 and 5 and terminated at least Teachers 1 and 6. ECF Nos. 28-3C; 28-4B; 28-5 ¶ 15. Teachers 2, 5, and 6 were reported to the TEA for investigation. ECF Nos. 28-4 ¶ 17; 28-5 ¶ 17; 26-6 ¶ 17. All these adverse actions occurred shortly after the Policy's publication. *See* ECF Nos. 28-3 ¶ 9; 28-4 ¶ 8; 28-5 ¶ 15; 28-6 ¶ 12. Principals and other administrators at Texas AFT members' schools told the members that, although the principals personally disagreed with the need for discipline, they were required to refer the teachers to Human Resources for their social media posts. ECF Nos. 28-4 ¶ 15; 28-5 ¶ 10; 28-6 ¶ 16. At least one teacher's written reprimand even specifically referenced the Policy. ECF No. 28-3B.

Moreover, superintendents who disregarded the Commissioner's directives risked jeopardizing their certifications and losing control of their district's operations under Texas law.[1] This was echoed in one school district's legal counsel's letter to Defendant stating that the district did not find the posts by its teachers to rise to the level of misconduct, let alone misconduct requiring reporting, but that it nevertheless reported the teachers because it was obligated to comply with the Policy. *See* ECF No. 28-7.

---

[1] TEX. EDUC. CODE § 39A.00; *Educator Misconduct & Investigations*, TEXAS EDUCATION AGENCY, https://tea.texas.gov/texas-educators/investigations/educator-misconduct-investigations ("SBEC may also take disciplinary action against a principal or superintendent who fails to report."); TEX. EDUC. CODE § 22A.051(k).

## II.    Plaintiff is Likely to Succeed on the Merits of Its Claims.

### A.    The Policy Is Facially Unconstitutional.[2]

#### 1.    The Policy Is Void for Vagueness.

Defendant claims the Policy "is clear" because it is "no more than a reminder to superintendents of existing policies" and "does not impose a mandatory duty on superintendents to do anything." ECF No. 31 at 20-21. But the Policy is *not* framed as a general or discretionary reminder to follow the Educators' Code of Ethics as Defendant alleges. Instead, the Policy creates a new requirement for reporting "reprehensible" and "vile" social media posts specifically concerning the assassination of Charlie Kirk and directs superintendents to take action against teachers who posted content vaguely deemed as "inappropriate content." ECF No. 28-1. The text of the letter mandates superintendents to initiate TEA investigations by stating that what Defendant describes as "inappropriate" content "*should* be reported" to the TEA. *Id.* (emphasis added). "The word 'should' can impose a mandatory rule of conduct." *Wollschlaeger v. Farmer*, 814 F. Supp. 2d 1367, 1376 (S.D. Fla. 2011); *United States v. Anderson*, 798 F.2d 919, 924 (7th Cir. 1986) ("The word 'should' is defined as 'the past tense of shall,' (Webster's New World Dictionary at 1349 (1962)) and as listed in *Roget's Thesaurus* means 'be obliged, must ... have to.'").

In practice, school districts understood the Policy as mandatory. *See* ECF No. 28-7. In a letter to Defendant reporting six educators to the TEA, the Cypress-Fairbanks General Counsel wrote that these educators' posts did "not fall within the reporting requirements of Chapter 22A of the Teacher Educator Code. However, based on the [Policy], indicating superintendents should

---

[2] Defendant asks the Court to address Plaintiff's as-applied challenge before its facial challenge because the as-applied challenge provides a narrower remedy, citing to *U.S. v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995). However, in *Nat'l Treasury Emps. Union,* the Court stated that granting the as-applied remedy "will fully protect the litigants." 513 U.S. at 478 (citation omitted). That is not the case here. Plaintiff's members will continue to be injured by the Policy if it is not enjoined in its entirety.

report situations that appear to fall outside of Chapter 22A, the District is making this notification to the Educator Investigations Division." *Id.*

Defendant also maintains the Policy is not vague because it "clearly defines applicable social media posts," referencing "only social media posts discussing Charlie Kirk's assassination in a 'reprehensible' manner that 'could constitute a violation of the Educators' Code of Ethics."[3] ECF No. 32 at 20, 21. But the Educators Code of Ethics does not contain any constraints on teachers' speech such as those reflected in the language of the Policy. The Policy's mandate deviates from the misconduct that superintendents are required to report to the TEA for investigation: physical abuse, threats of violence, romantic relationships, or inappropriate boundary violations—all involving students or minors. *See* TEX. EDUC. CODE §§ 22A.051, 22A.052. Further, "reprehensible" is not an objective or clear criteria, nor has it been applied in the past to teachers' posts about other matters of public concern. This renders the policy "so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" ECF No. 32 at 21 (quoting *McClelland*, 63 F.4th 996, 101).

The same is true of the Policy's use of the word "inappropriate." As noted by another District that reported two educators to the TEA—even though it determined that "no disruption had occurred"—"the standard for 'inappropriate' is not outlined." Ex. 1, Frisco ISD letters. Thus, that District reported the teachers to TEA "out of an abundance of caution," and notified the educators at issue that they were under investigation by the TEA, which could lead to action against their teaching certificates. *Id*.

---

[3] Defendant also alleges that the "void for vagueness standard is heightened in the education context," citing *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023), *A.M ex rel. McAllum v. Cash*, 585 F.3d 214, 224–25 (5th Cir. 2009), and *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986). ECF No. 32 at 20. However, these cases all involve student speech and stress the importance of flexibility for disciplining children in the school system. This line of reasoning is not applicable to employment policies governing adult public school educators.

### 2.    The Policy Is Overbroad.

Defendant asserts that the Policy is not overly broad because "it merely contemplates investigation, which is not an adverse employment action," and "does not require superintendents to launch an investigation." ECF No. 32 at 20. But the Policy did in fact lead to a "substantial number of its applications" that violated educators' constitutional rights. *See id.* As a result of superintendents enforcing the Policy, Plaintiff's members have been subjected to adverse actions at both the TEA and district level without regard to whether the members' posts caused any disruptions to the classroom as required under *Pickering v. Bd. of Educ. of Twp. High School Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968). For instance, the Cypress-Fairbanks General Counsel explicitly stated in her letter to Defendant that she applied "the Supreme Court balancing test" and determined that each employee's speech "did not result in incitement of violence or disruption to the workplace." ECF No. 28-7. Still, she felt obligated to report all six of these educators to Defendant in order to comply with the Policy. *Id.* The same is true of Frisco ISD's Superintendent's letter. *See* Ex. 1. A non-infringing state policy regulating speech must account for educators' First Amendment rights. The Policy does not and is thus overly broad.

### 3.    The Policy Impermissibly Chills Speech.[4]

Defendant claims that Texas AFT members' fears are unreasonably based on a "chain of indefinite contingencies that involve the discretion of independent actors." ECF No. 32 at 18. But as explained above, the Policy does not actually afford superintendents the discretion to decide whether a post violates the Educators' Code in their own judgment as Defendant alleges. And, as the letters by school districts make clear, districts felt compelled to report educators to the TEA

---

[4] Defendant argues that Plaintiff's claim that the Policy impermissibly chills speech is made only as an as-applied challenge based on the chilling effect on Plaintiff's members' speech. While Plaintiff's members may serve as illustrative examples of this chilling effect, Plaintiff brings this claim as a facial challenge because the Policy has deterred the speech of Texas public school teachers through the prospect of its enforcement. *See Speech First, Inc. v. Fenves,* 979 F.3d 319, 330 (5th Cir. 2020).

despite believing that those educators were acting within their First Amendment rights. As these letters acknowledge, the Policy directs superintendents to make such reports. And districts who fail to do so risk losing funding and control over their district. *See* ECF No. 28 at 10. The TEA, which then determines whether to begin an investigation, conducts said investigation, makes a recommendation for resolution, and refers cases for legal action, is also not an independent actor separate from Defendant.[5] As Commissioner, it is Defendant himself who leads the TEA. It is Defendant—the official who has made clear that he finds Mr. Kirk's death "heartbreaking" and deems any opposing views "reprehensible"—who has the principal authority over the fate of Plaintiff's members' careers. Given this context, Defendant's threat to launch investigations that could lead in the revocation of a teacher's certification amounts to the "specific" and "objective" threat of harm required for a justiciable claim. *See Laird v. Tatum*, 408 U.S. 1, 13-24 (1972).

The Policy's chilling effect is also not imagined or "self-inflicted" as Defendant alleges. *See* ECF No. 32 at 17. While pre-enforcement chilling claims are permitted and courts do not demand that feared events must occur to entitle a litigant to challenge a policy infringing on their constitutional rights, *see, e.g.*, *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014), many of Plaintiff's members' fears in this case have in fact materialized. TEA misconduct investigations were launched against two teachers. ECF Nos. 28-5 ¶ 17; 28-6 ¶ 20. At least one teacher was placed on the TEA's Do Not Hire registry. ECF No. 28-5 ¶ 18. Two teachers had flags placed on their certificates. ECF Nos. 28-5 ¶ 17; 28-6C. Several teachers were terminated and reprimanded. *See* ECF Nos. 28-3C; 28-4B; 28-5 ¶ 15. Fear of such injuries would chill and have chilled people of ordinary firmness from continuing to engage in protected speech.

---

[5] *See Educator Misconduct & Investigations*, TEXAS EDUCATION AGENCY, https://tea.texas.gov/texas-educators/investigations/educator-misconduct-investigations.

### 4.    The Policy Discriminates Based on Viewpoint.

The Policy is not a neutral "remind[er] of existing standards and procedures," but rather espouses a particular viewpoint. ECF No. 32 at 22. Plaintiff is not aware of any other such reminders concerning educators' speech regarding the deaths of other public figures. For instance, just last week, in response to Robert Mueller's death, President Trump posted on social media, "Good, I'm glad he's dead."[6] This post was shared by thousands of users. Yet Defendant did not publish a letter praising Mr. Mueller as a husband and father and threatening discipline against anyone who made "inappropriate" posts about his death. Instead, he only felt the need to issue such a reminder when the speech involved the death of a public figure whose politics were aligned with his own. The Policy also does not pass strict scrutiny. While it is true that "schools have a compelling interest in having an undisrupted school session conductive to the students learning," the Policy is not narrowly tailored to achieve this goal. ECF No. 32 at 22. A narrowly tailored policy would instruct superintendents to first determine if an educator's speech disrupts the school environment before taking action against them. Defendant's Policy did not. "If there is a less restrictive alternative available, the governmental restriction cannot survive strict scrutiny." *Netherland v. City of Zachary, La.*, 626 F. Supp. 2d 603, 607 (M.D. La. 2009) (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)). The Policy thus fails strict scrutiny.

### B.    The Policy Is Unconstitutional as Applied to Plaintiff's Members.

#### 1.    Plaintiff Prevails Under Both the *Pickering* Balancing Test and the Alternative "Ordinary Citizen" Test.

Defendant urges that the *Pickering* test is inapplicable to this case because the TEA is not the employer of Plaintiff's members. Assuming *arguendo* that this is true, Plaintiff also satisfies

---

[6] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Mar. 21, 2026, 1:26 PM ET), https://truthsocial.com/@realDonaldTrump/posts/116268334535345382.

the three prongs of the "ordinary citizen" test used to assess First Amendment retaliation claims in which the defendant does not stand in the place of the plaintiff's public employer. *See Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 229 (5th Cir. 2016); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Defendant does not dispute Plaintiff's members were engaged in constitutionally protected activity in speaking out as private citizens on a matter of public concern (prong one) or that TEA's actions against educators were substantially motivated by their protected conduct (prong three). ECF No. 32 at 13. And Plaintiff has established prong two: that "defendant['s] actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage" in the protected conduct (prong two). *Id.* As discussed *supra* at 6-7, the Policy had a reasonable chilling effect on AFT members' speech. This case is distinguishable from *Cripps*, where the Court found the plaintiff suffered no injury because the Commission "took no action against him." 819 F.3d at 230. Here, the TEA acted against Texas AFT members. The TEA placed flags on two teachers' certificates and listed another teacher on the Do Not Hire registry. ECF Nos. 28-5 ¶ 17; 28-6 ¶ 20. And Teacher 6 remained on the Do Not Hire list with a flag on his certificate after he was terminated, which meant he was functionally unemployable in Texas public schools. ECF No. 28-5 ¶ 18. Further, the test here requires only that the defendant "caused" Plaintiff to suffer an injury, not that the defendant directly inflict that injury. As a result of the policy, Teachers 1 and 6 were terminated, and Teachers 4 and 5 were issued formal reprimands. ECF Nos. 28-3C; 28-4B; 28-5 ¶ 15. These actions all constitute injuries that would chill a person of ordinary firmness.

### 2.   *Pickering* Balancing Favors Plaintiff's Members' Interests.

If the Court finds that *Pickering* applies, it then must balance an employee's interest in commenting upon matters of public concern against the government's interest in promoting efficiency of the public services it performs. *Rankin v. McPherson*, 483 U.S. 378, 384 (1987).

Defendant concedes that Plaintiff's members were engaging in protected speech. ECF No. 18 at 8-9; *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011). Defendant also fails to demonstrate a real governmental interest in preventing disruptions to state services. *See* ECF No. 32 at 15-16 (citing *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794 (5th Cir. 1989)).

While courts have given weight to government employers' "*reasonable* predictions of disruption," "[h]ypothetical harms will not tip the *Pickering* scale." *Bevill v. City of Quitman,* 2025 WL 2306849, at *15 (E.D. Tex. Aug. 11, 2025) (emphasis added) (quoting *Nixon v. City of Houston*, 511 F.3d 494, 499 n.8 (5th Cir 2007)). Here, Defendant has not articulated any reasonable prediction of disruption to school operations caused by the Plaintiff's members' social media posts outside of conclusory and unfounded statements about educator's speech signaling their "unfitness to teach impressionable children." ECF No. 32 at 17. Several months have passed since the teachers made the social media posts at issue, and there remains no evidence of any disruptions.[7] To the contrary, at least one school district even explicitly stated they determined that their employees' posts, even those expressing they were "glad" about Mr. Kirk's death or that his assentation was "deserve[d], "did not result in incitement of violence or disruption to the workplace." ECF No. 28-7.

III.    The *Younger* Abstention Doctrine Does Not Apply.

Plaintiff incorporates by reference its briefing on *Younger* abstention in its Response to Defendant's First Amended Motion to Dismiss Plaintiffs' Complaint. ECF No. 33 at 18-22.

### Conclusion

Plaintiff respectfully requests that the Court grant its Motion for Preliminary Injunction.

---

[7] Defendant incorrectly claims that parents voiced their concerns in response to Teacher 5's post. ECF No. 32 at 17. The quote referenced in the written reprimand is from an unspecified "community member" with no clear ties to the teacher's school. ECF No. 28-4 at 11. *See Melton v. City of Forrest City*, 147 F.4th 896, 903 (8th Cir. 2025) "outsider complaints" that have no actual effect on government workplaces are insufficient to demonstrate disruption and to hold otherwise would "run[] the risk of constitutionalizing a heckler's veto").

Dated: March 31, 2026

Respectfully submitted,

/s/ *Karima Maloney*
Karima Maloney
Texas Bar No. 24041383
David Isaak
Texas Bar No. 24012887
Allison Standish Miller
Texas Bar No. 24046440
Alexander M. Wolf
Texas Bar No. 24095027
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Fax: (713) 221-2320
kmaloney@steptoe.com
disaak@steptoe.com
amiller@steptoe.com
awolf@steptoe.com

Ida Adibi (*admitted pro hac vice*)
Kylie Clouse (*admitted pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
iadibi@steptoe.com
kclouse@steptoe.com

Manuel Quinto-Pozos
Texas Bar No. 24070459
DEATS DURST & OWEN PLLC
2901 Bee Caves Road, Suite L
Austin, TX 78746
Telephone: (512) 474-6200
Fax: (512) 474-7896
mqp@ddollaw.com

*Counsel for Plaintiff*
*Texas American Federation of Teachers*

11

## Certificate of Service

I certify that on the 31st day of March 2026, a true and correct copy of the above document was served via the CM/ECF system on all counsel of record.

/s/ *Karima Maloney*
Karima Maloney
